

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

KCB/EJD/DEL/AMR                                   *271 Cadman Plaza East*
                                                  *Brooklyn, New York 11201*

September 3, 2022

<u>By E-mail and ECF</u>

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Shelton, et al.</u>
                <u>Criminal Docket No. 18-609 (S-3) (HG)</u>

Dear Judge Gonzalez:

      The government respectfully submits this letter in opposition to defendant Anthony Zottola's motion for reconsideration on Judge Dearie's ruling to preclude evidence of (1) Bushawn Shelton and defendant Zottola's plan to assault an individual in August 2017; and (2) Shelton and Zottola's assault of Sylvester Zottola in September 2017. <u>See</u> ECF Dkt. No. 470 ("Zottola Reconsideration Motion"). As Judge Dearie has already recognized, evidence of these incidents is direct evidence of and inextricably intertwined with the charged crimes. They are a vital chapter in the narrative of Shelton and Zottola's relationship and represent the beginning of the story of the violent attacks on the Zottola family; they explain the trust between Shelton and Zottola and Shelton and several of the other co-conspirators who carried out the various attacks on Sylvester and Salvatore Zottola; explain how these individuals' relationships evolved into a conspiracy to commit murder; and provide proof of motive and opportunity in this case. Zottola's motion for reconsideration, which he thinly disguises as a renewed opposition, either improperly advances new arguments or restates arguments that have already been rejected. The Court should deny this motion in its entirety.

      A.    <u>Factual Background</u>

      As the government detailed at length in its July 8, 2022 motion to admit other acts evidence, <u>see</u> ECF No. 389 ("Rule 404(b) Motion"), in early August 2017, Zottola saved Shelton's phone number into his phone. Shelton then began texting other co-conspirators about a "mafia" or "Italian" connect who would pay Shelton to beat up "one of his tenants." For example, on August 8, 2017, Shelton texted co-defendant Herman Blanco, a key figure in

recruiting one of the government's cooperating witnesses and in preparing the use of tracking devices used in the murder, "[h]e usually gives me a stack when I beat up his tenants lol I figured you can have it," specifying that the location of the assault would be "Hobart ave"—the street Sylvester Zottola then lived on, as well as other tenants of buildings owned and maintained by the Zottola family—and specifically identifying the name of a tenant (not Sylvester Zottola) who owed back rent to the Zottolas. Shelton informed Blanco that, "[i]f [the beating] happens near the house he said let him know and he will disable the cameras." Shelton also texted Blanco, on August 11, 2017, "Remember I said he got some other big shit lined up for us but I want to knock this out first."

Shelton texted another co-conspirator in August 2017 that Shelton's "mafia [n-word] usually throw me a stack to beat a old [n-word] up," and then, "[h]e hot shit coming down the pipe line but for now that's it." Later in August 2017, Shelton texted co-defendant Julian Snipe that "the dude [Shelton was] trying to rock with on this new deal has some issues with his neighbor," and that "[t]he neighbor [wa]s putting up a stack to violate boy." Snipe responded, "Whenever u want to solve the situation hit me I'm game like old times."

On August 15, 2017, Shelton texted Zottola requesting a photo of the would-be tenant victim, which Zottola indicated he would provide to Shelton. On August 17, 2017, Zottola requested to meet with Shelton in person and, later that day, Shelton texted Blanco, "Don't worry about home boy in the TL something came up and he wants to wait on that." Blanco responded, "Give me all the details on the new one." The next day, Shelton and Zottola began communicating in coded terms about schedules. For example, Shelton texted Zottola asking whether "the kids went to camp already this morning, the taxi has been waiting since 8," to which Zottola responded, "[a]t camp already. Try on Monday for sure." On August 25, 2017, Shelton texted another of his own phone numbers, "2005 Hobart ave sal"—Sylvester Zottola's nickname and home address—and texted co-defendant Branden Peterson the same day that he "need somebody grand father beat up in the Bronx," "He 70 and just need a good ass whooping," in exchange for approximately up to $1,500.

