LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
anthonycecutti@gmail.com


November 1, 2022

**BY ECF**
The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

**SENTENCING MEMORANDUM**

**Re: United States v. Branden Peterson; 18 Cr. 609 (RJD)**

Dear Judge Dearie:

Branden Peterson is a dedicated father and loving son.  He is kind and respectful, and helpful to others.  Raised in poverty in East New York, Brooklyn, he experienced ongoing hardships and racial trauma, and a lack of meaningful educational and employment opportunities. He has no history of violence or significant criminal history.  His involvement in the instant offense was limited and his culpability is far lower than his co-defendants, which accounts for the government's concession that he played a "minor role."

Branden has been incarcerated for approximately 41 months and under harsh and brutal conditions for most of this time.  Nonetheless, he has been productive and responsible.  He has worked hard as an orderly, been relied upon by staff, and engaged in ongoing programming.  He has done his best to be a father to his children while detained. Through reading and reflection, Branden has developed and set goals and educated himself.  He wants to give back and improve the lives of those in his community.  He wants to make a difference.  Most significantly, he has vowed to himself, his children, and his family to never get in trouble with the law again.

It is against this backdrop that we ask Your Honor to consider before a sentence is imposed. *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (recognizing the underlying principle of sentencing is that "the punishment should fit the offender and not merely the crime."); *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

1

It is our hope that this memorandum provides the Court with a more complete understanding of Branden Peterson, the adversities he has experienced, his full acceptance of responsibility and sincere desire to be become the man he aspires to be, so that it can impose a sentence that is "sufficient, but not greater than necessary."  We respectfully submit that no further incarceration is needed, and as such, a sentence of time served for Branden Peterson, is "sufficient but not greater than necessary," based on a full consideration of all the factors set forth in 18 U.S.C. § 3553(a).

1. **A Sentence of Time Served Should Be Imposed Based on the Factors Enumerated in 18 U.S.C. § 3553(a) as Such a Sentence Is "Sufficient, But Not Greater Than Necessary," for Branden Peterson**

   a. **Branden Peterson's Life History and Positive Characteristics[1]**

      i. **Introduction**

Branden Peterson is a 37-year-old Black man born in Brownsville, Brooklyn. He grew up in the Brownsville and East New York neighborhoods of Brooklyn.  He and his older brother, Roosevelt [Marcus] Johnson [38], are the only children of Olivia Johnson [56] and Roosevelt Peterson [61].  Branden's mother currently lives in Queens.  His father and stepmother, Letta Peterson, have lived in East Stroudsburg, Pennsylvania for the past 12 years.  Branden is the biological father of 11 children, including three sets of twins, and has two other children who consider him to be their father.

      ii. **Early Childhood**

Branden's parents started dating when his mother Olivia and his father Roosevelt were in their late teens. According to Roosevelt, "things were okay" between them at first but Olivia "was hanging out too much. She wanted to go out and party."  When Olivia became pregnant with their oldest son, Marcus, they were living with Roosevelt's father (his mother had passed away a few years prior).  They moved into their own apartment on Lott Avenue in Brownsville where they lived when Branden was born. There were multiple people coming in and out of the building who were using and selling drugs. As Roosevelt described:

> It was really run down. Someone got killed in the building while we lived there…I was often scared to leave the kids when I went to work, but I got to know some people who looked out for them.  Olivia was at home, but sometimes she would go out and leave them … When they were in daycare, I would get calls at work that the kids hadn't been picked up and I'd have to leave work and get them.

Marcus, Branden's brother, believed that his mother was using crack cocaine at that time, but both his parents denied drug use. Branden stated that when he was little, his mother "was out

---

[1] The information from this section is drawn from many mitigation interviews conducted with several individuals from Branden's life, along with records we obtained as part of our mitigation investigation.

on the streets." Roosevelt, who was having problems with Olivia, often stayed with his aunt, but came by regularly to check on the kids.

According to Marcus, "growing up in the environment that we did, we had to learn early to adapt to things.  Things weren't always good at home.  Often, we didn't have things, but our father made it happen. He is a hard worker and came from a great family." But there came a point in time, when their father "didn't have it," and they went into foster care for a short time before being placed with their maternal grandmother.  Branden believes he lived with his grandmother between the ages of three to six.

His mother "cleaned up," and his parents got into a family shelter in Manhattan.  They were there for around six months before they became eligible for an apartment in the Boulevard Houses, a housing project in the East New York neighborhood of Brooklyn. According to Roosevelt, they lived in a building that had six floors with three families on one side and three families on the other.  Roosevelt moved back into the family home, but only Olivia's name was on the lease, since her mother convinced her not to put him down.  Branden said he lived there from the ages of 6 to 14.



Growing up in East New York during the late 1980s and 1990s, racial and social forces created deprivation and lack of meaningful opportunity.  Branden was exposed to a wide range of criminal behavior.  He "saw everything"-- drug-dealing, dog-fighting, shootings (in broad daylight), people using drugs ("everything, and everywhere").  It was not uncommon to see people using drugs in the stairwells of Boulevard Houses. The East New York Oral History Project entitled their 1988 page "The Killing Fields," and stated that, "The 75th precinct, covering East New York, has a homicide toll of 105, the highest in New York City, earning East New York this nickname."[2] By 1992, when Branden was 7 years old, the "crack epidemic" was fully impacting the neighborhood.  In a 1993 article, *The New York Times* stated, "The police say there are several reasons for the violence in East New York, mainly arising from a combination of drugs and guns that leaves few untouched. Many neighborhood residents know several people whose lives have ended violently."[3]   Olivia, Branden's mother, recalled people being killed in the building they lived in and her best friend's

---

[2] http://eastnewyorkoralhistory.org/timeline.html; The *New York Times* noted that this nickname lasted into the 1990s "regularly logged more than 100 murders a year." (Southall, Ashley. "Once the 'Killing Fields,' East New York Has No Murders in 2018." *New York Times*, 20 April 2018, https://www.nytimes.com/2018/04/20/nyregion/east-new-york-precinct-no-murders.html)

[3] James, George. "East New York Homicide Breaks a Deadly Record (Published 1993)." *The New York Times*, 20 December 1993, https://www.nytimes.com/1993/12/20/nyregion/east-new-york-homicide-breaks-a-deadly-record.html.

son being murdered outside her friend's front door.  In 1993, when Branden was 8 years old, the 75th precinct "broke a 20-year record for homicides in a single precinct."[4]

> In the six-square miles of East New York, which has an average per capita income of $8,013 a year, one of the city's lowest, charred buildings and rubble-filled lots are giving way in patches to new houses in a struggle for renewal. Community policing is slow to take hold on the more dangerous streets. The effect at times is still one of a war zone, where bursts of gunfire trouble the sleep of children with dreams of violence.[5]

Branden recalled there was no safe outlet for him as a child, no place to go to get away from what was happening out on the streets or in his home.

According to Branden, his father always made sure they had what they needed for school and Christmas.  He described him as "hands on."  He was the one who did things for them.  He made sure they were in the house when they were supposed to.  He said his mother "was just there."

Roosevelt stated he worked "so the kids could have what they wanted and needed."  He has always had steady employment. He has worked for DMI (Dynamic Marketing Inc.) for the past 25 years. They were originally located in Canarsie (Brooklyn), but now are in Hamilton Township, New Jersey.  Prior to his current job, he did maintenance/cleaning at the Eastern District of New York courthouse for 5 years.  On the weekends, Roosevelt was with Branden and Marcus. Olivia would take off and be gone all weekend long. They had several conflicts where the cops were called and usually just suggested he "take a walk."

According to NYC Department of Education records, Branden attended P.S. 273 from kindergarten through the 5th grade. While he always struggled academically in school and failed most of his classes in the 4th grade, he was still promoted to the 5th grade.



While in the 5th grade, according to Brookdale Hospital records on February 14, 1996, when Branden was 11 years old, he was injured at school "where he had a physical altercation with a classmate.  According to Branden, his teacher attempted to stop the fight, when his teacher allegedly threw him against a window. In which his arm went through the window resulting to an injury to the forearm which required surgery. Branden told worker since incident he has been experiencing nightmares." He was out of school for several months, received counseling through the hospital and needed months of occupational therapy for his arm injury.

---

[4] *Id.*

[5] *Id.*

### iii. Fresh Air Fund

Roosevelt said he learned about the Fresh Air Fund through a social service agency and signed the boys up. He wanted the boys to go somewhere they could play outside. When Branden was around 6 years old, in 1991, he started going to Poland, Maine where he stayed with the Gallop family. He recalled that, when they asked them his name, he told them it was Omar, which is his middle name. To Branden, going to Maine was an escape from everything that was going on both in his home and in Brooklyn.

Branden kept his home life and his Maine life very separate. In Maine, he was Omar. According to Branden, at the Gallops, he could "just be a kid." Heidi Gallop acknowledged that she knew very little about his home life. She said there were several occasions when Olivia would call, usually in the middle of the night, sounding drunk and asking for money. She recalled that one time Ben, her husband, went to pick Branden up at his home and reported back that the house was horrible--cockroaches everywhere, a sink full of dirty water, lights hanging off the wall. But when he showed up in the summer, he always had a suitcase of new clothes. It was always her sense that his father was somehow responsible for this.



According to Heidi, she and Ben were only supposed to have him for two weeks, but after the first summer they arranged to have him stay the whole summer. Although she said that you weren't supposed to have the same child every summer, "we made it clear to the Fresh Air Fund

that we wanted him to come back."  On multiple occasions, they went to Brooklyn and got him for Christmas and February vacations.



