UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

UNITED STATES OF AMERICA,

    - against -                             18 Cr. 609 (RJD)

HERMAN BLANCO,

                 Defendant.

----------------------------------------------------X

## DEFENDANT HERMAN BLANCO'S SENTENCING MEMORANDUM

MICHAEL O. HUESTON, ESQ.
16 Court Street, 35th Floor
Brooklyn, New York 11241
mhueston@nyc.rr.com
(718) 246-2900

MICHAEL K. BACHRACH, ESQ.
224 West 30th Street, Suite 302
New York, New York 10001
michael@mbachlaw.com
(212) 929-0592

JOHN A. DIAZ, ESQ.
225 Broadway, Suite 715
New York, New York 10007
johnadiazlaw@gmail.com
(212) 566-8165

*Attorneys for Defendant Herman Blanco*

**Table of Contents**

I.    Preliminary Statement.................................................................................................1

II.   The Charges .............................................................................................................2

III.  A sentence of no more than 240 months' imprisonment is just and appropriate................3

    A.    Mr. Blanco's Family Background..........................................................................4

    B.    Mr. Blanco's Childhood......................................................................................6

    C.    The Impact of Pedro Lino's Stroke......................................................................9

    D.    Mr. Blanco's prior crime, his good conduct while on parole for that offense, and his friendship with Bushwan Shelton.................................11

    E.    Mr. Blanco's Stable Relationship and Purpose-filled Life ....................................14

    F.    A measure of lenience is also warranted by the conditions of confinement that Mr. Blanco has been subjected to at the MDC during the duration of this case ..................................................................................................19

IV.   The sentence on Counts 1 and 2 should be ordered to run concurrently ..........................22

V.    Conclusion .............................................................................................................26

## I.  **Preliminary Statement**

On October 4, 2018, Herman Blanco was arrested and detained for a violation of the terms of his New York State parole.  Later that day, while Mr. Blanco was still in custody, Sylvester Zottola was shot and killed by Mr. Blanco's co-conspirators; one of Mr. Zottola's sons, Salvatore Zottola, was targeted during a prior incident as well but survived.  Mr. Blanco was not the architect of the conspiracy, nor was ever expected to be the shooter.  Indeed, Mr. Blanco had also not been present for any of the prior attempts on Mr. Zotolla's life, nor any on his son. Nonetheless, Mr. Blanco acknowledges that he was well ensconced in the conspiracy and had aided and abetted the substantive offense by, inter alia, helping his co-defendants find individuals willing to accept money in exchange for murder.

The instant memorandum of law is submitted on Defendant Herman Blanco's behalf, not to offer excuses for his conduct, but rather to aid this Court's understanding of the factors that influenced his choices and behavior over the years, which we believe warrant a measured sentenced that is fair and just and complies with the purposes of sentencing.[1]  To that end, it is respectfully suggested that a sentence of 240 months' imprisonment on one or either counts of conviction, ***to run concurrent to each other***, is a fair and just sentence in this case – one that will permit Mr. Blanco an opportunity to work towards redemption as he serves what would still be a very lengthy sentence.

---

[1]  Attached collectively as "Exhibit A" are the letters from the following family and friends: Maura Blanco (Mr. Blanco's mother); Alexis Avila (Mr. Blanco's brother); Ebony Knight (Mr. Blanco's friend); Tracey Taylor (friend); Mark Gutierrez (friend); Robbert Kean (friend); Issa Mendez (niece); and Jazmyne Washington (friend and also Alexis Avila's life-partner).  Attached collectively as "Exhibit B" is a letter from Sanja Jones, Program Manager of The Osborne Association and certificates of completion received during Mr. Blanco's participation in their programs.

II.     **The Charges**

Mr. Blanco was charged in four counts of an eight-count Superseding Indictment with: Murder-for-Hire Conspiracy (Count 1); Murder-for-Hire (Count 2); Unlawful Use and Possession of Firearms (Count 3); and Causing Death Through Use of a Firearm (Count 4). Pursuant to the terms of his plea agreement, however, Mr. Blanco was only required to plead guilty to lesser included offenses contained in Counts 1 and 2. See Plea Agreement, dated, April 29, 2022, at ¶ 1; see also Pre-Sentence Report, dated, August 5, 2022 (hereinafter cited as, "PSR"), at ¶ 1

Pursuant to the terms of the plea agreement, Mr. Blanco faces a maximum sentence of 20-years' imprisonment on each count of conviction, which can be run concurrent or consecutive at the discretion of this Court. See Plea Agreement at ¶ 1; see also United States v. Pugh, 945 F.3d 9, 27 (2d Cir. 2019) (explaining that the Guidelines "provide a presumption in favor of concurrent sentences except when consecutive sentences are required in order to impose a total sentence reflecting just punishment"), citing, U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.").

There is no minimum sentence required on either count, see Plea Agreement at ¶ 1, and the recommended Guidelines range, *if applied consecutively*, would be an aggregate sentence of 360 – 480 months' imprisonment, see PSR ¶ 102, citing, U.S.S.G. § 5G1.2(b). If, however, this Court agrees that the sentences should run *concurrently* since the conspiracy (Count 1) and the substantive offense (Count 2) relate to the same underlying conduct, then the recommended Guideline sentence would be 240 months' imprisonment since the recommended Guideline

2

range is limited by the statutory maximum of 20 years' imprisonment.  See U.S.S.G. § 5G1.2(b); see also U.S.S.G. § 5G1.2, Application Note 3(B) ("where a statutorily authorized maximum sentence on a particular count is less than the minimum of the applicable guideline range, the sentence imposed on that count shall not be greater than the statutorily authorized maximum sentence on that count."), citing, U.S.S.G. § 5G1.1(a).

Notably, "The defendant has stipulated that, at sentencing, he will not advocate for a sentence below 240 months."  Plea Agreement at ¶ 2.  The defense was willing to enter into this unusual limitation on Mr. Blanco's rights under 18 U.S.C. § 3553(a), because, based upon Mr. Blanco's age, role in the offense, and other mitigating factors discussed herein, we believe an aggregate sentence of no more than 240 months' imprisonment would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing with respect to this defendant in this case.  We note, however, our strong belief that any sentence greater than 240 months' imprisonment would be unjust and unreasonable, at least with respect to Mr. Blanco.

III.    **A sentence of no more than 240 months' imprisonment is just and appropriate**[2]

When Mr. Blanco, Herman,[3] is sentenced by this Court on December 6, 2022, he will be about one week past his 38th birthday.  Although he has only one prior criminal sentence of any notable length, since he served over 11 years imprisonment in that case, he has spent much of his adult life incarcerated.  This, after a childhood filled with abuse, neglect, childhood depression, and loss.  His unusually difficult childhood led him to depend on his friends for support and guidance as a substitute for parents, and that crutch turned to misplaced loyalty, and in turn to

---

[2]    The following section is based upon a series of interviews conducted with: Mr. Blanco; his mother Maura Blanco; his sister Susie Mendez; his brother, Alex Avila; his friend, Ebony Knight; his mentor Karl Knight; and close friends Mark Gutierrez and Tracey Taylor.  In addition, in putting together the summary that follows, documents were reviewed from: the Social Security Administration; Osborne Association; Odyssey House; Edgecombe Treatment Center; Lincoln Hospital; and Taft High School.

