

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NJM:KCB/EJD/DEL/AMR
F. #2018R01984

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 23, 2022

By ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Branden Peterson
             Criminal Docket No. 18-609 (RJD)

Dear Judge Dearie:

      The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for December 8, 2022. For the reasons set forth below, the government recommends that a Guidelines sentence of 240 months' imprisonment be imposed in this case.

I.     Facts

    A.     The Defendants' Year-Long Efforts to Kill Sylvester and Salvatore Zottola

      This case was part of a long-term investigation by the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") into violence committed against Sylvester and Salvatore Zottola. Presentence Investigation Report ("PSR") ¶ 4. Over the course of a year, Sylvester Zottola was violently assaulted, menaced, stalked and ultimately murdered. Id. ¶¶ 4-30. His son, Salvatore Zottola, was also menaced and nearly shot dead. Id. The investigation led to charges against 11 defendants—including Anthony Zottola, the son and brother of the victims, and Bushawn Shelton, the hitman hired by Anthony Zottola to kill his father and brother. See generally id. Shelton, in turn, hired the defendant Branden Peterson, among many others.

    1.     August 2017 Conspiracy

      Beginning in August 2017—and shortly after meeting defendant Anthony Zottola—Shelton began texting other co-conspirators about a "mafia" or "Italian" connect who would pay Shelton to beat up "one of his tenants." See PSR ¶ 7. For example, on August 8, 2017, Shelton texted co-defendant Herman Blanco, "He usually gives me a stack when I beat up his

tenants lol I figured you can have it," specifying that the location of the assault would be "Hobart ave"—the street Sylvester Zottola then lived on, as well as other tenants of buildings owned and maintained by the Zottola family—and specifically identifying the name of a tenant (not Sylvester Zottola) who owed back rent to the Zottolas. GX 1206 at 1-3. Shelton informed Blanco that, "[i]f [the beating] happens near the house he said let him know and he will disable the cameras." Id. at 2. Shelton also texted Blanco, on August 11, 2017, "Remember I said he got some other big shit lined up for us but I want to knock this out first." Id. at 4. Later in August 2017, Shelton texted co-defendant Julian Snipe that "the dude [Shelton was] trying to rock with on this new deal has some issues with his neighbor," and that "[t]he neighbor [wa]s putting up a stack to violate boy." GX 1208 at 1-2. Snipe responded, "Whenever u want to solve the situation hit me I'm game like old times." Id. at 2. On August 17, 2017, Zottola requested to meet with Shelton in person and, later that day, Shelton texted Blanco, "Don't worry about home boy in the TL [the car driven by the Zottola's tenant] something came up and he wants to wait on that." GX 1206 at 5. Blanco responded, "Give me all the details on the new one." Id.

Approximately one week later, on August 25, 2017, Shelton drove by Sylvester Zottola's home. Video of the drive-by was recovered from Shelton's phone. On that same day, Shelton texted Branden Peterson that Shelton could pay Peterson "[a] stack, $1,500" to have "somebody grandfather beat up in the Bronx," that the individual was "70" and "just needs a good ass whooping." See GX 1311, at 3-4; PSR ¶ 8. Shelton texted Peterson that he was "trying to find [M]urda [i.e., another co-conspirator] because he owe but I'll pay, I just need it done ASAP." GX 1311 at 4. Peterson expressed interest, and the two met later that evening at approximately 10:00 p.m. See id. at 6. The two then had several additional conversations over text about payment and failed attempts to locate Zottola, including Peterson providing a description of Zottola's neighbors to Shelton and a discussion between the two of cars driven by the victim and his family. See id. at 6-23. At one point, after Peterson was encountering difficulty in locating Zottola to carry out the job, Peterson texted Shelton,

> PETERSON: Bout to knock on his door that morn an whip him out.
>
> SHELTON: Lol I was thinking that but it's to many cameras
>
> PETERSON: Yea I'm to the point cuzo I gotta get him
>
> SHELTON: I feel The same way I'm ready to move on to the next
>
> PETERSON: Word
>
> PETERSON: We need all that
>
> SHELTON: Definitely do, and it's mad simple shit
>
> PETERSON: I'm with it all

Id. at 24-26.