The first violent attack against Sylvester Zottola occurred on September 8, 2017. The day of the attack, Peterson informed Shelton about police presence near Sylvester Zottola's home. Shelton promptly relayed the information to Anthony Zottola, writing, "Peace brother is everything good with you. On my way to work I passed your house and it's a lot of police in front. Just making sure you ok." Zottola responded, "For now yes," after which Shelton texted Peterson, "He don't know, nothing on his end." Shortly thereafter, Peterson approached Sylvester Zottola near his residence, as captured on video surveillance. Peterson briefly inquired about a job, but then punched Sylvester Zottola in the face and body repeatedly before fleeing. The attack occurred after several failed attempts to locate Sylvester Zottola. Thus, by November 2017, the government will argue that Zottola was now confident he could trust Shelton with a much more serious request—the "other big shit" Shelton referenced in August—the murder of his father.

B. <u>Prior Ruling</u>

During an August 10, 2022 pretrial conference, Judge Dearie provided an oral ruling on the government's motion to introduce evidence concerning of incidents leading up to the October 4, 2018 homicide, including evidence of the August and September 2017 incidents that was extensively briefed in the Rule 404(b) Motion. Judge Dearie stated:

> Let me speak briefly about some of the 404(b) Motions . . . . Motions in limine, there has been a lot of back and forth about the evidence regarding incidents leading up to the homicide and so forth, which to me, as I think I've mentioned once before, don't really sound in the nature of 404(b) that were completely referred to as essentially evidence, primary evidence of the charges as far as I'm concerned. But whether it's 404(b) or not, certainly we're going to permit — we are going to permit that to come in.

Aug. 10, 2022 Tr., 11:7-8, 18-25.

C. <u>Applicable Law</u>

"[T]here is no specific rule, either in the Federal Rules of Criminal Procedure or in this court's Local Criminal Rules, providing for the reconsideration of a ruling on a criminal matter." <u>United States v. James</u>, No. 02-CV-0778 (SJ), 2007 WL 914242, at *3 (E.D.N.Y. Mar. 21, 2007). Instead, "courts in this district have resolved [such motions] according to the same principles that apply in the civil context[,]" namely Local Civil Rule 6.3. <u>Id.</u>; <u>United States v. DiPietro</u>, No. 02-CR-1237, 2007 WL 3130553, at *1 (S.D.N.Y. Oct. 17, 2007) (citing cases). Under Local Civil Rule 6.3, a motion for reconsideration "should inform the court of the matters or controlling decisions which counsel believes the court has overlooked."[1] A Rule 6.3 motion is "not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved, nor may a party on a motion for reconsideration advance new facts, issues or arguments not previously presented to the court." <u>James</u>, 2007 WL 914242, at *3 (internal quotation marks and citations omitted). As the Second Circuit has explained, the standard governing a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to

---

[1] Local Civil Rule 6.3 provides, in relevant part: "A notice of motion for reconsideration or reargument of a court order determining a motion shall be served within ten (10) days after the entry of the court's determination of the original motion . . . . There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. The time periods for the service of answering and reply memoranda, if any, shall be governed by Local Civil Rule 6.1(a) or (b), as in the case of the original motion. No oral argument shall be heard unless the court directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court."

3

controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995); United States v. All Right, Title and Present Interest in Real Property Known as 479 Tamarind Drive, Hallandale, Fla., No. 98-CV-2279 (RLC), 2007 WL 3118660, at *2 (S.D.N.Y. 2007) ("A motion for reconsideration is not a vehicle for litigants to make repetitive arguments that the court has already considered and it cannot be used to fill in the gaps of a losing argument."); Nielsen v. New York City Dep't of Educ., No. 04-CV-2182 (NGG)(LB), 2007 WL 2743678, at *1 (E.D.N.Y. 2007) (noting that the Shrader standard "is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the court").