Branden recalled that he learned to ride a bike, swim, and drive a car in Maine.  According to Heidi, Branden was the only person of color in their town, so he stood out.  But she was always clear to anyone who questioned them that he was a member of their family.  He played on the town baseball team. The Gallops had two girls together, Robin and Megan, and two boys from separate relationships, Jason, and Joshua.  Jason Mills, Heidi's son, said that he has always thought of Branden as his brother and he and his siblings referred to him that way.

In the 1996 Fresh Air Fund Host Family evaluation, Heidi wrote, "Branden is an exceptional child.  He has become one of the family.  His behavior and manners are a delight.  It is wonderful to have him here."  While the Fresh Air Fund records end in 1997, Heidi thought that Branden continued to come up until 1999. He stopped in a year when both Heidi and Ben had cancer diagnoses.  Ben has since died.

### iv.  Adolescence

While summers in Maine provided a temporary respite, things were more challenging at home.  At some point, Roosevelt said he couldn't stand the conflicts with Olivia and left.  Soon, according to Branden, his mother was essentially gone too.  He wasn't sure if she was using drugs again, but thought it was possible.

On April 22, 1998, when Branden was 13, he and his brother were home alone when their apartment was set on fire by a group of kids who his brother had a conflict with poured gasoline under their front door and lit it.  They lived on the 6th floor at the time, and the fire spread all the way down the hall to their room.   Branden said Marcus had them pour water on a rag and breathe through it. Brookdale Hospital records from this date state that Branden was treated for smoke

inhalation and "no parent [was] present" when he was there. Branden thought his mother was out at a bar. Roosevelt said he got a call to come to the hospital.

Millie Gonzalez, the mother of Branden's childhood best friend, remembers that, when her son, Johnny, became friends with Branden, he would often stay at their house, sometimes for an extended period of time. They lived across the street from the Boulevard Houses at the time. "He never had a stable home." Olivia "seemed lost," and very skinny then, "like she used [drugs]." It was Millie's impression that, as a young child, Branden didn't have the "right guidance, love, and understanding at home and that was why he often came to my house."



Branden graduated the 6th grade from P.S. 213, where he transferred after the incident with the teacher. Both elementary schools that Branden attended were identified as having long histories of underperformance. In 2019, New York State Education officials identified them as being in the bottom 10 percent of schools across the state of New York.[6] He began the 7th grade at I.S. 166, which was also marked by poor performance and was "on the state's list of persistently dangerous schools."[7]

For some time, Olivia would go out and lock the boys out of the apartment. They would come home at 8 or 9 p.m., hungry, and she wouldn't be there. Sometimes, they would sleep in the hallway. It is unclear how long this went on, before they finally told their father. He was living in a studio apartment on Arlington Avenue in downtown Brooklyn and gave them a key to his apartment. He worked nights. He would either leave them food to eat or money to buy food. At some point, Olivia kicked Marcus out, and he went to stay with his father. But Branden continued to live with his mother.

One day, when he was 14, Branden came home to discover that Olivia had taken his pit bull, Loco, to the ASPCA and had him "put to sleep" without telling him. Branden was so upset that he started breaking things in the house. Olivia called the police and claimed that he had assaulted her. The police took him to the precinct and asked him if there was someone he could call to come get him. His father was working, so he called Millie, who took him home, where he stayed for two months. Millie didn't recall all the details, except that something had happened with his mother and that he needed to stay. According to Millie, while he was there, Olivia came by a couple of times to see him. As Millie described Olivia, she was "a hot mess. She's still a hot mess, just a better hot mess." Branden stopped talking to his mother for a couple of years after this incident. He said he "forgives her, because she is my mother, but she didn't show us a lot of love."

---

[6] Zimmerman, Alex. "These 124 New York City schools are now considered struggling." *Chalkbeat New York*, 17 January 2019, https://ny.chalkbeat.org/2019/1/17/21106611/these-124-new-york-city-schools-are-now-considered-struggling-by-the-state.

[7] https://insideschools.org/school/19K166

Shortly after this, he joined his brother at his father's house.  Roosevelt got them bunk beds, and they lived for some time in his studio apartment.   He said he went to social services to have Olivia sign over custody. He was happy to have the boys back with him.  Once they were with him, he could make sure they got to school. Branden transferred to J.H.S. 302, since it was closer to his father's home. Both middle schools that Branden attended closed in 2015 after years of poor performance. According to Inside Schools, "For years, JHS 302 had struggled to overcome low test scores and discipline issues."[8]

Allison Howard, a childhood friend of Branden's, whom he also refers to as his sister, said:

The boys would see Olivia still on occasion, but she was unpredictable and so they didn't always want to be around her. As kids, it was often rough for all of us.  There were times that at home we didn't have enough food to eat or there wasn't money to pay all the bills, but we all always managed to get by.  There was a lot of a day to day environment of trying to survive.

While they lived in the studio apartment, Branden's father met his stepmother, Letta Peterson.  According to Roosevelt, the boys knew his current wife, Letta, before he did, because she lived across the street and they had become friends with her daughter, Ashley. They all moved to a house in East New York.  Branden refers to Letta as "mom" and Olivia as "Olivia."

### v.  Late Adolescence and Teenage Years

In middle school, Branden had become involved with Melissa Santos, and they were still together when they began attending Franklin K. Lane High School. In 2003, a few years after they had attended the Franklin K. Lane High School, it was identified in a class-action suit filed against the NYC Education Department in the Eastern District of New York as "giving up on their students."[9] In 2004, then Mayor Bloomberg and Police Commissioner Ray Kelly named Lane High School as one of the worst 12 high schools in New York City.[10] The NYC Department of Education finally identified it to close in 2007 after it had been  "[b]eset for decades by the underachievement of its students and a legacy of violent crime on and around its campus on the Woodhaven-Brooklyn border..."[11]

---

[8] https://insideschools.org/school/19K302

[9] Lewin, Tamar. "High School Under Scrutiny For Giving Up on Its Students (Published 2003)." *The New York Times*, 1 August 2003, https://www.nytimes.com/2003/08/01/nyregion/high-school-under-scrutiny-for-giving-up-on-its-students html.

[10] Joiner, Bryan. "Mayor Targets Franklin K. Lane As School Safety Is Bolstered." *Queens Chronicle*, 8 January 2004, https://www.qchron.com/editions/south/mayor-targets-franklin-k-lane-as-school-safety-is-bolstered/article_501f4313-b7b8-5282-bab3-3e2bae25f191.html.

[11] Wendelken, Joseph. "City Plans To Close Franklin K. Lane HS." *Queens Chronicle*, 13 December 2007, https://www.qchron.com/editions/queenswide/city-plans-to-close-franklin-k-lane-hs/article_c1644816-6d5d-5c1f-838c-24815aca1152.html

Melissa, who was living in the Pink Houses, a housing project in East New York,[12] became pregnant when they were both 16. Melissa said Branden went with her to the prenatal doctor's appointments with her and was present when their son, Branden, Jr., was born on December 24, 2001, at Brookdale Hospital.

According to NYC Department of Education records, Branden stopped attending the Franklin Lane High School in December 2001 when his son was born, and Melissa stopped soon after. When she started to work, Branden would watch Branden, Jr. Branden's friend Allison could relate: "I made it to the 11th grade and at that point had to choose between making money or continuing to go to school." She left to help her own grandmother financially and raise her son.



Melissa recalled that Branden was in and out of jail during the early years of their son's life. According to Branden, he was first arrested when he was 17, because he had a small amount of crack cocaine. Brooklyn TASC (Treatment Alternatives for Safer Communities) initially placed him at Aurora Concept, a drug treatment program, in Queens. For the first few months he was there, he would come home to his father's house and visit with Branden, Jr. After a series of deaths in his family and concerns as a young father about providing for his son, he left the program. In 2003, he was sent to Phoenix House in Yorktown, which he also failed to complete.

During this time, he fathered two more children. He and Joanna Perez became parents to Tyler Perez (DOB 12/6/20005). He also fathered a child with Nefratia Caldwell--Breinny Peterson (DOB 7/8/2006), who was born with spina bifida. Both Tyler and Breinny live with their respective mothers in East New York.

In late 2005, after the birth of Tyler, Branden was remanded to Rikers, where he spent approximately 3 months before pleading guilty and receiving a sentence of 1 to 3 years and Youthful Offender adjudication. After Rikers, he spent about 1 month at Ulster Correctional Facility before being sent to Lakeview Correctional Facility to complete New York State's Shock described as an incarceration program "for young adults [which] provides a therapeutic environment where young nonviolent offenders receive substance abuse treatment, academic education, and other help to promote their reintegration into the community."[13] It was considered a "boot camp."[14] His stepmother, Letta, recalled that she and his father would visit him for family

---

[12] Long considered one of the most dangerous housing projects in New York. *See* Rivlin, Max, and Jonah Bliss. "One of New York's 'Most Dangerous' Housing Projects Now Has Its Own YouTube Show." *VICE*, 9 February 2016, https://www.vice.com/en/article/bnpkp3/one-of-new-yorks-most-dangerous-housing-projects-now-has-its-own-youtube-show.

[13] Clark, Cherie L., et al. "Shock Incarceration in New York." *Office of Justice Programs*, https://www.ojp.gov/pdffiles/shockny.pdf.

[14] *Id.*

meetings. After around 7 months, He successfully completed Shock and was given the title of "platoon leader."

### vi.  Adulthood and Fatherhood

Branden was 21 when he was paroled in late 2006.  He was supposed to be on parole for 2 years, but only had to do one year.   He was required to do the Anger Management and Ready, Willing, and Able programs.  Branden finished both programs successfully.