[3]    We will be referring to persons throughout this section by their first names to avoid confusion.  We mean no disrespect to those individuals, nor this Court, by doing so.

where he is today.  But through it all Herman has accepted responsibility and demonstrated genuine remorse for his involvement in Sylvester Zotolla's murder and Salvatore Zotolla's injury.  Herman knows that his crimes warrant a significant sentence, and he prays that this Court will agree that 20 years is significant enough.

### A.    Mr. Blanco's Family Background

Herman's parents were born and raised in Guatemala and are part of the Garifuna people of Central America.[4]   Though Herman was made aware of the importance of knowing his family's cultural heritage, he grew up not knowing his father.  He was raised by his mother, whose background and actions were the primary influences on his development.

Maura Blanco, Herman's mother, was born on November 2, 1957, in Guatemala.  She is the oldest of four children but she had no relationship with her parents.  She was raised by her maternal grandparents in extremely poor conditions.    When interviewed by Defendant's mitigation specialist, Maura explained that her father lived in the United States but failed to support her financially, which meant she was doomed to a childhood of poverty.

Maura's education stopped in the 2nd grade because she had to stay home to help her grandparents.  At the time, her grandparents were working on farms and selling cassava to eke out a living.  She started working on her own at age 15 as a maid for various people.  She was cleaning houses when she met Herman Sandoval, Herman's father, whose confident demeanor impressed her.  Sandoval made her feel he cared about her and wanted to help her achieve a better life.

Maura moved in with Sandoval and his mother because that arrangement seemed like a step in the right direction, but a few months later she broke up with Sandoval and returned to her

---

[4]       Also known as the Black Caribs, they are the descendants of the Aboriginal Carib Indians and Africans who intermarried and created a large populous civilization that still lives in St. Vincent and the Grenadines, Belize, Guatemala, and Nicaragua.

mother's home.  The return to her grandmother's home came about after she learned that her father had filed for her to join him in the United States.

Maura and her sister traveled to the United States on March 19, 1983, to live with her father and his wife in the Bronx.  Maura was 25 years old at the time but still unsure about the direction of her life.  Having had no relationship with her father during her childhood, she doubted whether a father who had been estranged for so long could be trusted to treat her well.

As she feared might happen, Maura and her sisters were "treated horribly" by her father and his wife.  Her father was impatient and unsupportive and had a complete lack of sympathy for her sister Isabel who was pregnant.  In September 1983, six months after joining her father in the United States, Maura was so discouraged that she returned to Guatemala.

In Guatemala, Maura reunited with Sandoval and got pregnant, which reportedly was welcome news for Sandoval who wanted to be a father.  However, instead of staying with Sandoval, she returned to the United States in July 1984 to live with her sister Isabel.  According to Maura, she relied on her sister for financial support.  She was about five months pregnant with Herman when she arrived in the United States.

About a year after Maura gave birth to Herman, she became pregnant with Herman's brother, Alex Avila.   Maura explained that Alex was the product of a brief sexual encounter with a man named, Vincente Avila.   Alex was born in 1986 and is a year and a half younger than Herman.  With the birth of her second son, Maura was left as a single mother with no support from either father; she never saw or heard from Vincente while she was pregnant with Alex and she lost contact with Herman's father, Sandoval, because she ended communications with him after she returned to the United States.

Maura explained that she could not afford to support her two babies and was dependent on her sister for housing and financial support for much longer than she had intended. She later became involved with Cesar Mendez, for whom she became pregnant with her third child, Suzette Mendez. By this point, living conditions had become so cramped that it was no longer feasible for her to remain with her sister. For a period of time, out of desperation, Maura moved in with Suzette's father, but that arrangement was untenable as he was abusive.

In 1988, Maura moved to a homeless shelter. She realized that it was no longer feasible to depend on her sister for lodging and support and she could not live with Suzette's father any longer because of the abuse. Maura's daughter, Suzette, confirmed that her father (Mendez) abused her mother. Suzette recalled that her parents' interactions were conflict driven. According to Suzette, Mendez did not live exclusively with Maura but made regular visits, which frequently ended in fights.

### B. Mr. Blanco's Childhood

Herman, who was three years old when his sister Suzette was born, still has memories of the domestic abuse between his mother and Mendez. "They argued a lot," Herman remarked, but due to his need for a father, Herman also developed a bond with Mendez. He was hoping that his need for a father would prompt his mother and Mendez to resolve their differences.

According to Herman, Mendez allowed him to feel like a regular kid. He noted that his brother, Alex, who was also fatherless, was treated fairly by Mendez. When Mendez gave to his daughter Suzette, he also gave to Herman and Alex. Given Herman's hope for a normal family, it was devastating for him when his mother and Mendez separated. Herman was seven years old when the separation occurred. He felt his life had been altered and as a child could not fully understand the reasons why.

After Mendez left, Herman was forced into assuming the role of "man of the house" – thus, he was seven years old when the responsibility of taking care of his younger siblings was thrust upon him.  His mother impressed upon him that his siblings' safety was in his hands because she had to earn money by babysitting children in the neighborhood.  Herman not only had to prepare himself for school, but also ensure that his brother Alex was ready for school.  In addition to taking care of his siblings, he also had to find time to help his mother care for the neighbors' babies.

Things got better when Herman's mother entered into a long-term relationship with Pedro Lino.  Herman latched on to Pedro as "the only father [he] ever knew."  Maura confirmed the close relationship between Herman and his stepfather Pedro and noted that Pedro was good to her and her children.  "He was the best thing that happened to us," she added.

Maura's relationship with Pedro started shortly after she was transferred from the shelter to an apartment at 605 Franklyn Avenue in the Bronx.  Pedro moved in with her and the children. He worked as a janitor and was a good provider.

Herman saw Pedro as the man who came to rescue his childhood.  He was 12 years old when Pedro moved into the home.  Herman embraced Pedro as a role model and wanted to be just like him.  He said of Pedro, "He was a real standup dude, and, if there is anyone I would like to be, it would be him."

With the support and assistance from Pedro, the family was able to move into a better neighborhood.  Herman was optimistic when the family moved to 1650 Toppin in the Bronx, which he saw as better than the neighborhood he lived in previously.  According to Herman, having the support and guidance of his stepfather, and living in a better neighborhood, made him feel like he had a future.  Herman's siblings echoed the same.

Suzette stated that Pedro gave them guidance on conduct and on personal hygiene.  Pedro insisted that the children take regular baths, and, at Christmas, his gifts included towels and socks.  Alex remarked that he was skeptical of Pedro's intentions initially, but he came to realize that Pedro was genuine about being a positive influence.  Pedro was the kind of parent who rewarded good behavior, Alex stated.  Alex recalled an instance when Pedro kept his promise to reward Herman with a pair of sneakers for getting an A in class.

Herman also explained that Pedro motivated him to achieve in school.  The encouragement Pedro gave him also supported by an African American teacher, Levi Murray.  According to Herman, Mr. Murray preferred for the students to call him Brother Levi.  He said Brother Levi instilled in students of color a sense of purpose and pride.

Sadly, Herman's relationship with his teacher changed for the worse in the 7th grade.  According to Herman, Brother Levi asked students to write about what they wanted to be when they grow up.  Herman wrote that he would like to become the President of the United States.  "I was serious.  That was what I wanted to be," Herman recalled.  He had learned that the United States had not yet elected a black man to be President throughout its history, and so he took on the aspiration of becoming the first black president.  His aspiration was shattered, however, when his African American teacher, Brother Levi, told him his ambition was impossible.