2

2. September 2017 Assault of Sylvester Zottola

After several failed attempts to locate Sylvester Zottola, Peterson committed the first violent attack against Zottola on September 8, 2017. See PSR ¶ 8.[1] Shelton and Peterson exchanged messages about the attack in early September 2017, including about Peterson traveling to Zottola's residence to surveil it. See id. at 27-36. The day of the attack, Peterson informed Shelton about police presence near Sylvester Zottola's home and sent Shelton a photograph of police cars near the Zottola residence. See id. at 37; see also GX 101 at 1-2.[2] Shelton promptly relayed the information to Anthony Zottola, writing, "Peace brother is everything good with you. On my way to work I passed your house and it's a lot of police in front. Just making sure you ok." GX 101 at 1. Zottola responded, "For now yes," after which Shelton texted Peterson, "He don't know, nothing on his end." Id.

Shortly thereafter, Peterson approached Sylvester Zottola near his residence, as captured on video surveillance. See GX 401; 402. The video depicts Peterson, whose face is clearly visible, lingering outside Zottola's residence and then approaching Zottola as Zottola checked his mail. See id. Peterson briefly inquired about a job, and then punched Sylvester Zottola in the face and body repeatedly, knocking him to the ground and watching him roll on the street, before fleeing. Zottola remained immobile in the middle of the street until passersby came over to assist him. Id. After the attack, Shelton and Peterson exchanged numerous phone calls. See GX 101.

3. November 2017 Menacing of Sylvester Zottola

After the September assault, the defendants began their attempts to murder Sylvester Zottola. On November 26, 2017, a dark van pulled in front of Sylvester Zottola while he was driving, forcing him to stop. PSR ¶¶ 9-10. An individual wearing a mask exited the van and pointed a gun at Sylvester Zottola. Id. ¶ 10. After Sylvester Zottola escaped and notified law enforcement, police officers recovered the van at the scene and found a checkered face mask and jacket. Shelton's DNA was on both the mask and the jacket, and Peterson's DNA was on the mask. Id. ¶ 10.

Shelton and Peterson began texting about this second attack in late October and early November 2017. See GX 1210 at 8-9. For example, on November 12, 2017, Shelton and Peterson exchanged the following text messages:

---

[1] The PSR mistakenly identifies the victim of this assault as Salvatore Zottola. PSR ¶ 8. The victim of the September assault was his father, Sylvester Zottola. The same is true for the November and December 2017 attacks described in the PSR. See PSR ¶¶ 9-13.

[2] Government Exhibit 101, introduced at the trial of Peterson's co-defendants, is comprised of text messages recovered from various of Shelton's phones as well as call detail records, indicated by the "data source" column, placed in date and time order to provide a full chronology of the timeline of the attack on September 8, 2017.

3

| | |
|---|---|
| PETERSON: | See if u can see who got a G ride [i.e., car] for 2000 to 2500 for this week by Thursday Cuzo peace call u later |
| SHELTON: | I'll check |
| PETERSON: | Got that mask for u |
| SHELTON: | What mask? |
| PETERSON: |  |

Id. at 9.  As set forth above, the mask in the photograph sent by Peterson to Shelton is identical the mask recovered after the November attempted murder on Sylvester Zottola, which had DNA from both Shelton and Peterson.  Shelton and Peterson continued to text about the attack in early November, including exchanging texts about needing a car "[t]o finally get this out the way." Id. at 10.  On November 18, 2017, Shelton and Peterson exchanged the following text messages:

| | |
|---|---|
| PETERSON: | 10 Richmond Plaza (1:05 PM ) |
| SHELTON: | Down stairs (1:37 PM ) |
| PETERSON: | Coming down now (1:37 PM) |
| PETERSON: | Shit was a trying another (8:44 PM) |
| SHELTON: | Any luck (8:48 PM) |

Shortly thereafter on the same day, SHELTON and a relative, an unindicted co-conspirator ("UCC"), exchanged the following text messages:

| | |
|---|---|
| BUSHAWN: | This nigga pissed me off (9:56 PM) |
| UCC: | Who (9:57 PM) |
| BUSHAWN: | Brandon [i.e., Peterson] (9:57 PM) |

4

| | |
|---|---|
| UCC: | Lawd (9:57 PM) |
| BUSHAWN: | Now I gotta get the piece back cause it's on 20% (9:57 PM) |
| UCC: | Yes u do (9:58 PM) |

See GX 1212. Throughout the pendency of the murder-for-hire conspiracy, Shelton regularly referred to GPS tracking devices used to track Sylvester and Salvatore Zottola as "the piece," often with references to the percentage of battery left on the tracking device ("I gotta get the piece back cause it's on 20%"). Each tracking device used by Shelton and his conspirators were battery operated; the user of the tracking device could view the percentage of battery power left in the device at any given time using an application powered by the LandAirSea, the company servicing the tracking devices.