D.   Analysis

The Court should deny Zottola's last-ditch effort to preclude the government's evidence of Zottola and Shelton's fledging criminal relationship, and the beginning of the attacks on murder victim Sylvester Zottola, because Zottola fails put forth any basis for the Court to find the strict standard for reconsideration has been satisfied or, in any event, to cause this Court to question Judge Dearie's ruling.

Zottola first attempts to argue that Judge Dearie did not rule on the August and September 2017 evidence. However, this issue was fully briefed in the government's July 8, 2022 Rule 404(b) Motion. Zottola opposed the introduction of evidence of the August and September 2017 incidents in its July 29, 2022 opposition. See ECF Dkt. 404. On August 10, 2022, in a pretrial conference, Judge Dearie clearly stated the prior incidents leading up to the murder were admissible as direct evidence of the charged crimes—going so far as to say the evidence did not "really sound in the nature of 404(b), but rather, "essentially evidence, primary evidence" of the charged crimes. The fact that Judge Dearie did not specifically mention the August or September 2017 incidents does not somehow indicate he silently was rejecting the government's motion to introduce evidence concerning Shelton and Zottola's criminal association; indeed, he did not mention any of these incidents by date or name. Moreover, Judge Dearie specifically noted that each of the "incidents leading up to the homicide" were admissible, not only acts of violence, as Zottola argues on reconsideration.

In any event, this ruling is overwhelmingly supported by precedent. As the government outlined at length in its Rule 404(b) Motion, which it incorporates by reference herein, courts routinely admit evidence to show how the criminal relationship and trust developed between co-defendants in a conspiracy. See Rule 404(b) Mot. at 41-45; see also e.g., United States v. Tartir, 347 F. App'x 655, 657 (2d Cir. 2009) (testimony about "prior acts was admissible as direct evidence because it provided background related to [co-conspirator's] relationship with [defendant]"); United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (evidence of uncharged acts admitted to show "how illegal relationships and mutual trust developed" between individuals); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may

4

be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed."); see also, e.g., United States v. Graziano, 558 F. Supp. 2d 304, 319 (E.D.N.Y. 2008) (holding that prior interactions between the defendant and the victims, including an alleged assault, were admissible as background evidence to show the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed); United States v. Lombardozzi, No. 02-CR-273 (S-1) (PKL), 2003 WL 1907969, at *2 (S.D.N.Y. Apr. 17, 2003) (admitting evidence of the defendant's prior extensions of credit to a victim because it provided relevant background evidence regarding the development and nature of the victim's relationship and interactions with the defendant and a co-conspirator).

That developing relationship and trust is illustrated through the August and September 2017 evidence: Zottola and Shelton's initial meeting, Shelton's first criminal assignment to beat up a Zottola tenant, his new assignment to arrange for the assault of Sylvester Zottola, and the burgeoning trust between Shelton and Zottola, which ultimately led to Zottola entrusting Shelton with the ultimate act of violence—the murder of his father and brother. This evidence is necessary to depict the development of the conspiracy. The jury should be allowed to understand the origins of the criminal conspiracy, not simply asked to accept that Zottola and Shelton, two men with no prior relationship, plotted to kill Sylvester Zottola. Indeed, without this evidence, the jury would be left with a misleading portrait of what happened in this case: they would not understand when the attacks on the Zottola family began; they would not know how Shelton and Zottola ever came to be connected or the origin of their relationship—a criminal relationship that will be sharply disputed at trial; and they would not understand certain later conversations between Shelton and other co-conspirators, including Blanco and Snipe, without reference to the explicit explanations provided by Shelton about what he was hired by Zottola to do for money in August and September 2017. Rather, the jury will be left with evidence of two individuals plotting a murder for hire with no understanding of how that plot began, how these individuals met and what had happened to the family prior to the November menacing of Sylvester Zottola. Leaving the jury with this misimpression of how the conspiracy formed would be severely detrimental to the government's case, and unsupported by any precedent. Moreover, to the family members who are expected to testify at trial, the long and horrific saga of violence began in this case with the September 2017 attack on Sylvester Zottola; the government should be permitted to introduce evidence corroborating their accounts of what happened to them—particularly where, as here, Zottola has made clear that his trial strategy will encompass seeking to undermine the credibility of his own family members.