His daughter, Breinny, was born when Branden was in custody, but lived with her mother and Branden when he returned home.  Nefratia subsequently became pregnant with a son, Isis (DOB 12/23/2007). She wasn't sure who his father was and never had a paternity test done, but she gave Isis Branden's last name.

In 2007, when he was 22 years old, Branden became involved with Shamecca Williams when her daughter, Shanora Williams, was only 3 months old. Shanora considers Branden her father as she has no contact with her biological father. Shamecca became pregnant and was told she "was having a really big boy."  She went into labor at Brookdale Hospital.  When the first baby came out, Branden was in the delivery room holding their daughter.  Shamecca said they were starting to stitch her up when she told the doctors that something wasn't right.  Suddenly she delivered the second baby.  Branden "was so surprised, he jumped up and ran out of the room." Their daughters Amaih and Chamaya were born on March 27, 2009.

A few weeks prior to his daughters' birth, at the beginning of March 2009, Branden was arrested for a firearms offense after being stopped by the police. According to Brookdale hospital records, in what is described as "exacerbating Factors that occur[ed] are while being arrested by NYPD," he sustained a bruised left eye and right shoulder." He was out on bail for two years, when the case went to trial in 2011. The trial ended in a mistrial after the jury "hung" as they couldn't reach a unanimous verdict.  In January 2012, Branden accepted a plea to a misdemeanor (criminal possession in the 4th degree) and was sentenced to 1 year at Rikers (8 months with good time).

After their daughters were born, Shamecca went into a shelter in Manhattan and then moved to a shelter in Jamaica, Queens where Branden joined them.  On December 18, 2010, during a snowstorm, she delivered her second set of twins.  Since she went into labor and before an ambulance made it, Branden helped deliver Marcus.  His twin Makai waited until they got to the hospital.

Sometime after this, Branden began a relationship with Melanie Barbee, who gave birth to their son Kaedyn Barbee on August 19, 2011. While Branden maintains a close relationship with Melanie, he has not met Kaedyn in person.  Until recently, Kaedyn lived with his maternal grandmother on Long Island.

Shamecca, Branden, and their children were transferred to a scattered site family shelter on Mosholu Parkway in the Bronx. Though Branden and Shamecca had an off-and-on relationship, his primary residence continued to be at the shelter on Mosholu Parkway. He moved back in when

he was released from Rikers in 2012 and they had another son, Amir Peterson (DOB 8/15/2013). Around this time, the Administration for Children's Services (ACS) became involved with the family, allegedly because Shanora was not in school. Shamecca continued to bounce between multiple shelters around New York City. She said that no matter where she was, Branden would come over at least every other day to see the kids. At some point, she got an apartment in the Pink Houses, one of the most dangerous housing projects in New York City, where she still lives. Branden notes that her apartment is on the first floor, and, on multiple occasions, he has had to have the children get onto the floor because of gunshots in the neighborhood.

Shamecca became pregnant again with twins Amber and Alexis Peterson (DOB 9/19/2015). While she was pregnant, her older daughter alleged she had abused her daughter whom Shamecca was caring for and a new ACS case was opened. Before the babies were born, all the children were removed from the home. The girls were placed in foster care, and the boys lived with Olivia, Branden's mother, who had temporary custody. Branden rented a room from a friend during this time. He and Shamecca went to a parenting class together. After a few months, they were returned to her care. Although he wasn't living with her then, Branden would come over every day to help her out, give her money, and take the kids to the park.



This continued over the years--even when they weren't living with each other. According to Melanie Barbie, "He would wake up early when I lived with him and leave to go to Shamecca's house to make sure his kids got up on time for school. He made it his business to make sure they were there when they were supposed to be. He was always clear that his kids came first." Shamecca said he came over every day in the morning to help get them ready for school, give her money to help out, and come back in the evenings to check up on them.

Branden is highly regarded as a father. As stated by Felicia Pelzer, close friend of 27 years:

> [Branden] is a great father and has been there for his kids. While we don't have kids together, I have spent time with him and his children. While he has been incarcerated, I help his children's mother care for the kids. I have often been with the kids when he has talked to them on the phone. He has genuine conversations with his kids about life. He talks to them about his past and the things he has done and tries to sway them to do better and different in their lives. He did that before he was in jail, and he continues to have those conversations with his children. He tries to explain to them that they need to take a different path in life than what he has taken and that things can be different for them. He wants them

to have a better life and opportunities than he had and be around for them to support them.

*See* Exhibit "A" (Felicia Pelzer Letter).

Likewise, Shamecca, in her letter discusses the missed milestones and the losses that she and their children have suffered with Branden's incarceration.  She writes:

> Since he has been incarcerated, it's been hard for both the kids and for me. The kids really miss him. For the first year and a half, it was particularly difficult because the kids would cry since he wasn't there. Now they just ask all the time when he is coming home. He has missed a lot of milestones with them - he's missed Amir's kindergarten graduation, Amber and Alexis' pre-k and kindergarten graduations, Marcus and Makai's 5th grade graduation, Chamaya and Amaih's 5th grade graduation, and Shanora's middle school graduation. Chamaya and Amaih will graduate middle school at the end of this school year.

> Amir has severe asthma which at times means he has to be hospitalized. With Branden not around, it makes it extra difficult because I can't be with him and with the other kids at home at the same time. I worry about them all and if he was home, he would be able to help me out as the second parent.

> Branden calls regularly to speak to them. They are always happy to hear from him. He asks them about how their days are going, he tries to interact with them the best he can given his current circumstances. For example, Chamayaamaya is in the 8th grade and is involved in multiple clubs and sports - basketball, cosmetology, etc. - she tells him about everything she is doing. Shanora will tell him about her Anime club. Makai was going to join the basketball team, but decided he was too short. But they all want their dad to know what is going on with them.

> We can't wait for him to come home. I think it is important for him to be physically present in all of his kids lives again. Thank you for hearing me out.

*See* Exhibit "A" (Shamecca Williams Letter).

### vii.  Employment History

After dropping out of school in 2001, Branden struggled to find and maintain regular employment. As one of Branden's childhood friends said, "Branden has struggled with work.  He was doing odd jobs–UberEats, scrap metal…he never had anything consistent for too long." Johnny, his childhood best friend, who has had steady employment since he was a teenager, said that "living with Shamecca and all those kids caused Branden a lot of stress . . . he wanted to do right, but had a hard time getting a job."

The timeline of some of Branden's employment is a bit unclear, though in 2008 he went to apply for food stamps and Medicaid from the NYC Department of Social Services (DSS) - Human Resources Administration, which approved him and referred him to job training centers. As part of the application process, he was given Tests of Adult Basic Education (TABE), which are generally given to gauge if someone is ready to take the GED. According to the DSS file, when the test was administered on August 28, 2008, he tested on the 6th grade level. When he was retested a year later on June 25, 2009, he was at a 3rd grade level in reading and math.[15] He was sent to the Euclid Job Center in Brooklyn and approved for food stamps, but he dropped at the end of 2009 after he didn't complete a job training program. He reapplied in 2010.

In July 2008, Branden completed a "Security Training Course" offered by Pinpoint Investigations. The certificate is in his DSS file. By his own self report, he did security for a company called Securitas and, through them, he worked at Barnes & Noble as well as several churches in Manhattan.

According to DSS records, he started renting a chair in 2010 at a barber shop owned by Ray Adams [since deceased]. A year later, when he was 26, he went to the A.B.I. (American Barber Institute) School of Barbering and Cosmetology for 3 months. DSS records indicate that they referred him to the East River Job Center in 2012. According to a letter in his NYC DSS file, in 2015, he worked for Gigi McGrilff at Ian Home Improvement. Branden said they did home construction jobs, and his jobs varied from working at a scrap metal yard to working with a company that contracted to clear the street for Con Ed. In 2018, he worked with Felicia Pelzer at Pennywise, her party decorating/event planning company, where Branden did photography. Prior to his arrest in 2019, he was doing UberEats deliveries.

*       *       *

Branden's childhood was marked with family instability and periods of neglect. Due to racial and social forces that produced inequities, deprivation and lack of opportunity, he lived in a community overwhelmed with poverty and high murder rates amidst the "crack epidemic." For years, he attended chronically failing public schools, where he struggled academically. For several years, he found temporary respite by going to Maine through the Fresh Air Fund, where he could be "Omar," a child accepted into a different family where life felt at least more carefree, where he didn't have to worry about what was happening either at home or in his neighborhood. But when this time away ended, he couldn't avoid the trauma of growing up in East New York. The murder rates in East New York were at all-time highs when he was a young child, breaking records year after year. Branden knows at least 9 people who had been killed over the years, the most recent being his cousin just prior to his incarceration.

When his parents separated, the little bit of stability his father was able to provide slipped away; his mother would disappear, locking Branden and his brother out of the house and causing them to sleep in the hall of their housing project. When things got difficult, Branden sought refuge

---

[15] ███████████████████████████████████████

████████████████████████████████████████

at his friend's house across the street. Only after he was a young teenager did he finally move to his father's home.

This instability continued into adulthood where he regularly didn't have a stable place to call home. Even as he was having children, primarily with Shamecca Williams, they struggled with persistent homelessness living in family shelters and scattered site apartments.   With increasing family responsibilities, Branden continued to struggle to find regular and consistent employment.

He became a father when he was still a teenager. School wasn't providing the support that Branden needed and he, like others in his community, had to choose how to support his young family. That took priority over completing his education.  He was trying to survive someplace with a lack of resources, education, and job opportunities and skills.

Family and friends indicate that Branden's role as a father is extremely important to him. His oldest son, Branden, Jr. said that his father "was always asking me important things like how I was doing and how school was.  He used to check up on me all the time and would text me every day and call as well."  Branden is constantly worried about the wellbeing of his children, even as he was overwhelmed by trying to provide for them.  Even while incarcerated, Branden's children continue to be his primary focus. He expresses concern about how they are doing, what they are being exposed to in the neighborhood, and his not being present to supervise them.