According to Herman, Brother Levi told him that the United States would never elect a black president.  As a point of reference, this was now the mid-90s, and, as this Court will surely recall, that pessimism was shared by a great many people of all races at the time.  Even those hopeful for change referred to Bill Clinton, a white man born in Hope, Arkansas, as "the first black President".  Herman was crushed by what his teacher told him, as he felt those words must be true coming from a teacher whom he loved and trusted.  That interaction with his teacher –

8

and not just any teacher but one he looked up to and trusted – made Herman feel that as a black kid he was wrong to aspire too high because his educational and career options were limited.

Given the interaction with his teacher, Herman felt that the only achievable career path was to follow in his stepfather's footsteps – still an honest and respectable living, but not one reaching nearly as high. His stepfather, Pedro, was a porter/janitor and Herman started to follow him to work on weekends. He also assisted his stepfather on "side jobs," which involved fixing electronic equipment.

Herman's brother Alex also accompanied Pedro to construction and electronics jobs. "We worked with him on the weekends and on holidays," Herman said. Pedro showed them how to buy material and equipment for work projects and taught them how to dismantle and fix electronic appliances. "He became the best role model I could have," Herman stated.

### C.   The Impact of Pedro Lino's Stroke

In 2001 or 2002, Herman's stepfather, Pedro Lino, had a massive stroke. Herman was 17 years old at the time. Pedro was the backbone of the family and the primary income earner, so his debilitating illness became a crisis for the family. Herman was once again thrust into the role of "man of the house." He dropped out of high school while in the 11th grade, so he could work to support the family.

Herman worked at T.J. Maxx and used his wages for rent, utilities, food, and other household expenses. His mother continued to babysit, but her income was unreliable and insufficient to support Herman and his siblings.

Alex and Suzette confirmed that Herman dropped out of school to provide for the family. They said Herman became the head of the household, and thus was responsible for their

9

wellbeing and that of his mother.  According to Alex, he eventually started to work to ease some of the financial burden Herman had to carry.

Another disturbing issue resulting from Pedro's disability was the breakdown in structure and discipline at home.  Herman and his siblings became susceptible to the streets.  As confirmed by Alex: "We started to hangout.  When Pedro was in the home we couldn't go outside if the house was not clean.  When he got sick, everything went downhill."  According to Alex, the breakdown in structure affected not just him and Herman, but also their sister Suzette who became pregnant.

Suzette explained that financial and emotional tension led her and her siblings to look for answers outside the home.  She explained that when Pedro became ill, family members felt under siege by forces they could not control.  She indicated that there was very little that Herman could do, despite his efforts, to make the family feel hopeful.

According to Suzette, a difficult situation was made worse when Pedro's estranged wife and relatives emerged to assert themselves as his next of kin.  Pedro had separated from his wife before he moved in with Maura, but they never divorced.  When he became ill, according to Suzette, his wife re-inserted herself into his life and forbade Maura from making decisions on his behalf.  Suzette recalled that Pedro eventually made it known to his wife that Maura should have an input in any decision affecting him.  "My mother was there everyday to take care of him," Suzette stated, the estranged wife was not.

The emotional and financial impact of Pedro's illness was especially hard for Herman.  He idolized Pedro as his hero and role model, and so he was unable to cope with seeing Pedro in a diminished state.  "It was like seeing Superman in a wheelchair," Herman remarked.  Suzette

confirmed that Herman was emotionally unable to accept Pedro's incapacity.   According to Suzette, Herman stayed away increasingly to avoid seeing Pedro deteriorate.

Herman was lost and disoriented without his stepfather and wilted emotionally as Pedro's condition worsened.  Herman soon became susceptible to any outside interaction that appeared to offer consolation or support.  This made him impressionable to choices he would not have entertained before.

### D.     Mr. Blanco's prior crime, his good conduct while on parole for that offense, and his friendship with Bushwan Shelton.

In 2006, when Herman was 21 years old, he was arrested for a home invasion. This was not his first arrest, but it was certainly his most serious to this point.  He expressed regret for the "stupid stuff" that resulted in that arrest, and explained that his current co-defendant, Bushwan Shelton, was also arrested in the 2006 case, had also been convicted but had the conviction reversed.  Herman's appeal, however, was denied, and he ended up serving approximately 11 years in prison for the offense (from his arrest on April 21, 2006, until his release from custody on May 16, 2017).

Notwithstanding the different outcomes of their appeals, Herman and Shelton were close friends at the time and remained close friends ever since.  Their long-standing friendship goes back to the time they lived on the same block as teenagers, and that friendship took on added meaning for Herman after his stepfather Pedro became incapacitated.  While Herman was reeling emotionally, he became impressionable to Shelton's apparent ability to make progress.  Herman cited, for instance, that he had to drop out of school, but Shelton was able to complete high school.  Furthermore, according to Herman, Shelton obtained a job with the Transportation Security Administration (TSA), but Herman had to settle for a job as an overnight stocker at a store where he was unable to earn enough to support his family.

11

While incarcerated for the 2006 case, Herman received news that his stepfather Pedro had passed away.  Even though Pedro had never fully recovered from the stroke, the death of Herman's stepfather had a deep emotional impact on him.  Herman felt that by being incarcerated he had let down the family who depended on him while Pedro was dying.

Herman also indicated that upon being incarcerated in 2006, he worried about his safety but also tried to focus on positive goals.  He identified with the Rastafarian faith, being both black and Hispanic, but noted that the prison system kept putting him with gang members to whom he had no affiliation.  He recalled being placed with Bloods gang members, despite his protest to prison authorities that he was not a gang member.  He also explained that other inmates nicknamed him "Taliban" because of his long beard.

According to Herman, he tried to get transferred to safer facilities while he was serving time for the 2006 offense.  He wanted to focus on preparing for his release rather than having to worry about assaults or provocations from other inmates.  Records from New York State Corrections and Community Supervision show that Herman participated in academic classes, work, and training programs while serving his sentence.

When Herman was released on parole to the home of a friend, Mark Gutierrez, on May 16, 2017, he turned his attention to getting employment.  Mark, who lives with his wife, corroborated that Herman, "just worked, come home, and work again the next day."  He noted that Herman appeared stressed but was a good house guest.  Herman was not the hanging out type, Mark said.  Sometimes while Mark and his wife were watching movies at home, Herman would join them.  Herman also made a financial contribution to help cover household expenses when he lived in Mark's home.

After living with Mark for a few months, Herman was forced to seek shelter with his co-defendant Shelton.  This occurred when Mark lost his apartment.  Herman was faced with the urgent choice of either finding a new place or sleeping on the street, so Herman turned to Shelton for help to avoid being homeless.   At the time, Shelton was living with his wife but agreed to take Herman in.

Herman and his then-girlfriend, Ebony Knight, lived in Shelton's home from September 2017 until March of 2018.  Ebony said she did not notice any suspicious activity while she and Herman lived with Shelton.  She stated that Herman worked, and she operated a hair salon business, called Textured Press, during the time in Shelton's home.  According to Ebony, Shelton operated an employment agency geared to finding employment for the formerly incarcerated.  She remembered that Shelton also had a T-Shirt company and his wife was an airport employee.