       The investigation has revealed that a battery-operated tracking device was used in the days leading up to the November 26, 2017 attempted murder of Sylvester Zottola (the "November Tracking Device"), although not on the day itself.[3] Specifically, the November Tracking Device was activated on November 10, 2017, in the vicinity of Shelton's residence in the name "Bushawn Shelton." Around the time of the exchange between Shelton and the UCC on November 18, 2017, the November Tracking Device was in the vicinity of Sylvester Zottola's residence on Hobart Avenue in the Bronx. As of 10:23 p.m., the November Tracking Device was recording locations in the same vicinity. It then stopped recording locations until 11:20 p.m., when it appears to have been located in a different section of the Bronx. By 11:42 p.m., the November Tracking Device was back in the vicinity of Sylvester Zottola's residence. During this time period, Shelton and Blanco exchanged text messages needing to "put the piece back," and, when Blanco was not immediately able to do so, Shelton texted:

| | |
|---|---|
| SHELTON: | It's good I'll go put it back, I just didn't want to because I was just under there to take it off (11:02 PM) |
| BLANCO: | Bet Bro… I think the fast way is better (11:04 PM) |
| SHELTON: | Fast way? (11:14 PM) |
| BLANCO: | Bang bang!!! (11:15 PM) |
| SHELTON: | Kopy (11:15 PM) |
| BLANCO: | That's ur style (11:16 PM) |

---

[3]     The tracking device was registered in Shelton's name, and, based on the activity of the tracking device and text messages between Shelton and Anthony Zottola, Shelton used the tracking device to establish Sylvester Zottola's patterns in order to know where and when to best attack him but removed the device shortly before the attack as not to implicate himself. See, e.g., PSR ¶ 9.

5

| | | |
|---|---|---|
| SHELTON: | Best way (11:16 PM) | |
| BLANCO: | 1,2,3 (11:16 PM) | |

Thus, as the text message correspondence makes clear, by at least November 18, 2017, the goal of the conspiracy had shifted from beating up Sylvester Zottola to killing him ("Bro . . . I think the fast way is better" "Bang bang!!!"). Further, based on the locations of the November Tracking Device and Shelton's text messages, Shelton retrieved the November Tracking Device on the evening of November 18 from Sylvester Zottola's car, recharged it, and then repositioned it on the car. In the following days, Shelton and Peterson continued to text about the plan. For example, Shelton texted Peterson, "Let's just buy a car from some side block the ones for sell [sic] like 500-1000 put plates on it and go." GX 1210 at 12. Peterson indicated he was going to look for some cars online. Id. at 12-13.

Early in the morning of November 25, 2017, a blue van (the "Blue Van") was stolen. The owner of the Blue Van informed NYPD that he left his car in the vicinity of Linden Boulevard and Berriman in Brooklyn, New York, on the evening of November 24, 2018 at approximately 11 p.m. and noticed it was missing at approximately 4 p.m. the following day. Shelton and Peterson texted about meeting at approximately 12:45 a.m. early in the morning on November 25. Id. at 17.

The following day, November 26, 2017, Shelton and Peterson exchanged the following text messages:

| | |
|---|---|
| PETERSON: | Coming now I know u trying to go im coming (9:24 AM) |
| SHELTON: | Bet (9:24 AM) |
| SHELTON: | After all the spending I think we left with 6.5 or 7. You take it and give your man what you want being that he going (10:05 AM) |
| PETERSON: | Ok np (10:05 AM) |
| PETERSON: | I know u got me I got u to not going to leave u hanging my guy I'm (10:06 AM) |
| PETERSON: | with it all u will see (10:06 AM) |
| SHELTON: | I know cuzo we been looking out for each other since we were younger (10:07 AM) |
| SHELTON: | Any opportunity I got I call you from the job to work we family (10:08 AM) |
| SHELTON: | We got each other (10:08 AM) |

6

        PETERSON:        Copy (10:28 AM)

See GX 1210; see also GX 102 at 1.[4]

      At around the same time, Shelton texted UCC, "I'm over here given This nigga a pep though text [laughing emoji] [emoji] [laughing emoji] [emoji]." GX 1212 at 2; GX 102 at 1. Shelton and Peterson exchanged a number of voice calls, and then UCC texted Shelton about parking her car in an area with no cameras so that Shelton would not "be seen getting in" the car. GX 1212 at 2-6; GX 102 at 1-2. Shelton asked UCC whether she was near "2717 Bruckner Boulevard, Bronx, NY," a location in the Throggs Neck section of the Bronx, near where the Zottolas lived, to which she confirmed she was moving in that direction. Id. at 6-7.