Zottola provides no proper grounds for reconsideration here; rather, he uses his motion for reconsideration to advance purportedly "new facts, issues or arguments not previously presented to the court." James, 2007 WL 914242, at *3. The Court should reject the motion on that basis alone. For instance, in his July 29, 2022 opposition, Zottola argued that "other acts" evidence beginning in August 2017 risked an improper propensity purpose and would unduly prejudice Zottola. ECF 404 at 2-3. In his September 1, 2022 motion, Zottola argues (for the first time) the August and September 2017 evidence will not aid the jury's

understanding of the conspiracy; the three-month gap between this evidence and their first attempt to kill Sylvester Zottola is too distant; and once again, the specter of unfair prejudice.

understanding of the conspiracy; the three-month gap between this evidence and their first attempt to kill Sylvester Zottola is too distant; and once again, the specter of unfair prejudice.

These arguments are entirely unsupported in law and fact. First, as explained above and in the Rule 404(b) Motion, this evidence is vital to the jury's understanding of how and why defendant Zottola would entrust a stranger with the murder of his father and brother, as well as each of the other probative points outlined above. Second, as to Zottola's claim that the "period of inactivity" between August and November 2017 should preclude the admission of the challenged evidence, the cases cited are inapposite. United States v. Russano, 257 F.2d 712, 715 (2d Cir. 1958) (finding a period of inactivity between 1952 and 1955 — three years — supported the inference that two conspiracies, not a single conspiracy existed); United States v. Nektalov, 325 F. Supp. 2d 367, 373 (S.D.N.Y. 2004) (finding a series of transaction from 1998 to 2001 were admissible in trial to prove defendant laundered money for Colombian drug dealers when the charged conspiracy lasted from 2001 to 2004). Moreover, the argument ignores not only the facts of this case but common sense. Zottola met Shelton in August 2017, plotted an assault against his father throughout August and September 2017, and then the menacing—which the government will argue was a murder attempt—in November 2017. Any period in between activities is not a "period of inactivity" but a time spent planning the next attack. Third, and finally, Zottola's argument about unfair prejudice should be rejected. As the parties already briefed in their prior motion papers on this topic, evidence must be analyzed under Rule 403, but is admissible so long as the evidence "'[does] not involve conduct any more sensational or disturbing than the crime[] with which [the defendants have been] charged.'" Pitre, 960 F.2d at 1120 (quoting United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990)). An assault that did not come to fruition and the brief assault of Sylvester Zottola does "not involve conduct any more sensational or disturbing" than the murder-for-hire offenses charged, Pitre, 960 F.2d at 1120. Accordingly, there is no risk of unfair prejudice with respect to that evidence.[2]

---

[2] Zottola's argument that "the volume of evidence" of the August and September incidents will create a heightened focus for the jury on these two incidents is completely unsupported. For example, of 28 charts of text message content involving Zottola and Shelton, only two pertain to the August and September 2017 time period. As another example, of the 108 slides in the powerpoint presentation expected to be used by the government's cell site expert, only three slides pertain to the September 2017 time period; none pertain to August 2017.

The Court should deny Zottola's motion to reconsider.

Respectfully submitted,

BREON PEACE
United States Attorney

By:      /s/
       Kayla C. Bensing
       Devon Lash
       Emily J. Dean
       Andrew M. Roddin
       Assistant U.S. Attorneys
       (718) 254-7000

Cc:   Clerk of Court (ECF and Email)
       Counsel of Record (ECF and Email)