Shamecca Williams, mother to seven of Branden's children, stated that it has been very difficult for her not having Branden around.  "He was always there to support me and the kids.  If I couldn't provide something for them, he could…he has always been a good father to the kids. At the end of the day, I could always rely on him to be there to help with the kids."  This is consistent with what others observed as well.  His childhood friend, Allison Howard, said that when Branden was home, "there was more stability for his children with Shamecca.  They listened to him, and they really need him.  He's always been there to make sure they have what they need. He's still constantly checking on them.  [While he has been incarcerated] he asks friends and family to make sure they are doing ok."

Branden's father moved a few years ago to the Poconos in Pennsylvania.  Branden said he wants to move his children to live near his father "to a place where it's quiet, where there are no shootings, or crackheads, and where you don't wake up to sirens all the time." He recalled that as a kid, "I always saw addicts in the hallways of buildings.  From our apartment you would hear gunshots and could look out the window and see people up on the roof shooting down.  When I went to Maine for the summer and Christmas, I got to get away from that and I want the same for my children."

Branden is well thought of and loved by many.  As described in the attached letters, *see* Exhibit "A," he is a "wonderful father," and "loving brother," who has a "big heart and looks out for others":

- "I knew Branden even before I was involved with his father.  He was friends with my kids and used to come over to my house.  Everyone liked to come over because I was

the neighborhood mom who cooked for all the kids.  He was always the sweetest kid. As a young teenager, we would talk all the time about what was going on in his life … When I got married, he was immediately like a son to me … When I got married, he was immediately like a son to me. He is a thoughtful and caring individual. He is a wonderful father to his children. He is a loving brother to his siblings which includes my daughter and son. If anyone needs help, he's always there to lend a hand. When we lived in Brooklyn, and I worked a couple of jobs, he was the one to make sure that I was home safe at night, coming to the train to pick me up since his father worked overnight. Now we are raising my daughter's kids and he's always concerned about us and whether we need extra help and wishing he could be home to help us out. We also worry about him and no matter if he's having a hard time, we are always there to help him out." (Letta V. Peterson Letter)

- "[Branden] has always been thoughtful of me and my wife. He would check in to see if we needed any help around the house. He was conscientious. You never had to tell him to do something, he was the one to offer his help to us or anyone in his extended family. He was the first to think of others before himself." (Roosevelt Peterson Letter)

- "Our friendship has grown over the years. There was a time where we lost connection and we then reconnected about 7 years ago. He has always been sweet, genuine and straightforward. He has a big heart and looks out for others. He's always there when you need him no matter the situation … When we reconnected, I wasn't in the best place in my life, and he became my hero in many ways. I was in a bad relationship, and he helped me get out of an abusive situation. He helped me find a place to live, he pushed me to go back to school - which is great, because I'm close to finishing my bachelor's degree. He's been a constant support system to me. He pushes me to the best I can in everything I do. He made me focus on myself and realize that I had to put myself first and he became my best friend again." (Felicia Pelzer Letter)

- "In 2016 tragedy struck again, and Brandon was there for me in a way I couldn't begin to articulate. My brother was killed, and Brandon immediately came to my side. The level of grief and depression I felt was debilitating. My brother was all I had. Brandon cleaned my house and helped care for my son. He helped me tremendously while I was struggling, but that is the type of person he is – showing up when a friend needs assistance.  I didn't want him to see me grieving so much, but the way Brandon showed up is how he has shown up ever since." (Victoria Davis Letter)

- "I was living on Long Island and had been in a housing shelter and I needed a place to live. In 2018, I started to live with him. Every morning when we were living together, he'd get up and go to his other children's home and make sure they were up, fed, and got to school. At night, he would do the same thing, make sure they were set for the evening, that they had done their homework and had dinner. When he was done, he would come back to the house that we were living in. He was very active in all his children's lives.  To me, he has always been a sweetheart … When I first moved to Brooklyn, I was struggling. He made sure that I opened a bank account so I could start saving money. He helped me to connect to different job opportunities. I now work for

15

Amazon at the fulfillment center and at the FedEx processing center." (Melanie Barbee Letter).

- "My son Branden keeps me happy, he keeps me going. He keeps a smile on my face. He goes to the store for me. I don't have to ask him for anything, he'll help me out. He likes me to cook for him. If I want to go for a walk, he'll go for a walk with me. If I need to go shopping, he'll take me. I need him here to go with me to see his grandmother. He's very close with his grandmother. She is 85 and she hopes to be able to see him again. We miss him so much … He's a loveable father. He's caring and loves his children. They miss him. He used to take them to school and help them with their homework. He used to take them to the movies and the park. When we talk now, he talks about his children and his goals for them. He talks about wanting to move them out of NYC to be in a better living situation.  I miss having him around to joke with me. Branden is my heartbeat. He's always been quiet and stayed to himself. He has a good heart and has always been willing to help people. He was the type of person who would give you the shirt off his back. If you were hungry, he would make sure you were fed.  My son is a good man and I miss him. He's still my baby. I just want him to be able to come back home again." (Olivia Johnson Letter)

### b. Branden Peterson's Limited Participation in the Offense, "Minor Role," and Acceptance of Responsibility and Remorse

On October 4, 2018, Sylvester Zottola was murdered.  As the government proved at trial, defendant Anthony Zottola planned and coordinated multiple attacks of violence against his father and brother, Salvatore Zottola.  He hired defendant Bushawn Shelton, a leader within the Bloods. Shelton recruited other Blood members into the plot.  Branden did not participate in the October 4th murder.  Nor did he participate in any of the murder planning.  *See* PSR ¶¶ 24 - 30.

A series of acts of violence targeting Sylvester Zottola and Salvatore Zottola occurred prior to the October 4th murder in 2018.  Branden did not participate in any of these.  *See* PSR ¶¶ 14 – 23.  Branden's involvement was limited to 2017.  Of all the defendants, he was only connected to Shelton.  In September 2017, Shelton recruited Branden to assault Sylvester Zottola in exchange for $1,500.  On September 8, 2017, Branden assaulted Mr. Zottola.  The assault was coordinated by Anthony Zottola and Shelton.  *See* PSR at ¶ 8.  In November 2017, Shelton recruited Herman Blanco and made it clear that rather than assault Mr. Zottola, the coconspirators were to locate and kill him.  Shelton and Blanco discussed a plan over text and in person.  Branden was not involved in the planning discussions.  Rather, he supplied a mask to Shelton who provided it to a coconspirator.  On November 26, 2017, a van pulled up near Mr. Zottola's vehicle while he was driving, forcing him to stop.  A man exited the van wearing the mask that Branden had given Shelton.  He pointed his firearm at Mr. Zottola.  Mr. Zottola fled in his own car and reported the incident to the police.  Branden did not directly participate in this act of violence.  *See* PSR ¶¶ 9-10.

Following this incident, a home invasion of Mr. Zottola's residence occurred on December 27, 2017.  Branden did not participate in this act of violence.  *See* PSR ¶ 12-13.  And as stated, a

series of violent acts occurred in 2018 prior to the October 4th murder.  Again, Branden did not participate in any of these.

Branden was recruited by Shelton to participate in the murder conspiracy.  Following his involvement in the incident on November 26, 2017, Branden distanced himself from Shelton. While he knew and was aware of the murder plot, he did not engage in any subsequent acts of violence against Mr. Zottola or Salvatore Zottola.  Further, since he was not involved in any of the planning of the murder, was not present when the murder occurred, and did not participate in nor was involved in the planning of the vast majority of the acts of violence perpetrated against Mr. Zottola or Salvatore Zottola, his involvement in the murder conspiracy was limited.  In essence, Branden played a "minor role."  *See* PSR ¶ 31-33.

As reflected in Branden's letter, *see* Exhibit "A," he is regretful and remorseful for his actions.  He is aware of the seriousness of his actions, has taken full responsibility and has sought to live productively and responsibly.

## 2.  Sentencing Guidelines Analysis[16]

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[17]  As such, and as this Court well knows, the Supreme Court has determined that the United States Sentencing Guidelines now play simply and only an advisory role in the overall process of arriving at a sentence that is "sufficient, but not greater than necessary" to meet the purposes of a just sentence; nothing more, nothing less.[18]  The Guidelines carry no presumptive value or weight. Neither may they be presumed reasonable. The Supreme Court made this latter point clearly in *Nelson v. United States*, 129 S. Ct. 890 (2009), where the Court summarily reversed a Fourth Circuit decision that had upheld the application of a presumption of reasonableness to the Guidelines. In reversing, the Supreme Court stated:

> [t]he Guidelines are not only *not mandatory* on sentencing courts;
> they are also not to be *presumed* reasonable.

*Id*. at 892 (emphasis in original). Thus, the Guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence. When imposing sentence on Branden Peterson, this Court is required to create an "individualized assessment" based on the

---

[16] Branden was the first defendant to plead guilty and accept responsibility.  On March 9, 2022, he pled guilty pursuant to a plea agreement before Your Honor to the lesser-included offense within Count One of an eight-count third-superseding indictment.  The stipulated Guidelines Range in the plea agreement is 240 month's imprisonment. There is no mandatory minimum sentence.  This is based on a total offense level of 40 and a criminal history category III and a statutory maximum of 20 years' imprisonment.

[17] *Pepper v. United States*, 562 U.S. 476 (2011) (*quoting Koon v. United States*, 518 US 81, 113 (1996)).