In March 2018, Ebony and Herman moved from Shelton's house to her uncle's home in the Bronx.  According to Ebony, they left Shelton's home because it was undergoing major renovations, and Herman continued to work in construction after they moved to her uncle's home.

Herman's Parole Officer, Ms. Marshall, corroborated that Herman was working in construction and recalled that he impressed as a dedicated worker who was focused on "positive pursuits."   In a letter from the Osborne Association, dated, December 6, 2019, the program Manager Sanja Jones indicated that Herman participated in a 4-week Re-Entry Employment Program at the Career Center.  See Exhibit B at 1.  She noted that the program started on July 5, 2017, and was completed on July 28, 2017, at which point Herman obtained a 10-hour OSHA Certification.  Id.  Ms. Jones writes that Herman was "such a pleasant and mild-mannered

participant [that] he was allowed to return to take the 30-hour OSHA the following year," and received his 30-hour OSHA card in July 2018.  Id.  (emphasis removed).  Ms. Jones described Herman as a "model participant" who "was always on time; assignments were completed within a timely manner and had excelled during the Hard Skills component of the training."  Id.

His training and early exposure to construction from his stepfather Pedro served him well in the construction industry where he primarily worked following incarceration.  According to Herman, his last job prior to his arrest for the instant offense was at All Island Concrete where he was earning $25.00 per hour.  He recalled that his employment at All Island allowed him a take-home income of $800.00 per week.

In the summer of 2018, just a few months after Ebony and Herman had moved in with Ebony's uncle and moved out of Shelton's home, Herman was approached for assistance in finding people willing to participate in the offense.  Herman agreed out of his loyalty to his friends, but Herman knew that committing any crime was wrong and he is genuinely remorseful and ashamed for having participated in the murder, regardless of his role; a tragic decision he can never take back.

Herman was arrested on October 4, 2018, for a parole violation after testing positive for marijuana.  Later that evening, while Herman remained in custody, Sylvester Zotolla was murdered.  Herman was transferred to the Edgecombe Residential Treatment Facility and later to Federal custody, and he has remained in custody since his October 4, 2018, arrest.  See PSR at 1 (listing November 16, 2018, as the date of his arrest *in the instant Federal case*).

### E.   Mr. Blanco's Stable Relationship and Purpose-filled Life

For several years, Herman maintained a steady relationship with Ebony Knight.   In acknowledging her relationship with Herman, Ebony then referred to him as her fiancé.   She

14

recalled meeting Herman in May 2000 when he was 15 years old.   She was drawn to him because they shared a deep sense of responsibility to family, despite their young age.

Ebony explained that, unlike Herman, she came from a household of married parents and was raised in the Jehovah's Witness faith.  She indicated that although Herman did not have a similar faith, she perceived that he was a good person at heart and was trying to do the best he could under difficult circumstances.  It was obvious to her that Herman was determined to succeed despite the odds against him.

In interviews, Ebony described Herman as "compassionate, giving and forgiving."  She said his demeanor was "calm and laid back" during their many years of interaction.  She said Herman was never abusive and he would get emotional when talking about their relationship.  She added that Herman treated her with love and respect.

According to Ebony, Herman and her father, Carl Knight, developed a close bond.   She said her father had spent eight years in prison but was able to "pull himself up" and buy a home and support his family.  "I was raised not to give up on who you love and that was how I felt about me and Herman," Ebony stated.

Ebony expressed that the rehabilitation she saw in her father was also possible for Herman.  As a result, she was encouraged when Herman gravitated to her father.  "He admired my father who always worked two jobs," Ebony recalled.  She added that, given Herman's motivation to improve, she was willing to stick with him like her mother stuck with her father.

Herman confirmed his bond with Ebony's father, Carl Knight.  According to Herman, after he lost Pedro, he began to see Carl Knight as a substitute father figure.  Herman said of Carl: "He had such a positive energy.  A humble dude with a positive attitude."  He expressed admiration for Carl's strong work ethic and commitment to family.

Ebony and Herman were thinking of expanding her hair salon business before he was arrested for the instant offense. Reportedly, Ebony continues to operate the hair salon she has owned for over three years. Ebony stated that she and Herman recognized that the salon chair held some therapeutic value for several of her customers. "We came up with the concept of catering to African American women and educating them about the process of hair as well as personal growth," Ebony stated.

According to Ebony, she and Herman worked on a business plan to improve their ability to earn income. She said the plan entailed expanding the salon business and pursuing investment opportunities. She recalled that his work within the construction industry opened the possibility of securing foreclosed properties or "fixer-uppers" where he would fix and flip them for sale. He explained that he had a credit score of over 800 and with both their incomes, it would have been easy for them to get loans. His arrest in this case, of course, thwarted those plans.

The relationship between Herman and Ebony has gone through changes since his decision to plead guilty in this case. This was a decision that Herman made in an effort to allow her to move on with her life; Ebony demurred when we spoke to her about their breakup, stating that she prefers not to discuss the current status of her relationship with Herman. He pointed out however that following his decision to take a plea and not fight his case at trial, he told Ebony that it would be unfair to have her put her life on hold for him as he faces what will be many years in prison. Even though she had prepared to once again be there for him, he remains adamant that Ebony have a bright future with her ambition and business savvy, and that she have the opportunity to live a full life that would include having a family. Waiting for him, yet again, in his opinion would be unfair to her.

16

Despite Herman's decision, Ebony has indicated her support for him even as a friend, and this is evident in the letter that she has written to Your Honor on Herman's behalf.  In that letter, Ebony writes:

> Ensuring safety, showing concern and giving freely are all parts of Herman's character that the world needs especially today.  Some years back I expressed to Herman my dream of owning my own business which would serve the underprivileged community we grew up in.  Even while incarcerated he was able to keep pushing and encouraging my efforts to be successful because he understood how that would uplift our community.  Proudly my business has been featured in several magazines like Allure and Cosmopolitan while our products have been raved by some of communities very influential women.  I won't say these things couldn't have happened without Herman.  What I will say is success is nearly impossible without encouragement.  Myself, my business and our community is grateful for Herman's encouragement, amongst others.

Exhibit A at 3.

Ebony also describes other stories including one that speaks to Herman's character, as well as his motivations and learned experience gained through shelter-life and homelessness:

> One evening Herman was again walking me to my destination in the pouring rain.  I remember holding close to him because the neighborhood was not the safest, I felt the need to grab tighter hold of him as a homeless woman was getting ready to walk past us.  While I was ready to speed up Herman made sure to slow down as the women who had clearly fallen on hard times was getting ready to brush past the two of us.  I didn't know what to expect next but was so taken aback when I saw Herman give this woman in need what little money he had in his pants pocket.  After asking if he had known this woman drenched in the rain, walking with all of her belongings in a shopping cart he said "no but I always give to the homeless and you should to".  This along with so many other moments of selflessness are what fostered a friendship that lasted more than 15 years.

Exhibit A at 3.