      The November attempted murder of Sylvester Zottola occurred at approximately 3:11 p.m. Specifically, the Blue Van attempted to cut off Sylvester Zottola and a man with a gun and a mask—Shelton—exited the Blue Van in an attempt to kill Sylvester Zottola, who narrowly escaped by placing his car in reverse and speeding away to a police precinct to report the attack. License plate reader records show that the Blue Van had been parked in the Locust Point section of the Bronx, near where the Zottola family compound was located and near the section of the Throggs Neck Expressway where the November attack occurred, at approximately 2:45 p.m. See GX 801. At the same time, cell site location data placed both Peterson and Shelton at the same location as the Blue Van in the Locust Point section of the Bronx—far from their residences in Brooklyn—and just south of Edgewater Park, where the attempted attack occurred. See GX 150 at 11. Approximately 10 to 15 minutes after the attack, cell site location data placed Peterson just north of the location of the attack. See id. at 12. Sylvester Zottola immediately reported the attempt on his life to the police.

      Shortly after the attempted murder, Shelton and Anthony Zottola exchanged coded text messages. See PSR ¶ 11. Anthony Zottola wrote to Shelton, "I hope you can get the actor [i.e., Sylvester Zottola]." Shelton replied that "the costar just got into it with the director about 15 minute ago and they had to call security [i.e., the police]." Id. After Anthony Zottola said that he "needed this bad," Shelton wrote that "[t]oday was set to be the end finally until the actor wanted to do his own stunts and throw it in reverse in the middle of shooting a scene and drive in the opposite direction"—a description of Sylvester Zottola's escape efforts. Id. Anthony Zottola replied, "[o]k. But we can still do the end I hope." Shelton assured Anthony Zottola that he was "putting together a new cast," and that they were "going to film in his dressing room [i.e. Sylvester Zottola's residence]." Id.

---

      [4]      Government Exhibit 102, like Government Exhibit 101, was introduced at the trial of Peterson's co-defendants and is comprised of text messages recovered from various of Shelton's phones as well as call detail records, indicated by the "data source" column, placed in date and time order to provide a full chronology of the timeline of the attack on November 26, 2017.

4. <u>Stabbing and Shootings of Sylvester and Salvatore Zottola</u>

The spree of violence continued in the following months. In December 2018, two days after Christmas, three men beat and stabbed Sylvester Zottola inside of his home—an attack planned by Shelton and Anthony Zottola. PSR ¶¶ 12-13. Specifically, on the evening of December 27, 2017, three men entered Sylvester Zottola's residence. PSR ¶ 12. One of the men, carrying a gun, struck Sylvester Zottola on the head, knocking him to the floor. Id. The men then stabbed Sylvester Zottola multiple times in and around his neck and torso, although their victim miraculously survived. Before leaving the residence, the men stole approximately $3,000 in cash. Id.

In the months after the brutal home invasion, Shelton and Anthony Zottola planned additional attempts, with Shelton attempting recruit numerous individuals with the promise of payment. See, e.g., PSR ¶¶ 14-24. In addition to hundreds of text messages recovered from Shelton's phones recruiting and attempting to recruit individuals, Shelton also recruited a cooperating witness ("CW-1"), in or around January or February 2018, to kill the victims in exchange for money. Id. ¶ 17. Shelton recruited a second cooperating witness ("CW-2") in or around Spring 2018, to do the same. Id. ¶ 16. Shelton provided these hit men with firearms, access to vehicles and drivers on multiple occasions to carry out the murder-for-hire plot.

During this time period, Peterson remained involved in the murder plot. For example, in March 2018, Shelton asked Peterson to hold a car for him after the "Dawgs [i.e., the Murderous Mad Dawgs, the Bloods subset that Shelton led] were supposed to handle something but they didn't and now I want the car back in the east and not with them." See GX 1218 at 1-2. Then, on March 20, 2018, Shelton texted Peterson, "If you got someone to finish the mission I'll give them 10k [i.e., $10,000] and you can keep the car." Id. at 3. Peterson responded that he would try to find someone ("Ok I'm a see"). Id. Later that day, Shelton texted Peterson for an update and Peterson indicated he was "working on that now," and then, three days later, informed Shelton that he "[g]ot someone for work." Id. at 4. The two then met in person to speak. Id. at 4-5. The following day, on March 24, 2018, Shelton and Peterson texted about obtaining a gun ("[t]he Dawg is bringing me the situation," i.e., a gun) and a car ("Ok gotta get the van")—the two items provided by Shelton to each of the cooperating witnesses in this case for each attempt on the victims' lives. Id. at 5.