[18] *See* 18 U.S.C. § 3553(a).

defendant's particular circumstances.[19]   The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."[20]   That is certainly true in this case, for Branden Peterson.   This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[21]   In *Pepper*, the Supreme Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"[22]

Notwithstanding the Supreme Court's clear mandate that a sentencing court must consider the individualized circumstances of a defendant's life history and background, the Guidelines are too often relied upon as a talismanic measure by which to impose a sentence.   Courts continue to utilize and rely on the Guidelines and their policies even where, as here, they discourage, admonish and fail to accord any numerical value to an offender's youth, their traumas and hardships, and lack of guidance and direction, and the impact of trauma on an individual offender's life.[23]   § 5H1.12 is an example of a policy contained in the Guidelines that was aimed directly at young offenders from impoverished urban areas and had a disproportionate impact on African American and Latino offenders.[24]   Nor do the Guidelines consider a defendant's post-arrest rehabilitation

---

[19] *Gall vs. United States*, 552 U.S. 38, 49-50 (2007); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).

[20] *Cavera*, 550 F.3d at 188; *see also Branden v. United States*, 550 U.S. 350, 351 (2009); *see also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[i]n conducting this review [of the § 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory'").

[21] Likewise, in 21 U.S.C. § 850, which specifically pertains to narcotics offenses and their penalties, Congress further determined that "… no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence …" 21 U.S.C. § 850.  *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).

[22] 562 U.S. at 488, *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *see also Cavera*, 550 F.3d at 189 (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

[23] *See* § 5H1.12 (prohibiting courts from considering "[l]ack of guidance as a youth and similar circumstances," even if such had a direct relationship to the crimes committed); Office of Gen. Counsel, U.S. Sentencing Comm'n, Departure and Variance Primer 30 (2013) (listing age as a "Discouraged Ground for Departures").

[24] Osler and Bennett, "*A Holocaust In Slow Motion? America's Mass Incarceration and the Role of Discretion*," Journal for Social Justice 117 (2010).

efforts or their family or parental responsibilities.  In this case, the Sentencing Guidelines fail to consider in any way and account for the individual circumstances of Branden Peterson's life history, namely, his challenging and difficult childhood, serious traumas, family and parental responsibilities, and post-arrest rehabilitation efforts.

As stated, *United States v. Booker*, 543 U.S. 220 (2005) and its progeny provide this Court with the clear authority to vary from a strict application of the Guidelines.  A significant downward variance from the Guidelines is warranted in this case, based on the individualized assessment and consideration of the § 3553(a) factors as applied to Branden Peterson.  As described, the Guidelines Range is primarily constructed by and driven by aggravating factors, using points and numbers.  Mitigating factors are not part of the Guidelines calculation.  Further, the sentence of Branden Peterson, or any individual, should not be left to an algorithm, enhancements, points, or a mathematical formula.  "No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience.  While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula."[25]  Rather, the aim must be to impose a sentence that is fair and just given the particular facts of this case and the facts relative to Branden Peterson, and consistent with the purposes of sentencing.

As this Court is also well aware, the overarching goal in any case is to fashion a sentence that is "sufficient, but not greater than necessary."  And "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[26]  Mercy too, *must* play a role in determining a just and fair individualized sentence (emphasis added).[27]  For the reasons set forth in this memorandum, a sentence anywhere close to the Guidelines is excessive.  Rather, a sentence of time served (41 months' incarceration) is "sufficient, but not greater than necessary" for Branden Peterson.

### 3.  Analysis of the Purposes of Sentencing as they Relate to Branden Peterson Further Favors a Sentence of Time Served

Pursuant to § 3553(a), the Court must consider the purposes of sentencing, specifically "just punishment," deterrence, incapacitation, and rehabilitation as they relate to Branden Peterson.  Here, Branden does not need to be further incarcerated to "protect the public."  Rather, the central purposes of sentencing in play in this case are "just punishment" and deterrence.

---

[25] *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008).

[26] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

[27] *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001).

### a.  "Just Punishment"

Section 3553(a)(2)(A) requires a sentencing judge to consider "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   Despite his limited involvement, there is no question that Branden participated in a serious offense and that he must be held accountable.   However, Branden has been subjected to excessively punitive conditions of confinement at MDC Brooklyn and currently at Hudson County Correctional Center ("Hudson") because of the ongoing threat of COVID-19 and related restrictions and complications largely due to the continuing problem of staff shortages, including lockdowns and lack of social visits.[28]   Judges in this Circuit have recognized the increased punishment suffered by incarcerated individuals during the COVID-19 pandemic.[29]   As stated by the Honorable Paul A. Engelmayer, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *United States. v. Lizardi*, 11 Cr. 1032-55 (PAE), Dkt. No. 2523, at 7-8.

Life is never intended to be easy while in prison.   However, Branden' incarceration experience has been far bleaker and harsher than "normal."   It has been brutal.   As Branden states in his letter, "[b]eing incarcerated at MDC Brooklyn and now at Hudson has been *awful*."   *See* Exhibit "A" (Branden Peterson Letter) (emphasis added).   In *United States v. Daniel Gonzalez*, 18 Cr. 669 (JPO), the Honorable J. Paul Oetken, recounted the stark deprivations that inmates have experienced during the pandemic at the MDC and MCC, and observed:

> And I do believe that because it has been harsher than a usual period, that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think that having served 24 months

---

[28] Branden was incarcerated at MDC Brooklyn from his arrest on June 17, 2019, until his transfer to Hudson on August 11, 2022.

[29] Significant downward variances at sentencing have been granted based on the harsh conditions during the pandemic. *See, e.g., United States v. Polanco*, 20 Cr. 94 (AJN) (sentence of time served, four-and-a-half months, for illegal reentry and false statement to an ICE officer, a variance from Guidelines of 10-16 months based in part on conditions at the MDC during the pandemic and the likelihood that the defendant would remain detained until deported); *United States v. Paez Vazquez*, 20 Cr. 28 (JPO) (sentence of time served, approximately six months, despite Guidelines range of 87-108 months, taking into account difficult conditions in detention during the pandemic); *United States v. Morgan*, 19 Cr. 209 (RMB) (considering brutal conditions at MDC before and during pandemic and imposing sentence of time served -- less than 15 months -- where stipulated Guidelines range was 33-41 months and actual applicable Guidelines range was 41-51 months); *United States v. Casillas*, 19 Cr. 863 (VSB) (time-served sentence of approximately five months where Guidelines range was 15-21 months, in part based on conditions at MCC during the pandemic); *United States v. Pierson*, 14 Cr. 855 (LTS) (time-served sentence of less than two months where Guidelines advised 6-12 twelve months). For example, a sentencing court explained that its decision to impose a time-served sentence of three months where the Guidelines suggested 5-11 months rested in part on the reality that detention for three months during "ordinary times is very different from being detained for three months during the COVID-19 pandemic" due to "additional burdens, including increased risk of infection, along with other complications such as the suspension of legal and family visits." *United States v. Rivera*, 16 Cr. 66 (AT).

is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been.

Like defendant Gonzalez, Branden has been held in harsh conditions for the duration of the pandemic; conditions that resulted in his contraction of COVID-19 and that have undoubtedly impacted his physical and emotional health. And, with an ongoing pandemic and staffing issues at Hudson and MDC Brooklyn, Branden has continued to experience heightened punitive conditions. Accordingly, we respectfully submit that in consideration of the brutal and harsh conditions Branden has had to endure over approximately the last 41 months, and will need to continue to endure, along with all the other mitigating factors presented, a sentence of time served is "just punishment," and more than "sufficient, but not greater than necessary."

Despite the brutal conditions of confinement, Branden has worked hard and engaged in programming. He has done all he can to be productive and responsible, helpful, and kind to others, and to grow from his past wrongdoing while at MDC Brooklyn and Hudson:

- Branden worked as a unit kitchen orderly for approximately two years at MDC Brooklyn before being transferred to Hudson. According to his work evaluation by R. Alamo, Correctional Counselor at MDC Brooklyn, dated March 2, 2022, Branden was "an outstanding orderly. [He] performs his duties with little to no supervision. [He] assists other inmates in their duties in addition to his own. [He] is an outstanding orderly who goes above and beyond to ensure the unit is clean and works well with others. He is well organized, dependable, timely and always brings a positive attitude toward his work." In further assessing his work performance, Branden is described as an individual who "does superior work;" "drives self exceptionally hard all the time;" "has good ideas on better ways of doing things;" "Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things to improve knowledge;" "very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice;" "No supervision required. Completely dependable in all things;" "Makes a real effort to please the instructor. Does exactly as told;" and "Gets along well with everyone. Very popular;" *See* Exhibit "B" (MDC Brooklyn Work Evaluation).

- Counselor M. Robinson, in her letter to the Court, writes to "attest to all the hard work Mr. Peterson has completed while incarcerated here at MDC Brooklyn. Mr. Peterson has been the unit kitchen orderly of unit I-63 since 2019. [He] has shown nothing but a positive can do attitude. Not only is highly respected by his peers but he also shows respect to all staff at all times. Apart from maintaining the unit kitchen Mr. Peterson also maintain[s] his own living quarters and other areas of the housing unit especially during these difficult times of the COVID-19 pandemic. He has done this without any complaints and always with a positive can do attitude. Please consider [his] contributions and his effort at reform during his sentencing. *See* Exhibit "C" (Counselor Robinson Letter).

- Desiring to learn and study, Branden has taken approximately 10 classes, including, "Enjoying the Second Half of Life-Sentry Course;" "Resume Writing and Social

Media;" "Parenting;" "The Importance of Saving;" and exercise and wellness classes. *See* Exhibit "D" (MDC Brooklyn Programming and Certificates).