Tracey Taylor, a childhood friend of Herman's, stated that the charges came as a shock to her.   Tracey has known Herman for about 20 years.   She used to attend school in the neighborhood where he lived.   She stated that Herman, whom she dated briefly has been a true friend to her over the years.   She said that despite the problems in the community, Herman stood out as a person inclined to be productive rather than to cause trouble.   She also cited Herman's capacity to be charitable and to take an active interest in the needs of others.   Tracey, who has a long history of kidney problems, stated that Herman accompanied her at times when she went for dialysis treatment.   She was successful in having a kidney transplant and Herman was there to support her.   As she further discussed in a letter to Your Honor:

> I have known Mr. Blanco as a good friend and neighbor for over twenty years.  At the age of 9 I was diagnosed with kidney failure and was put on dialysis.  I can recall the countless times Mr. Blanco has taken me to dialysis, picked me up and cared for me.
>
> I have been by Mr. Blanco side supporting him through these trying times as he was once for me.  It comes as no surprise that he is ready to accept accountability for his actions.  I believe that as we move forward, he will emerge a better person than he was yesterday.  Mr. Blanco is a loving warm individual loved by his family and friends.

Exhibit A at 4.

Robbert Kean, another longtime friend and neighbor adds:

> Herman Blanco has always been an upright character in the community.  In our friendship he has really been there for me especially when the company I work for closed.  He made it a point to be there and show a significant amount of support during a sudden and abrupt job search.  It was Herman Blanco that was a source of support for both me and my family.  He has truly been a good friend over the years.

Exhibit A at 6.

Herman's brother writes:

18

> Herman Blanco is a very caring person who takes care of his
> family. He's looked after me and my sister ever since we were
> kids. As a boy, he always tried to help our mother the best he
> could. For example, when our stepfather, [Pedro] Lino, got a
> stroke and was hospitalized, Herman stepped up with the rent and
> made sure we had food in the refrigerator. He also would babysit
> my nephew and made sure we always had clothes for school.
>
> Herman stepped up to the plate when we needed him. Even today,
> when we speak on the phone, he still shows that he is thinking
> about the welfare of me and our family.

Exhibit A at 2.

Herman's mother and additional friends have also written to Your Honor to express their

support. See, generally, Exhibit A. They all recognize that Herman participated in a murder,

pled guilty to the charges, and has accepted responsibility for his role in the murder, but the

common thread throughout is an honest – and we believe accurate – belief that "Herman Blanco

is a good person" at heart. Exhibit A at 1. A good person who acknowledges that he made a bad

decision to participate in a tragic crime.

Finally, we note that as one would expect from the man described in the quoted letters

above and attached, Herman has not had any disciplinary problems since his incarceration at the

MDC, and we do not anticipate him having difficulty adjusting to the conditions of his

confinement as he serves out the remainder of his sentence.

### F.     A measure of lenience is also warranted by the conditions of confinement that Mr. Blanco has been subjected to at the MDC during the duration of this case.

Absent from the PSR, and thus presumably absent from the Probation Department's

consideration of its recommended sentence, are the abhorrent conditions of confinement that

Herman has been forced to endure during the **_nearly four years_** he was detained at the MDC.[5]

---

[5]     Mr. Blanco was detained at the MDC from November 16, 2018, until approximately August 2022. He was transferred to Hudson County Jail shortly before the Zottola trial began.

Your Honor is well aware of the conditions of confinement that inmates have been subjected to at the MDC during the COVID-19 pandemic as well as during the 2019 blackouts. However well-intentioned the measures were, the conditions exacted an immeasurable toll on Mr. Blanco and many of the other inmates.  For most of the pandemic and during both pre-pandemic blackouts, Mr. Blanco was "locked down" almost 24 hours per day.  At times during the pandemic inmates were allowed out of their cells for an hour, at other times for an hour and a half or two hours, and other times not for more than 30 minutes, if permitted out at all.  Normal food service was interrupted and could not be supplemented by commissary, which was likewise curtailed.  Days would go by, multiple times over a week, where inmates were deprived basic sanitary conditions such as a shower or cleaning supplies for their cells – this despite COVID-19 raging alarmingly through the jails and at one-point feces backing up and floating through the cells due to massive flooding.

Judge McMahon described the conditions at the MCC and MDC during the pandemic in one case as "inhumane, cruel and harsh, and unreasonably unjust."  Transcript, dated, April 29, 2021, at 11, United States v. Days, 19 Cr. 619 (CM) (SDNY).  In another case, Judge McMahon restated her concerns, describing the "inhumane conditions" at the MCC and MDC as "conditions that should not exist at any incarcerative facility in the United States of America," harshly condemning the MCC and MDC as "prisons of which this country should be massively ashamed."  Transcript, dated, May 5, 2021, at 12, 16, United States v. Nunez, 19 Cr. 691 (CM) (SDNY).

Other judges in this Circuit have weighed in as well agreeing that defendants incarcerated during the pandemic at the MCC and/or MDC have until recently spent "[most of the time … in lockdown conditions 23 hours a day, basically like solitary confinement with no access to

visitors for most of that time….." Transcript, dated, April 2, 2021, at 17, <u>United States v.</u> <u>Gonzalez</u>, 18 Cr. 669 (JPO) (SDNY).

Indeed, within the context of the Court's 18 U.S.C. § 3553(a) analysis, Judge Oetken ruled that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served. So I think having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been." <u>Id.</u> at 17-18. <u>See also</u> <u>United States v. Juan Carlos Aracena de Jesus</u>, 20 Cr. 19 (PAE) (SDNY July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic); <u>United States v. Morgan</u>, 19 Cr. 209 (RMB) (SDNY May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines based in part based on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC *even prior* to the pandemic); <u>United States v. Dayss</u>, 19 Cr. 863 (VSB) (SDNY May 4, 2020) (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 pandemic); <u>United States v. Pierson</u>, 14 Cr. 855 (LTS) (SDNY May 4, 2020) (same for defendant detained at MDC).

Each of these issues appear to have been omitted from the Probation Department's consideration of its recommended sentence for Mr. Blanco in this case. We respectfully submit, however, that the conditions of confinement at the MDC during the period of time that Mr. Blanco was detained there (November 16, 2018, until approximately August 2022) is an appropriate additional consideration under 18 U.S.C. § 3553(a).

**IV.**     <u>**The sentence on Counts 1 and 2 should be ordered to run concurrently**</u>

In reaching this Court's decision on the appropriate total sentence in this case, the defense respectfully submits that the sentences should run *concurrently* with each other since the conspiracy (Count 1) and the substantive offense (Count 2) relate to the same underlying conduct.

In <u>United States v. Pugh</u>, <u>supra</u>, 945 F.3d 9, 27 (2d Cir. 2019), the Second Circuit recently emphasized that a presumption in favor of concurrent sentencing applies in most instances. In that case, the defendant was convicted of one count of providing material support to a terrorist organization under 18 U.S.C. § 2339B(a)(1) and one count of obstruction of justice under 18 U.S.C. §§ 1512(c)(1),(c)(2). The defendant was sentenced to the statutory maximum of 180 months' imprisonment on the terrorism count to be followed by a consecutive sentence of 240 months' imprisonment on the obstruction count, again the statutory maximum, for an aggregate sentence of 420 months' imprisonment. The Second Circuit reversed on procedural grounds finding that the District Court, Judge Garaufis, failed to sufficiently articulate its reasoning for imposing the maximum sentence. In doing so the Second Circuit explained:

> [W]hen a defendant has been convicted of multiple counts, the sentencing judge should set forth why a sentence equal to the statutory maximum on one count will not produce a sufficient sentence within the meaning of 18 U.S.C. § 3553(a). That principle is reflected in the Guidelines, which provide a presumption in favor of concurrent sentences except when consecutive sentences are required in order to impose a total sentence reflecting just punishment. <u>See</u> U.S.S.G. § 5G1.2(c) ("If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.").