On March 31, 2018, after Shelton unsuccessfully attempted to get in touch with Peterson, Shelton texted Peterson, "Yeah it kind of put me in a ham but im on my way to Harlem now to talk to my guy he been ready I just need a driver for him." Id. at 7. CW-1, who lived in Harlem, testified at trial in this case about Shelton's difficulties finding a reliable driver for him to carry out the hits. Peterson responded, "Ok cousin so talk to him and call him," "I will drive let me know so I get temps [i.e., a temporary license plate]." Id. at 8. Shelton and Peterson arranged to meet on April 1. A couple days later, Shelton and Peterson again texted about the plan. Specifically, Shelton texted Peterson, "Yeah tell me why in the middle of the mission today they put a boot on the v [i.e., the car]," and then, "So I'm trying to go back tonight but I don't want to drive me [sic] shit but I will if I have to." Id. at 10. As this text message and other text messages with co-conspirators during the pendency of the conspiracy made clear, although Shelton often used his own car to drive back and forth to the victims' residences in the Bronx to, among other

things, conduct surveillance and place the tracking devices, he did not want to use his own car in connection with an attack because it was a distinct, black and red Dodge Charger that was registered in his own name.

Several attempted attacks occurred in the spring of 2018, including an incident in which a co-conspirator approached Salvatore Zottola with a gun outside of one of the family's properties in the Bronx, and a break-in of the family's office by defendant Jason Cummings. See PSR ¶¶ 18-20. Cummings, who broke into the Zottolas' office on May 1, 2018, with a gun and with the intent to kill Sylvester Zottola, fled after he accidentally tripped the panic alarm and the police responded. Id. ¶ 20. Then, on May 29, 2018—as Shelton was still attempting to put together a driver and a shooter to carry out the next attack—Peterson committed to being the driver. Specifically, Peterson and Shelton exchanged the following messages:

| | |
|---|---|
| SHELTON: | He will be ready at 430 so we can roll out in an hour and half around 330/345 (1:37 AM) |
| SHELTON: | Just hit me when you situated (1:37 AM) |
| PETERSON: | Got u (1:50 AM) |
| SHELTON: | What's poppin (3:31 AM) |
| SHELTON: | You ready (3:53 AM) |
| PETERSON: | Tomorrow night better then today no bs h Give ne time to get Phone send van (4:26 AM) |
| PETERSON: | Plus I got someone to follow me (4:36 AM) |
| PETERSON: | U want to now I need extra v (4:36 AM) |
| SHELTON: | Ok tomorrow it is (4:36 AM) |
| PETERSON: | I ain't been home in a week (4:37 AM) |
| PETERSON: | I will drive no matter what I need that (4:37 AM) |
| SHELTON: | Ok cuzo no problem but I really need you tomorrow on this. (4:38 AM) |
| SHELTON: | Get you some rest I know the lady miss you if you haven't been there in a week (4:38 AM) |
| PETERSON: | I got u (4:41 AM) |
| PETERSON: | U always got me if needed (4:41 AM) |

9

      PETERSON:       I'm about to go get my gear right (4:41 AM)

CW-1 testified about numerous failed attempts to commit the murder during this time period, including attempts with CW-2, another driver and, ultimately Ross—leading to a June 12, 2018 attempt by CW-1 and Ross to kill Sylvester Zottola, in which Sylvester Zottola fired a shot at Ross, among others. CW-2 also went to the Bronx by himself with a gun on one occasion to kill Sylvester Zottola, but fled after he was seen by Salvatore Zottola. Throughout this entire time period, Shelton and Anthony Zottola continued to exchange coded text messages about the conspiracy.

In June 2018, Shelton began tracking Salvatore Zottola's location through the use of two tracking devices on his personal vehicle and a work van that he frequently used. On the morning of July 11, 2018, Salvatore Zottola parked his vehicle in front of his residence. PSR ¶ 21. As he exited the vehicle, a red Nissan Altima driven by Codner pulled up to the residence. Id. Ross exited the vehicle and shot Salvatore Zottola several times in the head, torso, and hand and fled in the red Nissan. Id. Salvatore Zottola survived the attack after undergoing surgery. Id. Law enforcement officers later recovered a tracking device from the underside of the vehicle Salvatore Zottola was driving on the morning he was attacked.