### b. Deterrence

Section 3553(a)(2)(B) requires a sentencing judge to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Here, in this case, for Branden Peterson, a sentence of time served more than satisfies the sentencing purpose of deterrence, both specific and general.

With respect to the need for a sentence to afford adequate deterrence to criminal conduct, we doubt that the imposition of a Guidelines sentence or a sentence anywhere close to the Guidelines in this case, for Branden, will have *any* bearing on deterrence and we are not aware of any empirical data establishing that it would. The data is to the contrary. There simply is no evidence that increases in sentence length reduce crime through deterrence.[30] In one of the best studies of specific deterrence, in the pre-guideline era, no difference was found, even between probation and imprisonment.[31] The von Hirsch analysis, commissioned by the British Home Office, examined penalties in the United States and in several European countries. It concluded that the "correlations between sentencing severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the manner one might expect.[32] "There is generally no significant association between perceptions of punishment levels and actual levels. . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."[33] Further, attempting to justify punishment of one person as a means to deter others, raises serious questions of morality in that it presents the issue of whether it is moral to punish one person beyond what is necessary and just for that person to promote deterrence of others. "Juridical punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (W. Hastie trans., 1790). General deterrence simply is not a good reason to

---

[30] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

[31] *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

[32] *See Id.* at 28-29.

[33] Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

impose a sentence beyond time served for Branden, especially in light of the mitigating factors present in this case.

The Court should not overlook Branden's positive characteristics and resiliency, devotion to his children, family and community and loved ones solely to "send a message" to others. Branden should not be sacrificed for a principle of general deterrence that is difficult, if not impossible, to quantify. After all, and as stated, vast amounts of research on general deterrence show that the chance of being arrested—that is, "caught"—is a substantially more powerful deterrent than the severity of punishment, or whether incarceration is part of the punishment imposed. Multiple courts have relied on such data and research and concluded the same.[34] At bottom, general deterrence is served by making arrests and convicting defendants of crimes that, regardless of jail sentences, cause severe and debilitating real-life consequences. In Branden's situation, the message is clear: if you engage in serious wrongdoing (no matter the level of involvement), you will face a permanent felony conviction, loss of liberty and separation from your children and family.

Again, as reflected in his letter, Branden is remorseful and deeply regrets his actions. And he has been deterred. *See* Exhibit "A" (Branden Peterson Letter). Branden is focused on his own personal growth. He writes,

> But, while I've been incarcerated, I've set goals for my life for when I am released. I've worked hard. I've tried to stay healthy and also educate myself through reading. I want to help those who are formerly incarcerated. I also want to help kids in group homes and foster care – kids that remind me of me and my upbringing and the chaos and instability. I want to make a difference and help others. I want to help them make good decisions.

*See Id.*

Others have noticed positive changes in Branden. Roosevelt, Branden's father, writes, "I know that while he's been incarcerated, he has spent time reflecting on how he could have been better. I believe that he can change things and be more productive when he comes home." *See* Exhibit "A" (Roosevelt Peterson Letter). Similarly, Felicia Pelzer, writes,

> While incarcerated, I've seen Branden mature and become more aware of the things that are most important in his life, specifically his children. I know he's not perfect, but I see him growing and changing into a more perfect man. He is more aware of himself and the things around him. He has grown emotionally and become more insightful. Branden has always been a standup, supportive,

---

[34] *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment."); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a [] deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

caring and loving person.  He will continue to grow.  I believe that when he finally re-enters the community, he will do great things in his life and become the man he aspires to be.

*See* Exhibit "A" (Felicia Pelzer Letter).

Likewise, another friend, Melanie Barbee, writes,

I am confident that whatever requirements he has when he gets out, that he will take them seriously and follow through on them.  He is committed to doing better when he is out.  I just hope that at some point he can be out and present for his children, being there for their important milestones and as a support to them.

Lastly, Victoria Davis, who has known Branden for over twenty years, and regards him as her "confidant and supporter," writes,

Since he has been incarcerated, he continues to reach out and be supportive of me.  We have had multiple conversations about the ways that Branden can give back to the community when he returns home.  We have talked about him being a mentor to others who want to be positive members of the community and even talked about starting a non-profit to work with young people from the community where he grew up on East New York.  I hope to be able to support him in this endeavor.

*See* Exhibit "A" (Victoria Davis Letter).

Branden's positive characteristics and sincere remorse, his limited involvement and "minor role" in the offense, his impressive post-arrest rehabilitation efforts and commitment to his own personal growth and improving the lives of others, suggest that he is exceedingly unlikely to commit additional crimes. In addition, Branden is now 37 years old, and, according to Sentencing Commission data, "[o]lder offenders [are] substantially less likely than younger offenders to recidivate."[35]  Indeed, research has established that rearrests uniformly decline as offender age increases.  This is undoubtedly true for Branden.  Now 37 years old, his risk of re-offense declines significantly, every four years:

---

[35] U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, 3 (Dec. 2017), https://bit.ly/3jyQbWX.



Branden has been specifically deterred and a lengthy incarceration will not lower any risk of recidivism, which is already low. He is highly motivated to be reunited with his children, family and community in a new way. He fully appreciates the pain and suffering he has caused others. He wants to grow and make a difference in the lives of others.

### 4.   Conclusion

*"I will never be back in your courtroom or any courtroom again."*

Exhibit "A" (Branden Peterson Letter).

Branden is prepared to accept his sentence. He has been humbled. He has worked to better himself. He is remorseful and ashamed. He lives with tremendous regret. As a result of his arrest and incarceration, Branden has had substantial time to reflect upon his decision to engage in wrongdoing. Further, he is aware of the seriousness of the offense he committed, has fully taken responsibility for his actions, and is working to amend, repair and rebuild. With each day incarcerated, he leads a productive and responsible life, and tries to maintain hope that he may somehow be soon offered an opportunity to be reunited with his children and family, and positively contribute to his community.

Accordingly, we respectfully submit that a sentence of time served (41 months' incarceration) is "sufficient, but not greater than necessary," based on a full consideration of all the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/

Anthony Cecutti, Esq.
David Ruhnke, Esq.
Anna Bulkin, MSW, LICSW

# Exhibit "A"

Dear Judge Dearie,


I would like to apologize to and express my condolences to the Zottola family for their loss.

I am embarrassed and ashamed to say that I assaulted Mr. Zottola.  I also agreed to participate in the murder conspiracy.  While I agreed to do so, in 2018, I distanced myself from those that were trying to kill Mr. Zottola.  He didn't deserve to get killed.

I live with a lot of regret and remorse for my actions.

I also want to apologize to my family and loved ones, especially my children.  They are going through the pain of my incarceration along with me.

Being incarcerated at MDC Brooklyn and now at Hudson has been awful.  But, while I've been incarcerated, I've set goals for my life for when I am released.  I've worked hard.  I've tried to stay healthy and also educate myself through reading.  I want to help those who are formerly incarcerated.  I also want to help kids in group homes and foster care – kids that remind me of me and my upbringing and the chaos and instability.  I want to make a difference and help others.  I want to help them make good decisions.

I need to be home as soon as you let me to support my children and family.  I will never be back in your courtroom or any courtroom again.


Sincerely,

Branden Peterson

May 11, 2022

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

### *Re: Sentencing for Branden Peterson*

To the Honorable Judge Dearie,

My name is Felicia Pelzer and I have known Branden for almost 27 years. We were in 6th grade when we met. He's been my best friend since that time. I was the awkward kid and he befriended me. In elementary school, I was the tallest kid and I didn't have the best self-esteem. He made me feel like I was pretty. He never insulted me. I used to fight as a younger kid, and he used to push me away from that negativity and tell me that I was better than that. As an adult he still tells me the same things and encourages me in all ways.

Our friendship has grown over the years. There was a time where we lost connection and we then reconnected about 7 years ago. He has always been sweet, genuine and straightforward. He has a big heart and looks out for others. He's always there when you need him no matter the situation.

When we reconnected, I wasn't in the best place in my life, and he became my hero in many ways. I was in a bad relationship, and he helped me get out of an abusive situation. He helped me find a place to live, he pushed me to go back to school – which is great, because I'm close to finishing my bachelor's degree. He's been a constant support system to me. He pushes me to the best I can in everything I do. He made me focus on myself and realize that I had to put myself first and he became my best friend again.

He is a great father and has been there for his kids. While we don't have kids together, I have spent time with him and his children. While he has been incarcerated, I help his children's mother care for the kids. I have often been with the kids when he has talked to them on the phone. He has genuine conversations with his kids about life. He talks to them about his past and the things he has done and tries to sway them to do better and different in their lives. He did that before he was in jail, and he continues to have those conversations with his children. He tries to explain to them that they need to take a different path in life than what he has taken and that things can be different for them. He wants them to have a better life and opportunities than he had and be around for them to support them.

He's a hard worker and has dreams and aspirations to be a better person. He has talked to me about starting his own business and going back to school when he comes home so that he can

help support his children financially. I believe that when he has his mind set on something, he can achieve it. His ambitions to improve himself will only lead him down a positive path.

While incarcerated, I've seen Branden mature and become more aware of the things that are most important in his life, specifically his children. I know he's not perfect, but I see him growing and changing into a more perfect man. He is more aware of himself and the things around him. He has grown emotionally and become more insightful. Branden has always been a standup, supportive, caring, and loving person. He will continue to grow. I believe that when he finally re-enters the community, he will do great things in his life and become the man he aspires to be.

Thank you for taking the time to read my letter.