<u>Pugh</u>, 945 F.3d at 27. The Second Circuit continued:

A district court should explain why the total punishment imposed is sufficient, but not greater than necessary, taking into account the particular characteristics of the defendant and the circumstances of the offense. That justification should guide the determination whether to impose sentences on multiple counts consecutively, partially consecutively, or concurrently. ***Explaining why concurrent sentences would not achieve a "sufficient" sentence is particularly appropriate where, as here, each statutory imprisonment range is quite long, the district court imposed the statutory maximum for each count, with the counts to run consecutively, and, therefore, the defendant was sentenced to the longest legal sentence available.***

Ultimately, after consideration of the section 3553(a) factors, the district court must impose a sentence that is sufficient, but not greater than necessary, to fulfill the purposes of sentencing. In doing so, if the court determines that a lower sentence will be just as effective as a higher sentence, it must choose the lower sentence. See United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006) ("[I]f a district court were explicitly to conclude that two sentences equally served the statutory purposes of [section] 3553, it could not, consistent with the parsimony clause, impose the higher.").

Pugh, 945 F.3d at 27-28 (emphasis added); see also U.S.S.G. § 5G1.2, Application Note 1 (explaining, inter alia, "Except as otherwise required by subsection (e) or any other law, the total punishment is to be imposed on each count and the sentences on all counts are to be imposed to run ***concurrently*** to the extent allowed by the statutory maximum sentence of imprisonment for each count of conviction.") (emphasis added).

Here, Mr. Blanco has pleaded guilty to his role in the murder-for-hire (Count 2) and conspiracy to commit murder-for-hire (Count 1) of Sylvester Zotolla. He was neither the architect of the scheme nor the shooter. Indeed, there is no dispute that he was not even present for the murder nor is there an allegation that he was ever intended to be the shooter. Mr. Blanco was certainly involved in key moments of the conspiracy, which is one reason why the defense agreed not to advocate for a sentence below 240 months' imprisonment, but he was not the

individual primarily driving or directing the action.  Nor was he indispensable to the ultimate success of the crimes.  Thus, for all of the reasons discussed above, because both counts arise out of the same underlying conduct charged in the same case, the presumption in favor of concurrent sentencing applies.  Moreover, because Mr. Blanco's role was not so aggravating as to overcome that presumption, a concurrent sentence is appropriate in this case.

Finally, we note that a sentence of no more than 20 years imprisonment is also fundamentally reasonable and would avoid unwarranted sentencing disparities given Mr. Blanco's relative role in the case.  Both this District and the other Districts in this Circuit have a long history determining 20 years (or around 20 years) to be a reasonable sentence for defendants convicted of participating in a murder, including in cases in which the defendant took on a greater role than Mr. Blanco.

For example, in United States v. Jose Rodriguez and Kyle Mullings, 19 Cr. 779 (AKH) (SDNY), the defendant (Mullings) who ordered the murder of a rival gang member and also provided the guns to the shooters to do so received a sentence of 240 months' imprisonment, and the defendant (Rodriguez) who was present for the murder and attempted to shoot the victim (but had his gun jam) received 225 months' imprisonment.[6]  Similarly, in United States v. Jamie Rivera, 17 Cr. 050 (DRH) (EDNY), the defendant received a sentence of 220 months' imprisonment as the shooter of an innocent individual who had been erroneously believed to have been involved in an earlier altercation between two rival gangs.  Notably, the Government and the defense *jointly recommended* a 17-year term of imprisonment in that case.  Also, most recently, in United States v. Humberto Rodriguez, et al., 20 Cr. 301 (PKC) (SDNY), the shooter (Rodriguez) received a sentence of 222 months imprisonment, the defendant who provided the

---

[6]        The shooter in that case cooperated and his sentence is either not public or has not yet taken place.

gun to the shooter (Abello) received a sentence of 212 months' imprisonment, and the lookout (Tavarez) received a sentence of 144 months.

Indeed, in MS-13 cases, almost all more brutal than this case, there are many such examples:

| Defendant | Docket No. | Sentence |
|---|---|---|
| Yonis Acosta-Yanes | 10 Cr. 074 (JFB) (EDNY) | 240 months |
| Mario Diaz | 14 Cr. 068 (JFB) (EDNY) | 240 months |
| Jeremias Amaya-Ramirez | 14 Cr. 068 (JFB) (EDNY) | 252 months |
| Yobany Calderon | 10 Cr. 074 (JFB) (EDNY) | 262 months |
| Oscar Guifarro | 14 Cr. 068 (JFB) (EDNY) | 180 months |
| Edwin Yovani Guillen | 14 Cr. 068 (JFB) (EDNY) | 216 months |
| Mario Alphonso Herrera-Umanzor | 10 Cr. 074 (JFB) (EDNY) | 264 months |
| Jose David Luis | 04 Cr. 939 (LDW) (EDNY) | 260 months |
| Oscar Alexander Ortega-Aroujo | 03 Cr. 851 (ADS) (EDNY) | 204 months |
| Jose Luis Racinas | 04 Cr. 939 (LDW) (EDNY) | 240 months |
| Louis Ruiz | 10 Cr. 074 (JFB) (EDNY) | 276 months[7] |
| Edgardo Salino-Galiano | 04 Cr. 939 (LDW) (EDNY) | 240 months |
| Hector Torres | 12 Cr. 063 (JFB) (EDNY) | 204 months |
| Geovany Valledares | 14 Cr. 068 (JFB) (EDNY) | 204 months |
| David Valle | 10 Cr. 074 (JFB) (EDNY) | 252 months[8] |
| Franklin Villatoro | 10 Cr. 074 (JFB) (EDNY) | 210 months |
| Mario Zuniga | 03 Cr. 851 (ADS) (EDNY) | 240 months |

For all of these reasons, an aggregate sentence of 240 months' imprisonment would likewise promote consistency between the Southern and Eastern Districts of New York and avoid unwarranted sentencing disparities.   See 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

---

[7]   After a guilty plea encompassing coverage for two charged murders and one uncharged murder.

[8]   After a guilty plea encompassing coverage for two charged murders.

V.    **Conclusion**

This case presents a situation where the defendant has been convicted of very serious crimes and stands prepared to accept whatever sentence this Court deems appropriate. The question, however, is how lengthy must the sentence be to be sufficient, but not greater than necessary, to satisfy the purpose of imposing the sentence in the first place?

We respectfully submit that an aggregate sentence of no more than 240 months' imprisonment is appropriate for this defendant in this case. Such would be a reasonable and just sentence that could comply with the presumption that Mr. Blanco's two counts of conviction run concurrently to each other. Such a sentence is also appropriate when one balances the severity of the offense with the substantial mitigation discussed herein, which favors a reasonable, measured, approach to a determination of Mr. Blanco's sentence. Moreover, such a term of imprisonment would be consistent with the needs of sentencing outlined in 18 U.S.C. § 3553(a), and would be sufficient, and not greater than necessary, to achieve those goals.