Following the July 11 attempted murder of Salvatore Zottola, in or around September and early October 2018, Shelton, Ross and others texted about needing to procure a driver for the homicide, ultimately resulting in their recruitment of Alfred Lopez.[5] PSR ¶¶ 23-24. Shelton, Ross and Blanco also tested a tracking device that was placed on Sylvester Zottola's car. Id. In September 2018, Shelton and Peterson again texted about the murder-for-hire plot. Specifically, on September 28, 2018—approximately one week before the murder of Sylvester Zottola—Shelton and Peterson exchanged the following messages:

      SHELTON:       What's poppin with the situation?

      SHELTON:       Ok I gotta get with you because I need to know a serious window because I got your message that you wouldn't be good until Saturday last week. I'm good and the accident happened[6] but even if I was on my death bed i'd still be focused on this. At least I'd know that bread [i.e., cash] would have my boys and kay [Takeisha Shelton] good after I'm gone lol

      SHELTON:       So let me know when you can talk

      PETERSON:       Ok and yes I was waiting for u to hit me up cuzo… I'm a be in Nj for today but tomorrow we can link

---

    [5]     Defendant Alfred Lopez was acquitted at trial.

    [6]     Shelton was involved in a minor car accident around this time.

  PETERSON:   Pose to be going To Bushwick tomorrow so after 1 I'm good

See GX 1218 at 11-12. Shelton and Peterson exchanged additional messages on October 1, 2018—approximately three days before the murder—about needing to meet up. Id.

On October 4, 2018, Ross and Lopez tracked Sylvester Zottola's car to a McDonald's in the Bronx, where Ross shot him to death in the drive-thru lane. PSR ¶ 24. Immediately following the murder, Ross and Shelton exchanged texts, and then Shelton and Anthony Zottola exchanged texts, including in the minutes after Anthony Zottola was informed his father had just been murdered, in which Shelton and Anthony Zottola celebrated the completed hit. Id. ¶ 25. In the days after the murder, Zottola paid Shelton and Shelton paid additional co-conspirators, including Ross. Id. ¶¶ 26-30.

 B. The Defendant's Arrest

Peterson was arrested on June 21, 2019. PSR ¶ 31. At the time of his arrest, Peterson informed law enforcement officers that he was a member of the Crips street gang, and knew Shelton because he was a family friend. Id. ¶ 6. Peterson also lied to law enforcement officer, telling them he had punched Sylvester Zottola because Zottola had called him a racial slur—a lie belied by the video evidence, witness testimony and text message evidence in this case.

Also on the day of Peterson's arrest, FBI agents contacted the Administration for Children's Services ("ACS") after finding eight of the defendant's children living in deplorable conditions.[7]

[redacted]

---

[7]  The government respectfully requests that this portion of the government's letter, as well as the appended ACS file, be filed and remain under seal to protect the privacy of the defendant's children.

████████████████████████████████████

Since his arrest, the defendant has remained in custody, first at the Metropolitan Detention Center at later at the Essex County Correctional Facility. While at the MDC, the defendant lost 41 days of good time credit for possessing a hazardous tool in his cell. PSR ¶ 78.

C. <u>Guidelines Calculation</u>

The Guidelines calculated in the plea agreement and stipulated to by Peterson differ from those calculated in the PSR. Specifically, the PSR calculated the Guidelines with reference to a grouping analysis, as set forth below:

<u>Count 1, Murder-for-Hire – Sylvester Zottola</u>

| | | |
|---|---|---:|
| Base Offense Level (§ 2E1.4(a)(2); 2A1.1(a)) | | 43 |
| Less: | Minor Role (§ 3B1.2(b)) | -2 |
| Total: | | <u>41</u> |

<u>Count 1, Murder-for-Hire – Salvatore Zottola</u>

| | | |
|---|---|---:|
| Base Offense Level (§§ 2E1.4(a)(2); 2A2.1(a)) | | 33 |
| Plus: | Victim Sustained Life-Threatening Injury (§ 2A2.1(b)(2)(A)) | +4 |
| Plus: | Offer and Receipt of Pecuniary Value (§ 2A2.2(b)(2)) | +4 |
| Less: | Minor Role (§ 3B1.2(b)) | -2 |
| Total: | | <u>39</u> |

<u>Grouping Analysis</u>

| | | |
|---|---|---:|
| Highest Offense Level: | | 41 |
| Additional Points from 2 Units | | +2 |
| Less: | Timely Acceptance of Responsibility (§3E1.1(a), (b)) | <u>-3</u> |
| Total: | | <u>40</u> |

Because the defendant is in criminal history Category III, the resulting Guidelines range calculated in the PSR is 360 months to life. The parties' calculation in the plea agreement omitted the grouping analysis and, thus, resulted in an adjusted offense level of 38, and a Guidelines range of 292 to 365 months. However, in either case, because the statutory maximum is 240 months, the effective range of imprisonment is 240 months. PSR ¶ 96.