Sincerely,

Felicia Pelzer

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

**Re: Sentencing for Branden Peterson**

To the Honorable Judge Dearie,

I am Letta V. Peterson, Branden Peterson's stepmother. I have been with Branden's father,
Roosevelt Peterson, for 22 years and we have been married for 18 years. I knew Branden even
before I was involved with his father. He was friends with my kids and used to come over to my
house. Everyone liked to come over because I was the neighborhood mom who cooked for all
the kids. He was always the sweetest kid. As a young teenager, we would talk all the time about
what was going on in his life. He and his brother would talk about their father all the time till the
two of us finally met.

When I got married, he was immediately like a son to me. He is a thoughtful and caring
individual. He is a wonderful father to his children. He is a loving brother to his siblings which
includes my daughter and son. If anyone needs help, he's always there to lend a hand. When we
lived in Brooklyn, and I worked a couple of jobs, he was the one to make sure that I was home
safe at night, coming to the train to pick me up since his father worked overnight. Now we are
raising my daughter's kids and he's always concerned about us and whether we need extra help
and wishing he could be home to help us out. We also worry about him and no matter if he's
having a hard time, we are always there to help him out.

He is wonderful and loving and I'm proud to call him my son. Thank you for taking the time to
read my letter about my son.

Sincerely,

Letta V. Peterson

Letta V. Peterson

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

**Re: Sentencing for Branden Peterson**

To the Honorable Judge Dearie,

My name is Melanie Barbee and I have known Branden Peterson since 2010. We got involved in a relationship and had our son, Kaedyn Barbee, who was born August 19, 2011. We always got along really well. We never argued, if he saw that I was upset about something, he always gave me space and then we could always talk it out. He was good at doing that with me. Even when we lived in different places, we kept in touch and had really good communication.

I was living on Long Island and had been in a housing shelter and I needed a place to live. In 2018, I started to live with him. Every morning when we were living together, he'd get up and go to his other children's home and make sure they were up, fed, and got to school. At night, he would do the same thing, make sure they were set for the evening, that they had done their homework and had dinner. When he was done, he would come back to the house that we were living in. He was very active in all his children's lives.

To me, he has always been a sweetheart. He is always the person who just stays to himself. He doesn't get involved in confrontations.

When I first moved to Brooklyn, I was struggling. He made sure that I opened a bank account so I could start saving money. He helped me to connect to different job opportunities. I now work for Amazon at the fulfillment center and at the FedEx processing center.

Even now that he's incarcerated, he's still a big emotional support to me. He always reassures me when I need him to. He talks to Kaedyn on the phone, asking him about school, checking in on how he's doing. I am confident that whatever requirements he has when he gets out, that he will take them seriously and follow through on them. He is committed to doing better when he is out. I just hope that at some point he can be out and present for his children, being there for their important milestones and as a support to them.

Thank you,

Melanie Barbee

May 11, 2022

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

### Re: Sentencing for Branden Peterson

To the Honorable Judge Dearie,

My name is Olivia Johnson and I am Branden Peterson's mother. My son Branden keeps me happy, he keeps me going. He keeps a smile on my face. He goes to the store for me. I don't have to ask him for anything, he'll help me out. He likes me to cook for him. If I want to go for a walk, he'll go for a walk with me. If I need to go shopping, he'll take me. I need him here to go with me to see his grandmother. He's very close with his grandmother. She is 85 and she hopes to be able to see him again. We miss him so much.

When Branden was younger, I would send him to the Fresh Air Fund in the summer so he could leave the city. That was his other family. They would come and get him and take him for the holidays. He was always ready to go to his second mom. I didn't want him to sit and have nothing to do. We were living in the projects, and I wanted him to be in a different environment. It was really "fresh air," and he could go and not worry about what was going on in the community.

He always loved going to the movies when he was younger. He loved pizza. He finished junior high school, but then he had his older son and he needed to take care of him.

His children need their father. They are lost without him. He's a loveable father. He's caring and loves his children. They miss him. He used to take them to school and help them with their homework. He used to take them to the movies and the park. When we talk now, he talks about his children and his goals for them. He talks about wanting to move them out of NYC to be in a better living situation.

I miss having him around to joke with me. Branden is my heartbeat. He's always been quiet and stayed to himself. He has a good heart and has always been willing to help people. He was the type of person who would give you the shirt off his back. If you were hungry, he would make sure you were fed.

My son is a good man and I miss him. He's still my baby. I just want him to be able to come back home again.

Thank you for your consideration.

Sincerely,

Olivia Johnson

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

**Re: Sentencing for Branden Peterson**

To the Honorable Judge Dearie,

I am Roosevelt Peterson and I'm 61 years old. I'm Branden Peterson's father. He's the youngest of my two sons. I was around 23 years old when he was born. I live with my wife, Letta Peterson, in East Stroudsburg, Pennsylvania where we have lived for the past 12 years. Before that we lived in East New York, Brooklyn.

Life was hard for us when he was younger. We had to move around a lot and struggled to get stable housing for the kids and finally settled into an apartment in public housing. I have always worked to help support my kids. I always tried to spend time with them taking them to the park, playing games with them. When he was around 10, I left his mother and moved out. After a while, I had to take him in since his mother was struggling. He and his brother came to live with me when Branden was around 14. Later Letta and I met and got married. I taught Branden from a young age that it was important to be a gentleman and help other people. We always had a good relationship. I tried to be a supportive dad to him and to his friends as well.

I taught him a lot about being a dad. I taught him that it was important to always have your kids with you and make sure that they are ok. I told him that you need to talk to your kids. He's always had a really good relationship with all of his kids. He's always gotten along with the mothers of his children. He is always mindful of his kids and his family, making sure he keeps what is best for them in the front of his mind. He learned that from me – that you have to always be there for your kids. Whenever he needed help with them, he asked me for it.

He has always been thoughtful of me and my wife. He would check in to see if we needed any help around the house. He was conscientious. You never had to tell him to do something, he was the one to offer his help to us or anyone in his extended family. He was the first to think of others before himself.

I know that while he's been incarcerated, he has spent time reflecting on how he could have been better. I believe he can change things and be more productive when he comes home. When he is able to come home, me, my wife and family, will be there to support him and help him in any way he needs.

I appreciate you reading my letter.

Thank you so much,

Roosevelt Peterson
Roosevelt Peterson

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

**Re: Sentencing for Branden Peterson**

To the Honorable Judge Dearie,

My name is Shamecca Williams and I'm 42 years old. I live in the Pink Houses in East New York. I am the mother to 8 of Branden's children. My second to oldest daughter, Shanora, is not Branden's biological child, but he is the only father she knows. We have three sets of twins and another boy together.

We met in 2007 when my daughter Shanora was only a couple of months old. He was sweet and caring when we first met. We became friends and could talk about anything and everything. A couple of years later, we had our first set of twins, Amaih and Chamaya, then a year later we had Marcus and Makai, a few years after we had Amir and then in 2015, we had our final two kids Amber and Alexis. He has always been a good father to them. He was hands on - he would take them to school, we went food shopping together. If I had an appointment to go to, he would be there to watch them. If I ever needed a break, I knew that I could rely on him. He used to help me out financially as well.

Since he has been incarcerated, it's been hard for both the kids and for me. The kids really miss him. For the first year and a half, it was particularly difficult because the kids would cry since he wasn't there. Now they just ask all the time when he is coming home. He has missed a lot of milestones with them – he's missed Amir's kindergarten graduation, Amber and Alexis' pre-k and kindergarten graduations, Marcus and Makai's 5th graduation, Chamaya and Amaih's 5th grade graduation, and Shanora's middle school graduation. Chamaya and Amaih will graduate middle school at the end of this school year.

Amir has severe asthma which at times means he has to be hospitalized. With Branden not around, it makes it extra difficult because I can't be with him and with the other kids at home at the same time. I worry about them all and if he was home, he would be able to help me out as the second parent.

Branden calls regularly to speak to them. They are always happy to hear from him. He asks them about how their days are going, he tries to interact with them the best he can given his current circumstances. For example, Chamaya is in the 8th grade and is involved in multiple clubs and sports – basketball, cosmetology, etc. – she tells him about everything she is doing. Shanora will tell him about her Anime club. Makai was going to join the basketball team, but decided he was too short. But they all want their dad to know what is going on with them.

We can't wait for him to come home. I think it is important for him to be physically present in all of his kids lives again. Thank you for hearing me out.

Sincerely,

Shamecca Williams

The Honorable Judge Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza E
Brooklyn, NY 11201

*Re: Sentencing for Branden Peterson*

To the Honorable Judge Dearie,

I have known Brandon since we were preteens. We lived 1 block from each other. Brandon was always an extremely gentle, compassionate and an encouraging person. We dated in high school, and I ultimately had to seek safety and shelter with Brandon, his dad and brother, because I was being abused in my adoptive home after my mom died. After a few weeks in court, the adoptive person was arrested and charged with multiple counts of abuse inflicted on myself and my younger brother. During that whole ordeal Brandon was so patient and kind. Since that time, Brandon has always been my confidant and biggest supporter.

In 2016 tragedy struck again, and Brandon was there for me in a way I couldn't begin to articulate. My brother was killed, and Brandon immediately came to my side. The level of grief and depression I felt was debilitating. My brother was all I had. Brandon cleaned my house and helped care for my son. He helped me tremendously while I was struggling, but that is the type of person he is – showing up when a friend needs assistance.  I didn't want him to see me grieving so much, but the way Brandon showed up is how he has shown up ever since.

Since he has been incarcerated, he continues to reach out and be supportive of me.  We have had multiple conversations about the ways that Brandon can give back to the community when he returns home.  We have talked about him being a mentor to others who want to be positive members of the community and even talked about starting a non-profit to work with young people from the community where he grew up in East New York. I hope to be able to support him in this endeavor.

Thank you for your time.