Dated: New York, New York
        November 22, 2022

                          Respectfully submitted,

                          Michael K. Bachrach
                          Michael O. Hueston
                          John A. Diaz
                          *Attorneys for Defendant Herman Blanco*

                          Carmeta Albarus
                          *Mitigation Specialist for Defendant Herman Blanco*

# Exhibit A

**Exhibit A**

Honorable Judge Raymond J. Dearie

United States District Court

Eastern District Of New York

225 Cadman Plaza East

Brooklyn, NY 11201

My name is Maura Blanco I am the mother of Herman Blanco. I am aware that my son Herman has pleaded guilty to the criminal charges. We speak on regular basis via the phone . Herman has two other siblings and I reside with his sister my daughter. My son Herman took care of me when his step father Pedro Lino caught a stroke and was in a nursing home. My son went to care for his step father at the nursing home when I wasn't able to. Herman step father passed away in January 2010, Herman was devastated. Herman baptized my grand daughter Isaila Mendez in the year 2008, in which he became her God farther in the catholic church. Herman helped care for his niece and nephew taking them to daycare, school and the park. My son Herman Blanco is a good person.

Thank you,

Maura Blanco

**Exhibit A**

July 22, 2022

Dear Honorable Raymond J. Dearie:

My name is Alexis Avila; Herman Blanco's younger brother. I am writing this letter to speak to the compassionate nature of my brother.

Herman Blanco is a very caring person who takes care of his family. He's looked after me and my sister ever since we were kids. As a boy, he always tried to help our mother the best he could. For example, when our stepfather, Lino, got a stroke and was hospitalized, Herman stepped up with the rent and made sure we had food in the refrigerator. He also would babysit my nephew and made sure we always had clothes for school.

Herman stepped up to the plate when we needed him. Even today, when we speak on the phone, he still shows that he is thinking about the welfare of me and our family.

Sincerely,

Alexis Avila

To the Honorable Raymond J. Dearie,                    **Exhibit A**

My name is Ebony Knight, I am a longtime friend of Herman Blanco. We have been part of each other's lives since the age of 14. Thinking back on how young, naïve and impressionable we were in that season of our lives, I admire the way Herman stood out from his peers. I remember from even our first encounter his chivalry, thoughtfulness and care. He went out of his way to walk me to my destination and even wanted to be sure I had eaten before I got home. That moment marked the beginning of a close friendship for us. What happened a few years later I'll never forget.

One evening Herman was again walking me to my destination in the pouring rain. I remember holding close to him because the neighborhood was not the safest, I felt the need to grab tighter hold of him as a homeless woman was getting ready to walk past us. While I was ready to speed up Herman made sure to slow down as the women who had clearly fallen on hard times was getting ready to brush past the two of us. I didn't know what to expect next but was so taken aback when I saw Herman give this woman in need what little money he had in his pants pocket.  After asking if he had known this woman drenched in the rain, walking with all of her belongings in a shopping cart he said " no but I always give to the homeless and you should to". This along with so many other moments of selflessness are what fostered a friendship that lasted more than 15 years. That's more than some people have been married.

Ensuring safety, showing concern and giving freely are all parts of Herman's character that the world needs especially today. Some years back I expressed to Herman my dream of owning my own business which would serve the underprivileged community we grew up in. Even while incarcerated he was able to keep pushing and encouraging my efforts to be successful because he understood how that would uplift our community. Proudly my business has been featured in several magazines like Allure and Cosmopolitan while our products have been raved by some of communities very influential women. I won't say these things couldn't have happened without Herman. What I will say is success is nearly impossible without
encouragement. Myself, my business and our community is grateful for Herman's encouragement, amongst others.

Herman is connected to many successful, community leaders willing and able to lend him to tools for his own success. Talks he and I have had of him owning his own carpentry company, increasing the quality of life for his mother, siblings and 7 nieces and nephews are what await him upon his release. We are living in an era that feels like everyone is only thinking of themselves. For there to be some balance we need more citizens that
choose to be caring, giving and taking responsibility for their loved ones. Characteristics Herman has.


Respectfully,

*Ebony l Knight*
*Ebony Knight| CEO & Founder*

*(917)932-5086*
*www.Texturedpress.com| Contact@texturedpress.com*


**3**

**Exhibit A**

Bronx, NY 10467

Re: Herman Blanco

To: The Honorable Judge Raymond J. Dearie

United States District Court

Eastern District Of New York

225 Cadman Plaza East

Brooklyn, NY 11201

I have known Mr. Blanco as a good friend and neighbor for over twenty years. At the age of 9 I was diagnosed with kidney failure and was put on dialysis. I can recall the countless times Mr. Blanco has taken me to dialysis, picked me up and cared for me.

I have been by Mr. Blanco side supporting him through these trying times as he was once for me. It comes to no surprise that he is ready to accept accountability for his actions. I believe that as we move forward, he will emerge a better person than he was yesterday. Mr. Blanco is a loving warm individual loved by his family and friends.

Sincerely,

Tracey Taylor

4

**Exhibit A**

To Whom This May Concern,


My name is Mark Gutierrez and proud to offer my recommendation of  Good character to Hermen Blanco whom I have
personally known for over 20 years as my good friend
During my relationship with Hermen Blanco I
have experienced an individual who shows up earlier than asked, works hard, and carries themselves in a polite, respectable manner  The reason I know this is because we work together for  A construction company For which I still work. In addition, Hermen Blanco is a family-person who has always presented himself  with
levelheadedness and grace. He is the godfather to my children And as long as I've known him He has been someone to look up to
Please do not hesitate to contact me if you should require any further information.

Sincerely Mark Gutierrez

Robbert Kean
422 E 88 street
NewYork, NY 10035

Aug 10, 2022

I have known Herman Blanco as a good friend and neighbor for over 10 years, I was both troubled and surprised to hear about his recent case as he has always been a rather solid person. It is for this reason I am happy to write this letter of reference for Herman Blanco regarding this matter. I understand the seriousness of this matter however I hope the court will show some leniency.

Herman Blanco has always been an upright character in the community. In our friendship he has really been there for me especially when the company I work for closed. He made it a point to be there and show a significant amount of support during a sudden and abrupt job search. it was Herman Blanco  That was a source of support for both me and my family. He has truly been a good friend over the years.

In addition to our friendship he is usually an upstanding member of the neighborhood. while it is unfortunate that he has made some bad decisions, thus resulting in this case. While I was surprised to hear of the misconduct, it comes to no surprise that he is ready to accept his responsibility for his actions. I believe that as he moves forward he will emerge as a better person. in short, Herman Blanco expressed deep sense of remorse in making such a serious mistake and I believe in his ability to pay his debt society.

It is my sincere hope that the court takes this letter into consideration at the time of sentencing. despite the current case, I still believe Herman Blanco to be a honorable individual, a valuable member of my community and a good human being

Sincerely
Robbert Kean

**Exhibit A**

Honorable Judge Raymond J. Dearie

United States District Court

Eastern District Of New York

225 Cadman Plaza East

Brooklyn, NY 11201

My name is Isssa Mendez and Herman Blanco is my uncle. Mr.Blanco is my mother's older brother. One of my memories as a toddler was when my uncle Mr.Blanco took me to McDonald's and the park. We as a family keep in close contact with Mr.Blanco on regular basis through letters and phone calls. Throughout Mr.Blanco incarceration he has encouraged and supported me in going to college to better educate myself. It's my second year in college and I am pursuing a major in criminal justice behavior & law, I am also the first one in my family to attend college. I am aware that my uncle Mr.Blanco has pled guilty. I love my uncle and he has a big heart .