II. <u>Analysis</u>

A Guidelines sentence of 240 months' imprisonment would reflect the nature and circumstances of the offense, avoid unwarranted sentencing disparities, and promote general and specific deterrence. <u>See</u> 18 U.S.C. § 3553(a)(1), (a)(2) and (a)(6).

Peterson joined conspiracies to both assault and murder two people. He himself committed a brutal assault of an elderly victim, punching him until he fell to the ground and did not get back up, in exchange for cash. Peterson did not stop there, he also continued to conspire to kill the same victim—helping Shelton orchestrate and commit the November assault, as evidenced by the text message correspondence between himself and Shelton, his DNA on a mask recovered from the scene and cell site location data placing him there. But for the fact that the victim escaped them, Peterson and Shelton would have murdered Sylvester Zottola that day. Thus, there is no mitigation in the fact that Sylvester Zottola was not killed that day. Peterson and Shelton spent significant time staging that attack by tracking the victim and procuring supplies with the goal of completing and profiting from Zottola's murder.

Peterson remained a willing and able participant in this murder conspiracy long after the November 2017 attack. Peterson continued to profess his loyalty to Shelton and his willingness to help Shelton for the entire duration of the conspiracy, including by storing and procuring cars for Shelton, as well as by acting as a driver and bringing in another co-conspirator for $10,000 ("If you got someone to finish the mission I'll give them 10k and you can keep the car"). The text message correspondence, in which Shelton and Peterson regularly discuss the payment of large amounts of cash—including in late September 2018, days before the murder, when Shelton texted Peterson he would be "focus[ed] on this" even if he were on his "death bed" because he would know that "bread would have my boys and [wife] good after I'm gone"—clearly demonstrates Peterson's intimate knowledge of the plot through the end. Moreover, several attacks on the victims were highly publicized, including the July 11 attempted murder of Salvatore Zottola and the October 4 murder of Sylvester Zottola. Peterson did nothing to stop these brutal attacks and, to the contrary, continued to support Shelton. Indeed, from the group of eleven defendants charged in this case, Peterson was one of the defendants in the conspiracy for the longest amount of time, alongside Zottola, Shelton, Blanco and Snipe.

The government does not dispute that Peterson qualifies for a minor role adjustment based on his participation in the conspiracy—a significant determinant in the government's plea offer in this case capping his sentencing exposure at 20 years, rather than the 40-year or life sentences that his co-defendants face.[8] But this role adjustment speaks more to the particularly heinous nature of the crimes in this case—the sheer number of attacks that terrorized the Zottola family month after month, resulting in the final year of Sylvester Zottola's life being more akin to a horror movie than anything else—than the defendant's conduct in joining a murder-for-hire conspiracy and assisting Shelton in carrying out the plot when asked to do so. The defendant's

---

[8] In addition to Peterson, the government also offered Jason Cummings, who was involved solely in the May 2018 break-in of the office, an attempt to kill the victims, as detailed above, a plea agreement capping his sentencing exposure at 20 years.

13

conduct in joining the murder-for-hire scheme, providing help and support to Shelton throughout out, carrying out a brutal assault of an elderly victim and actively planning and participating in a second attack on the same victim is incredibly serious, deliberate conduct ultimately resulting in the execution of another person, and the Court, even considering the defendant's role, should treat it as such.

Nor was this conduct entirely aberrational for Peterson, who has two prior convictions—one for criminal possession of a controlled substance and another for possessing a gun. PSR ¶¶ 60-61. During the gun arrest, the defendant also resisted arrest. Id. Moreover, the defendant is a committed member of the Crips street gang, a violent street gang responsible for significant crimes throughout the New York City area, and even has the letters "C R I P S" tattooed on his knuckles. As noted in the PSR, Peterson has been largely unable to maintain regular employment, and that he would turn to committing physical acts of violence against another human in exchange for money, at the behest of a friend, demonstrates that a significant sentence is needed to deter him and protect the public.