Sincerely,


Victoria Davis

*Victoria Davis*

# Exhibit "B"

P-A0324
JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

# WORK PERFORMANCE RATING - INMATE

| Inmate's Name<br>PETERSON, BRANDON | Register No.<br>91668-053 | Unit<br>I-C |
|---|---|---|
| Evaluation Period<br>OCT 20, 2019 - PRESENT | Work Assignment<br>UNIT KITCHEN ORDERLY | |

Bonus Justification

Inmate Peterson is an outstanding orderly. Inmate Peterson performs his duties with little to no supervision. Inmate Peterson assists other inmates in their duties in addition to his own. Inmate Peterson is an outstanding orderly who goes above and beyond to ensure the unit is clean and works well with others. He is well organized,dependable,timely,and always brings a positive attitude to his work.

Signature and Date of Dept. Head Approval

Route to Dept. Head for Review, Then to Unit Team

Instructions: Check the best statement in each area.  Base your rating on the inmate's overall performance for the rating period--neither the inmate's best day nor worst day--as compared to what is expected of a satisfactory worker in the assignment.

**A.  QUALITY OF WORK**
___1. Unsatisfactory. Makes more errors than should for this level of training. Work must be redone.
___2. Fair. Careless; makes mistakes and does not check work. Should do better work.
___3. Satisfactory. Makes some mistakes but no more than expected at this level.
___4. Good. Makes fewer mistakes than most inmates at this level of training. Does Journeyman level work.
_✓_5. Outstanding. Does superior work

**B.  QUANTITY OF WORK**
___1. Unsatisfactory. Lazy, wastes time, goofs off.
___2. Fair. Does just enough to get by. Has to be prodded occasionally.
___3. Satisfactory. Works steadily but does not push self.
___4. Good. Willing Worker. Does a full day's work and wastes little time.
_✓_5. Outstanding. Drives self exceptionally hard all the time.

**C.  INITIATIVE**
___1. Unsatisfactory. Always waits to be told what to do. Needs help getting started.
___2. Fair. Usually relies on others to say what needs to be done.
___3. Satisfactory. Can adapt to changes in routine. Will start work without waiting to be told.
___4. Good. Can plan own work well. Acts on own in most things.  Doesn't wait to be told what to do.
_✓_5. Outstanding. Has good ideas on better ways of doing things.

**D.  INTEREST; EAGERNESS TO LEARN**
___1. Poor. Shows no interest in job. Regards job as a drag or waste of time.
___2. Fair. Shows minimal interest but not very eager to learn.
___3. Satisfactory. Shows average amount of interest. Wants to learn own job but does not put forth extra effort.
___4. Good. Above-average interest in job. Asks questions about own work and related work. May do extra work to improve skills.
_✓_5. Outstanding. Eager to master job. Wants to know everything there is to know about it. May read up on own time or volunteer to do things that will improve knowledge.

**E.  ABILITY TO LEARN**
___1. Poor. Has very low aptitude and is very slow to learn. Even when given extra instruction unable to learn, no matter how hard trying.
___2. Fair. Slow but if tries eventually will pick up the skills. Needs more instructions than most.
___3. Average. No slower and no faster to learn than most inmates. Requires average amount of instruction.
___4. Good. Learns rapidly. Good memory. Rarely makes the same mistake twice.
_✓_5. Outstanding. Very quick to learn. Excellent memory. Is learning much more rapidly than most inmates assigned here. Never makes the same mistake twice.

**F.  NEED FOR SUPERVISION; DEPENDABILITY; SAFETY; CARE OF EQUIPMENT**
___1. Needs constant supervision. If left unsupervised will foul up, get in trouble, or wander off. Undependable.
___2. Needs closer supervision than most. Not very dependable.
___3. Average. Can be relied on for certain things but must be supervised by others. Usually prompt and dependable.
___4. Needs little supervision. Good record of dependability an promptness.
_✓_5. No supervision required. Completely dependable in all things.

Replaces BP-S324, OCT 94

PDF

Prescribed by P5251

Replaces BP-S324, OCT 94

**RESPONSE TO SUPERVISION AND INSTRUCTION**
1. Poor. Resentful and hostile. May argue with supervisor.
2. Fair. Resists or ignores suggestions.
3. Satisfactory. Generally does what is told without any fuss.
4. Good. No hostility or resentment. Tries to improve.
✓5. Outstanding. Makes a real effort to please the instructor. Does exactly as is told.

**H. ABILITY TO WORK WITH OTHERS**
1. Poor. Negativistic, hostile, annoying to others.
2. Fair. Doesn't make friends easily. Has some interpersonal difficulties.
3. Satisfactory. Gets along OK with most co-workers and is accepted by them.
4. Good. Friendly, congenial, helpful; others like to work with.
✓5. Outstanding. Gets along well with everyone. Very popular.

**I. OVERALL JOB PROFICIENCY**
Based on this inmate's overall performance during this work period, if this inmate was an employee of yours in the community would you:

1. Fire or lay off that individual?
2. Transfer the person to a less demanding job at a lower pay scale?
✓3. Continue to employ the person but without a raise or promotion this time?
4. Raise the person's pay but keep the person at the same job?
5. Promote the person to a more demanding job at a higher pay rate?

**J. GRADES AND PAY**
1. Performance Pay - Grade Class (Check one) __ 1 __ 2 __ 3 ✓ 4 __ M.

2. Hours of Satisfactory work _100_____ .

3. Regular Pay _$12.00_____ .

4. Bonus Recommended: ___ yes; ✓ no

5. Total Pay _$12.00_____ . _____

| Supervisor's Signature<br>R. Alamo / Correctional Counselor | Date<br>03/02/2022 |
|---|---|
| Inmate's Signature | Date<br>03/02/2022 |

Inmate _____ was requested to sign this rating, but refused, citing the following reason:

| Staff Witness' Signature | Date |
|---|---|

**SECTION 4**

Prescribed by P5251

Replaces BP-S324, OCT 94

# Exhibit "C"



**U.S. Department of Justice**

Federal Bureau of Prisons

*Metropolitan Detention Center*

*Brooklyn, New York 11232*

Date   09/10/2021

To whom it may concern;

My name is Mrs. M. Robinson, I am a Correctional Counselor with the Federal Bureau Of Prisons. I am stationed at the Metropolitan Detention Center in Brooklyn New York where inmate  Peterson, B. # 91668-053 has been incarcerated here at the Metropolitan Detention Center since 06/21/2019.

I am gladly providing this letter of reference to attest to all the hard work Mr. Peterson has completed while incarcerated here at M.D.C Brooklyn. Mr. Peterson has been the unit kitchen orderly of unit I-63 since 2019 . Inmate Peterson has shown nothing but a positive can do attitude. Not only is he highly  respected by his peers but he also shows respect to all staff at all times. Apart from maintaining the unit kitchen Mr. Peterson also maintain his own living quarters and other areas of the housing unit especially during these difficult times of the COVID-19 pandemic. He has done this without any complaints and always with a positive can do attitude. Please consider contributions and his effort at reform during his sentencing. If you have any questions or concerns I can be reached at the Institutions main number which is 718-840-4200. Thank You again in advance for any consideration you have in this matter.

M. Robinson

Counselor Robinson

Exhibit "D"



# MDC Brooklyn

## Recreation Department

This is to Certify that

### Branden Peterson

Has Successfully Completed

At MDC Brooklyn

*Enjoying the Second Half of Life-Sentry Course*

This certificate is hereby issued this 28st day of May 2021

**D. Fulmore**

*Recreation Specialist*



# MDC Brooklyn
## Recreation Department

This is to Certify that

### Branden Peterson

Has Successfully Completed

*Sentry Weight Management Journal*

At MDC Brooklyn

This certificate is hereby issued this 29th day of March, 2021

D. Fulmore

Recreation Specialist



# MDC Brooklyn
# Recreation Department

This is to Certify that

## Branden Peterson

Has Successfully Completed

### Structure Exercise Program

At MDC Brooklyn

This certificate is hereby issued this 26TH day of July, 2021

D. Fulmore

Recreation Specialist



# MDC Brooklyn
# Recreation Department

This is to Certify that

*Branden Peterson*

Has Successfully Completed:

*Sentry Journal Eat Smart Course*

At MDC Brooklyn

This certificate is hereby issued this 1st day of August 2020

*R. SIMON*

Recreation Specialist

EatSmart



# MDC Brooklyn
# Recreation Department

## Branden Peterson

*Has Successfully Completed:*

### Structured Activity (Abs Strengthening)
*at MDC Brooklyn*

This certificate is hereby issued this 28th day of November, 2019

C. Nuñez

*Recreation Specialist*



# U.S. Department of Justice

Federal Bureau of Prisons

MDC Brooklyn Education Department

Presents this Certificate to

## Branden Peterson

In recognition of your completion of instruction course

# Resume Writing & Social Media

at

MDC Brooklyn

**October 10th, 2019**

C. Bramble – Education Technician



## MDC Brooklyn
## Recreation Department

This is to Certify that

### Branden Peterson

Has Successfully Completed

### Sentry Recreation & Leisure Journal

At MDC Brooklyn

This certificate is hereby issued this 14th day of August, 2021

D. Fulmore

*Recreation Specialist*



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

We present this certificate to

## BRANDEN PETERSON

### Parenting - Modified Operations

*Define Yourself Before You are Defined*

D. Greco

Mr. D. Greco Supervisor of Education
Metropolitan Detention Center

C. Emile

Mrs. C. Emile - Teacher
December 4, 2020





# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Branden Peterson*

**"The Importance of Saving"**

*Modified Operation - Self Study*

J. Chacon - Teacher

**March 8, 2021**