Thank you,

Isssa Mendez

**Exhibit A**

Re: Herman Blanco

June 19, 2022

Dear Honorable Raymond J. Dearie,

I have had the pleasure of knowing Herman Blanco though being the partner of his brother, Alex Avila, since 2009. I heard from Herman though phone calls and letters during the time he was incarcerated and was surprised at the immediacy of in-person visits upon his release. By this point Alex and I had two children together and I was pleasantly surprised at the effort Herman put in to getting to know his nephew and niece. He was a welcomed guest in our home through the holiday season, and besides showering our children with gifts, took a keen interest in recouping lost time with them. Perhaps this is par for the course, and I admit I have no frame of reference for this kind of situation, but he was always welcomed at our home and was always a pleasure to have around. We would travel to New York from Connecticut to help him from time to time, and he would do what he could to help us as well when needed. I have nothing but good memories of Herman; I speak with him on the phone when he calls to talk to Alex- his energy is infectious.

I have only had pleasant interactions with Herman and quickly wrote this letter when asked to do so. I don't know of any charitable or community work that he took part in, but I imagine that not being easy to pull off when the need to survive and keep yourself out of prison through work and curfews significantly constrains and re-prioritizes your free time when you are initially released. I do hope that factor will be taken into consideration.

Sincerely,

Jazmyne L. Washington

**8**

# **Exhibit B**

**Exhibit B**



## The Osborne Association
### Transforming Lives, Communities and the Criminal Justice System

**BOARD OF DIRECTORS**

*Chair*
Jeffrey G. Smith

*President*
Frederik R-L Osborne

*Secretary*
Zelma Weston Henriques

*Treasurer*
Victor F. Germack

*Directors*
Ralph S. Brown, Jr.
Constance P. Carden
Thomas Clancy
Gregory L. Curtner
Richard Fuller, MP
David T. Goldberg
Adam Hellegers
Caren Hendren
Clay Hiles
Carol Hill Albert
Maria Melendez
Cindy D. Ness
Elizabeth Osborne
Lithgow Osborne
Andrew Potash
Anthony M. Schulte
Carol Shapiro
Anthony R. Smith
Charles Toder
Katrina vanden Heuvel
Mark Walter
Alfonso Wyatt

*Executive Director*
Elizabeth Gaynes

*Assoc. Exec. Director*
Carolina Cordero Dyer

*Assoc. Exec. Director*
Susan Gottesfeld

*Assoc. Exec. Director*
Patricia Ritchings

*Assoc. Exec. Director*
John Valverde

*Director of Development*
David Condliffe, CFRE

www.osborneny.org
info.osborneny.org

December 6, 2019

<u>Re: Herman Blanco</u>

To Whom It May Concern:

The purpose of this letter is to serve as a reference for the above-mentioned, Herman Blanco.

Mr. Blanco is a graduate of The Osborne Association's 4-week ***Re-entry Employment Program Career Center***.  He began the program July 5, 2017 He completed the program on Monday, July 28, 2017 obtaining the **10-hour OSHA Certification**. Mr. Blanco was such a pleasant and mild mannered participant he was allowed to return to take the **30-hour OSHA** the following year and received the card July 2018.

During the 4 weeks, Mr. Blanco was been the model participant. He was always on time; all assignments were completed within a timely manner and had excelled during the Hard Skills component of the training.

Mr. Blanco is dedicated and continued to strive toward reaching and achieving his goals. If you have any further questions regarding Herman and/or The Osborne Association, please do not hesitate to contact me, (929)-239-5906 or sjones@osborneny.org.

I thank you for your time and consideration in this matter. Have a wonderful evening.

Sincerely,

*Sanja P. Jones*
*Program Manager*

| | | | |
|---|---|---|---|
| Administration | 809 Westchester Avenue, Bronx, NY 10455 | 718-707-2600 | Fax: 718-707-3102 |
| Bronx Site | 809 Westchester Avenue, Bronx, NY 10455 | 718-707-2600 | Fax: 718-707-3102 |
| Beacon Site | 380 Main Street, Suite 200, Beacon, NY 12508 | 845-440-7924 | Fax: 845-440-7435 |
| Brooklyn Site | 175 Remsen Street, Brooklyn, NY 11201 | 718-637-6560 | Fax: 718-237-0686 |

**Exhibit B**

# The Osborne Association
## OSHA 30

# Certificate Awarded To:

## *Herman Blanco*

For The Completion of OSHA 30
On this 1st Day of July 2018

---
Gyasi Headen
Deputy Director

---
Susan Gottesfeld
Executive Vice President

**Exhibit B**

OSHA                                 12-602056420
Occupational Safety
and Health Administration

This card acknowledges that the recipient has successfully completed:

**30-hour Construction Safety and Health**

This card issued to:

**Herman Blanco**

Timothy Dyer                              07/01/2018

Trainer Name                              Date of Issue

**Exhibit B**

12-006081900

OSHA
ational Safety
th Administration

This card acknowledges that the recipient has successfully completed:

## 10-hour Construction Safety and Health

This card issued to:

**HERMAN BLANCO**

Sacha Bien-Aime                    07/25/2017

Trainer Name                        Date of Issue

---

Atlantic OSHA Training Center
An Authorized
OSHA Training Institute
Education Center

OSHA recommends Outreach Training Courses as an orientation to occupational safety and health for workers. Participation is voluntary. Workers must receive additional training on specific hazards of their job. This course completion card does not expire.

Use or distribution of this card for fraudulent purposes, including false claims of having received training, may result in prosecution under 18 U.S.C. 1001. Potential penalties include substantial criminal fines, imprisonment up to 5 years, or both.

To verify this training, scan the QR code with your mobile device.

732.235.9450
aotc.sph.rutgers.edu



Rev. 1/2016

4

Exhibit B



# THE OSBORNE ASSOCIATION
## Workforce Development Program
# CAREER CENTER

UPON THE RECOMMENDATION OF THE STAFF

CONFERS ON

# HERMAN BLANCO

THE CERTIFICATE OF COMPLETION OF
THE CAREER CENTER TRAINING

Together with all honors, rights and privileges appertain thereto

Given this 28th day of July in the year Two Thousand and Seventeen.

Sanja P. Jones
Program Manager

Michelle Howard
Director of Workforce Development

**Exhibit B**

# THE OSBORNE ASSOCIATION

## WORKFORCE DEVELOPMENT PROGRAM
### CAREER CENTER

Upon The Recommendation Of The Staff

Confers on

### Herman Blanco

The Certificate of Completion of the 3-Weeks of Soft-Skills Training of the Career Center Job Readiness Program

Given this 28rd day of July in the year Two Thousand and Seventeen.

**MORAL RECOGNITION THERAPY, READY SET WORK, WORK-PLACE SOCIALIZATION**

Sonja P. Jones
Program Manager,
Career Center

Henry Bryden, CMRT
Workforce Development Instructor
Career Center

6



The Osborne Association

Workforce Development Program

Career Center

Confers on

*Herman Blanco*

The certificate of completion of the Practical Skills Training Component of the Career Center Job Readiness Program

Given this 28th day of July in the year two thousand and seventeen

Sanja P. Jones
Program Manager, Career Center

Mike Young
Practical Skills Instructor