Moreover, a sentence of 240 months would also guard against unwarranted, nationwide disparities. See United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007) (emphasis added) (re-affirming that the focus of 18 U.S.C. § 3553(a)(6) is primarily "to minimize nationwide disparities" and that a court is not even required to consider disparities among co-defendants), abrogated on other grounds by United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc). According to statistics maintained by the United States Sentencing Commission, the average sentence for murder is 244 months. For defendants in criminal history category III, like the defendant, that number jumps to 258 months. The average sentence for the defendant's primary guidelines—Sections 2E1.4 and 2A1.1, as outlined above—is yet higher, at 267 months, and still higher—269 months—when accounting for the defendant's criminal history category.[9] But Peterson was not a member of a conspiracy to commit an isolated murder-for-hire, or even an isolated murder. His crimes occurred in the context of attack after attack after attack; he had every opportunity to exit the conspiracy or stop the violence, but instead chose to continue helping and supporting Shelton in carrying out the attempted murder and murder.

Accordingly, although the government is not asking for a true Guidelines sentence in this case—given the statutory cap of 240 months, years below the Guidelines range calculated by the parties and by the PSR—the Court should impose a sentence significantly higher than the time-served sentence advocated for by Peterson, in which he grossly minimizes his conduct, failing to take full responsibility for his participation in the November attack and failing to address whatsoever the numerous additional conversations with Shelton about the murder-for-hire plot, including the ways in which Peterson readily agreed to help Shelton even up through late September 2018. Cf. Def. Mem. at 2 (indicating purported "full acceptance of responsibility" but failing to acknowledge the evidence of his role in the November attempted murder and failing to

---

[9] See U.S. Sentencing Commission Interactive Data Analyzer for Fiscal Year 2021, *available at* https://ida.ussc.gov/analytics/ (displaying data based on selection of "crime type" to be murder; primary guideline to be §§ 2E1.4 and 2A1.1; and criminal history category to be III, where applicable).

14

address his culpability throughout the charged conspiracy); id. at 16 (inaccurately asserting that he "did not directly participate in" the November 2017 attempted murder). Moreover, even were the Court to sentence Peterson to 240 months, when accounting for good-time credits under the First Step Act, see 18 U.S.C. § 3624(b)(1), Peterson could be eligible for almost three years' of good-time credit, meaning that he would be in his early 50s when he is released. A lower sentence would put Peterson back on the streets in his 40s or, if the Court accepted the defendant's request, in his late 30s—ages when he is statistically more likely to recidivate, particularly where he will still be in need of money with significant financial obligations to his family. Thus, the need to protect the public also counsels in favor of a serious sentence in this case.

Among the arguments the defendant advances in support of his request for a sentence of time-served are his qualities as a father. See Def. Br. 11 (indicating he would "help out" his children's mother and professing that "his kids came first"). However, the defendant's description is once again belied by actual records. As described in detail above and in Exhibit A, ▆▆▆▆▆▆▆▆▆▆▆▆▆ And this neglect was not the product of a need to provide for them—the defendant's employment history set forth in the PSR demonstrates that, although he was capable of getting jobs, he did not maintain them. PSR ¶¶ 85-90. Rather than care for his children or maintain steady, legitimate employment, the defendant chose to make cash by physically harming others.

Likewise, although the defendant professes that he has made efforts towards "rehabilitation [and] transformation," Def. Mem. at 4-5, which the government commends, possessing a weapon in jail is at odds with his self-proclaimed change. Moreover, the defendant's criminal history, his participation in a violent murder-for-hire, including his own commission of acts in furtherance of the plot, his refusal to stop the additional commission of violence and, instead, his continuing help and the incredibility serious nature of the offense require a lengthy sentence. Cf. United States v. Mumuni, 946 F.3d 97, 112 (2d Cir. 2019) (holding that "compliance with institutional disciplinary regulations" may earn good time credits towards a prison sentence but "has no bearing on the sentencing factors a district court must consider under 18 U.S.C. 3553(a)").

III.    Conclusion

For these reasons, a Guidelines sentence would properly reflect the history and characteristics of the defendant, the seriousness of the offense, promote respect for the law, and provide adequate specific and general deterrence, and is not greater than necessary to serve these

purposes. See 18 U.S.C. § 3553(a)(1) & (a)(2). Perhaps most importantly, it will protect the public from the defendant.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

By:    /s/
                Kayla Bensing
                Emily Dean
                Devon Lash
                Andrew Roddin
                Assistant U.S. Attorneys
                (718) 254-6279

cc:    Anthony Cecutti & David Ruhnke, Esq.
       United States Probation Officer Jennifer E. Baumann