

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:KCB/EJD/DEL/AMR                    *271 Cadman Plaza East*
F. #2018R01984                                *Brooklyn, New York 11201*

November 29, 2022

By ECF and Email

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Herman Blanco
              Criminal Docket No. 18-609 (RJD)

Dear Judge Dearie:

        The government respectfully submits this letter in response to defendant Herman Blanco's sentencing submission (ECF Dkt. No. 542, hereinafter "Def. Mem.") and in advance of sentencing in the above-captioned case, which is scheduled for December 8, 2022.  For the reasons set forth below, the government recommends that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") between 360 and 480 months' imprisonment be imposed in this case.

I.    Facts

    A.    The Defendants' Year-Long Efforts to Kill Sylvester and Salvatore Zottola

        This case was part of a long-term investigation by the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") into violence committed against Sylvester and Salvatore Zottola.  Presentence Investigation Report ("PSR") ¶ 6.  Over the course of a year, Sylvester Zottola was violently assaulted, menaced, stalked and ultimately murdered.  Id. ¶¶ 6-32.  His son, Salvatore Zottola, was also menaced and nearly shot dead.  Id.  The investigation led to charges against 11 defendants—including Anthony Zottola, the son and brother of the victims, and Bushawn Shelton, the hitman hired by Anthony Zottola to kill his father and brother.  See generally id.  Shelton, in turn, hired the defendant Herman Blanco, who assisted Shelton in nearly every step of the conspiracy, from its beginning to its end, culminating in the murder of Sylvester Zottola.

1.      August 2017 Conspiracy to Assault a Zottola Tenant

Beginning in August 2017—and shortly after meeting defendant Anthony Zottola—Shelton began texting other co-conspirators about a "mafia" or "Italian" connect who would pay Shelton to beat up "one of his tenants."  See PSR ¶ 7.  Shelton immediately turned to Blanco for assistance.  On August 8, 2017, shortly after being connected with Anthony Zottola, Shelton and Blanco exchanged the following text messages:

SHELTON:        [A]re you with plucking a nigga out for me?

BLANCO:         Where u at

SHELTON:        In at work

BLANCO:         Where boy at

SHELTON:        My old Italian dude hit me and needs one of his tenants beat up lol. Some old dude I guess he pissed him off

BLANCO:         Where?

SHELTON:        He usually gives me a stack when I beat up his tenants lol I figured you can have it

SHELTON:        In the Bronx

BLANCO:         But where?

SHELTON:        On Hobart ave

BLANCO:         Give me a second imma look that up.  How soon u need this done

SHELTON:        [No] time limit I was going to scope shit out to see the area and to see what he look like

BLANCO:         Kopy[1].. Let me know I'm on deck

GX 1206 at 1-2.  In this exchange, Shelton asked Blanco if he was willing to participate in a scheme ("Are you with") to assault a victim ("plucking a nigga out").  Shelton and Blanco exchanged additional text messages about the address—which was an address of one of the Zottola family's tenants—and discussed the plan to beat up the tenant.  Id. at 2.  Shelton informed Blanco

---

[1]      Members of the Bloods street gang, as were both Shelton and Blanco, routinely use the letter "K" rather than "C" in written communications because "C" is associated with a rival gang, the Crips.

that, "[i]f [the beating] happens near the house he said let him know and he will disable the cameras." Id. at 2. Blanco instructed Shelton that he "want[ed] to know [the victim's] schedule," "what time he leaves and Come in," "what he look like" and his "[h]ours of work." Id. at 3. Then, on August 11, 2017, Blanco and Shelton exchanged the following text messages, again discuss the violent plan:

| | |
|---|---|
| BLANCO: | Just got up..what time boy be going to work |
| SHELTON: | I don't know I figured you would know more than me by now |
| SHELTON: | I'm ready to step to boy with plan B lol |
| SHELTON: | But we still not clear with plan A |
| BLANCO: | Nah.. I got to it by foot.. |
| BLANCO: | What that |
| BLANCO: | Today or tomorrow. It will be done |
| SHELTON: | Remember I said he got some other big shit lined up for us but I want to knock this out first |
| SHELTON: | But let me know because I want to help |
| SHELTON: | You can keep the bread but he just want boy done right that's why he said a stack |
| BLANCO: | Kopy Bro..imma call u a little later |

Id. at 3-4. In the following days, Shelton and Blanco texted about "Throbs Neck"—a reference to Throggs Neck, the neighborhood in which the tenant-victim lived—and Blanco's surveillance of the property, including that an "old man live[d] down stairs..I haven't seen anybody come out from upstairs." Id. at 5.

On August 17, 2017, Anthony Zottola asked to meet with Shelton in person and, later that day, Shelton texted Blanco, "Don't worry about home boy in the TL [the car driven by the victim-tenant] something came up and he wants to wait on that." Id. at 5. Blanco responded, "Give me all the details on the new one." Id. Approximately one week later, on August 25, 2017, Shelton drove by Sylvester Zottola's home and recorded a video on his phone (which was later recovered by law enforcement agents). On that same day, Shelton texted Branden Peterson that Shelton could pay Peterson "[a] stack, $1,500" to have "somebody grandfather beat up in the Bronx," that the individual was "70" and "just needs a good ass whooping." See GX 1311 at 3-4; PSR ¶ 10. The two then had several additional conversations over text about payment and failed attempts to locate Zottola, including Peterson providing a description of Zottola's neighbors to

Shelton and a discussion between the two of cars driven by the victim and his family.  See GX 1311 at 6-23.

### 2.    September 2017 Assault of Sylvester Zottola

After several failed attempts to locate Sylvester Zottola, Peterson committed the first violent attack against Zottola on September 8, 2017.  See PSR ¶ 10.[2]  Zottola was 70 years old at the time of the attack.  Shelton and Peterson exchanged messages about the attack in early September 2017, including about Peterson traveling to Zottola's residence to surveil it.  See id. at 27-36.  The day of the attack, Peterson informed Shelton about police presence near Sylvester Zottola's home and sent Shelton a photograph of police cars near the Zottola residence.  See id. at 37; see also GX 101 at 1-2.[3]  Shelton promptly relayed the information to Anthony Zottola, writing, "Peace brother is everything good with you.  On my way to work I passed your house and it's a lot of police in front.  Just making sure you ok."  GX 101 at 1.  Zottola responded, "For now yes," after which Shelton texted Peterson, "He don't know, nothing on his end."  Id.

Shortly thereafter, Peterson approached Sylvester Zottola near his residence, as captured on video surveillance.  See GX 401; 402.  The video depicts Peterson, whose face is clearly visible, lingering outside Zottola's residence and then approaching Zottola as Zottola checked his mail.  See id.  Peterson briefly inquired about a job, and then punched Sylvester Zottola in the face and body repeatedly, knocking him to the ground and watching him roll on the street, before fleeing.  Zottola remained immobile in the middle of the street until passersby came over to assist him.  Id.

### 3.    November 2017 Menacing of Sylvester Zottola

After the September assault, the defendants began their attempts to murder Sylvester Zottola.  On November 26, 2017, a dark van pulled in front of Sylvester Zottola while he was driving, forcing him to stop.  PSR ¶¶ 9-10.  An individual wearing a mask exited the van and pointed a gun at Sylvester Zottola.  Id. ¶ 10.  After Sylvester Zottola escaped and notified law enforcement, police officers recovered the van at the scene and found a checkered face mask and jacket.  Shelton's DNA was on both the mask and the jacket, and Peterson's DNA was on the mask.  Id. ¶ 10.  Along with Shelton and Peterson, Blanco—as he had been with the August assault—was intimately involved in planning the November attempted murder.  Id. ¶ 11.

For example, on November 6, 2017, Blanco texted Shelton, "Bro send me a picture of our grandfather," because he "was going to tell ACE [i.e., Himen Ross] to take me over there

---

[2]    The PSR mistakenly identifies the victim of this assault as Salvatore Zottola.  PSR ¶ 8.  The victim of the September assault was his father, Sylvester Zottola.  The same is true for the November and December 2017 attacks described in the PSR.  See PSR ¶¶ 9-13.

[3]    Government Exhibit 101, introduced at the trial of Blanco's co-defendants, is comprised of text messages recovered from various of Shelton's phones as well as call detail records, indicated by the "data source" column, placed in date and time order to provide a full chronology of the timeline of the attack on September 8, 2017.

now…" GX 1206 at 7.  After Ross did not respond, on November 8, 2017, Shelton texted Blanco, "I got 10 bands [i.e., $10,000] sitting in the living room for a job that I can't even get ace to study for me."  Id. at 8.  Shelton and Blanco then discussed meeting up and surveilling the victim, because, according to Blanco, "I gotta know his moves I can't do nothing without that."  Id.  Blanco suggested meeting over the weekend, to which Shelton responded, "if it's not finished by this weekend then I have my own problem with these spaghetti eating mother fuckers."[4]  Id. at 9.  Blanco responded, "Ill go with u."  Id.

       Shortly thereafter on the same day, Shelton and a relative, an unindicted co-conspirator ("UCC"), exchanged the following text messages:

| | |
|---|---|
| BUSHAWN: | This nigga pissed me off (9:56 PM) |
| UCC: | Who (9:57 PM) |
| BUSHAWN: | Brandon [i.e., Peterson] (9:57 PM) |
| UCC: | Lawd (9:57 PM) |
| BUSHAWN: | Now I gotta get the piece back cause it's on 20% (9:57 PM) |
| UCC: | Yes u do (9:58 PM) |

See GX 1212.

       Around this time, Shelton and Blanco began using a GPS tracking device to track Sylvester Zottola—a tool that Shelton turned to several times throughout the pendency of the murder-for-hire conspiracy.  Shelton regularly referred to these tracking devices as "the piece," often with references to the percentage of battery left on the tracking device.  For example, on November 18, 2017, Shelton texted another co-conspirator, "I gotta get the piece back cause it's on 20%."  Each tracking device used by Shelton and his conspirators was battery operated; the user of the tracking device could view the percentage of battery power left in the device at any given time using an application powered by the LandAirSea, the company servicing the tracking devices.

       A battery-operated tracking device was used in the days leading up to the November 26, 2017 attempted murder of Sylvester Zottola (the "November Tracking Device"), although not on the day itself.[5]  Specifically, the November Tracking Device was activated on November 10,

---

[4]      Shelton regularly referred to Anthony Zottola with references to his Italian heritage.  Screenshots of text messages between Shelton and Anthony Zottola show Zottola stored in Shelton's phone as "Ant Mob."

[5]      The tracking device was registered in Shelton's name, and, based on the activity of the tracking device and text messages between Shelton and Anthony Zottola, Shelton used the tracking device to establish Sylvester Zottola's patterns in order to know where and when to best

2017, in the vicinity of Shelton's residence in the name "Bushawn Shelton." On November 18, 2017, the November Tracking Device was in the vicinity of Sylvester Zottola's residence on Hobart Avenue in the Bronx. As of 10:23 p.m., the November Tracking Device was recording locations in the same vicinity. It then stopped recording locations until 11:20 p.m., when it appears to have been located in a different section of the Bronx. By 11:42 p.m., the November Tracking Device was back in the vicinity of Sylvester Zottola's residence. During this time period, Shelton and Blanco exchanged text messages needing to "put the piece back," and, when Blanco was not immediately able to do so, Shelton texted:

| | |
|---|---|
| SHELTON: | It's good I'll go put it back, I just didn't want to because I was just under there to take it off (11:02 PM) |
| BLANCO: | Bet Bro… I think the fast way is better (11:04 PM) |
| SHELTON: | Fast way? (11:14 PM) |
| BLANCO: | Bang bang!!! (11:15 PM) |
| SHELTON: | Kopy (11:15 PM) |
| BLANCO: | That's ur style (11:16 PM) |
| SHELTON: | Best way (11:16 PM) |
| BLANCO: | 1,2,3 (11:16 PM) |

Thus, as the text message correspondence makes clear, by at least November 18, 2017, Blanco knew that the goal of the conspiracy had shifted from beating up Sylvester Zottola to killing him ("Bro . . . I think the fast way is better" "Bang bang!!!"). Further, based on the locations of the November Tracking Device and Shelton's text messages, Shelton retrieved the November Tracking Device on the evening of November 18 from Sylvester Zottola's car, recharged it, and then repositioned it on the car.

Early in the morning of November 25, 2017, a blue van (the "Blue Van") was stolen. The owner of the Blue Van informed NYPD that he left his car in the vicinity of Linden Boulevard and Berriman in Brooklyn, New York, on the evening of November 24, 2018 at approximately 11 p.m. and noticed it was missing at approximately 4 p.m. the following day. Shelton and Peterson texted about meeting at approximately 12:45 a.m. early in the morning on November 25. Id. at 17. The November 26, 2017 attempted murder of Sylvester Zottola occurred at approximately 3:11 p.m. Specifically, the Blue Van attempted to cut off Sylvester Zottola and a man with a gun and a mask—Shelton—exited the Blue Van in an attempt to kill Sylvester Zottola, who narrowly escaped by placing his car in reverse and speeding away to a police precinct

---

attack him but removed the device shortly before the attack as not to implicate himself. See, e.g., PSR ¶ 9.

to report the attack.  License plate reader records show that the Blue Van had been parked in the Locust Point section of the Bronx, near where the Zottola family compound was located and near the section of the Throggs Neck Expressway where the November attack occurred, at approximately 2:45 p.m.  See GX 801.  Cell site location data placed both Peterson and Shelton at the same location as the Blue Van in the Locust Point section of the Bronx—far from their residences in Brooklyn—and just south of Edgewater Park, where the attempted attack occurred. See GX 150 at 11.  Approximately 10 to 15 minutes after the attack, cell site location data placed Peterson just north of the location of the attack.  See id. at 12.  Sylvester Zottola immediately reported the attempt on his life to the police.

Shortly after the attempted murder, Shelton and Anthony Zottola exchanged coded text messages.  See PSR ¶ 11.  Anthony Zottola wrote to Shelton, "I hope you can get the actor [i.e., Sylvester Zottola]."  Shelton replied that "the costar just got into it with the director about 15 minute ago and they had to call security [i.e., the police]."  Id.  After Anthony Zottola said that he "needed this bad," Shelton wrote that "[t]oday was set to be the end finally until the actor wanted to do his own stunts and throw it in reverse in the middle of shooting a scene and drive in the opposite direction"—a description of Sylvester Zottola's escape efforts.  Id.  Anthony Zottola replied, "[o]k. But we can still do the end I hope."  Shelton assured Anthony Zottola that he was "putting together a new cast," and that they were "going to film in his dressing room [i.e. Sylvester Zottola's residence]."  Id.

4. Stabbing of Sylvester Zottola

The spree of violence continued the following month.  In December 2017, two days after Christmas, three men beat and stabbed Sylvester Zottola inside of his home—an attack planned by Shelton and Anthony Zottola.  PSR ¶¶ 12-13.  Specifically, on the evening of December 27, 2017, three men entered Sylvester Zottola's residence.  PSR ¶ 12.  One of the men, carrying a gun, struck Sylvester Zottola on the head, knocking him to the floor.  Id.  The men then stabbed Sylvester Zottola multiple times in and around his neck and torso, who miraculously survived. Before leaving the residence, the men stole approximately $3,000 in cash.  Id.

Blanco also assisted in coordinating this violent home invasion.  Prior to the attack, Shelton texted numerous individuals attempting to recruit them to play a role in the attack.  Blanco provided Shelton with contact information for an individual named Mark.  See GX 1206 at 12.

5. Blanco and Shelton's Recruitment Efforts

In the months after the brutal home invasion, Shelton and Anthony Zottola planned additional attempts, with Shelton attempting recruit numerous individuals with the promise of payment.  See, e.g., PSR ¶¶ 14-24.  In addition to hundreds of text messages recovered from Shelton's phones recruiting and attempting to recruit individuals, Shelton and Blanco also recruited another co-conspirator who ultimately became a cooperating witness ("CW-1"), in the winter of 2018, to kill the victims in exchange for money.  Id. ¶ 17.  Specifically, Shelton and Blanco offered to pay CW-1 $10,000 to murder Salvatore Zottola, and later offered CW-1 additional money to murder Sylvester Zottola.  Shelton provided CW-1 with a firearm and access to one or more vehicles on multiple occasions and arranged for multiple getaway drivers, including Himen Ross, to carry out the murder-for-hire plot.

7

Shelton and Blanco texted extensively about the plot.  For example, on March 5, 2018, Shelton texted Blanco, "Tell whoever I'll give them 10k plus a 2011 dodge avenger," to which Blanco responded, "Kopy." GX 1206 at 16.  On March 8, 2018, Blanco texted Shelton that he was "hitting a few people.  Looking for John Wick"—the name of a fictional assassin, often used by Shelton and Blanco throughout the conspiracy when referencing the hired hitmen, and, in particular, CW-1.  Id. at 17.  Blanco texted Shelton that he was going to "meet up with L.o man," a reference to the nickname of the individual ("L.O.") who connected Blanco with CW-1, and Blanco told Shelton he was going to throw "a # at him and see where it goes." Id.  CW-1, in fact, accepted Blanco and Shelton's offer to commit the murder for money, resulting in numerous attempts on the victims' lives.  Indeed, later that day, Blanco texted Shelton that "it's a touchdown," and that CW-1 would be ready as soon as that evening.  Id. at 18-19 (discussing that "John Wick" was "ready" and was asking for "homework," i.e., "pictures, the area").  Blanco directed Shelton not to send him the information directly but to send it instead to a "lady" whose number he supplied.  Id. at 19-20.  Shelton texted photographs of Salvatore Zottola and other information concerning the victims to the phone number Blanco provided.  Id.[6]

On April 26, 2018, Shelton texted Blanco, "Is John Wick still available to finish what he started," and then Shelton and Blanco discussed using either "the first John wick," i.e., CW-1, or a second individual—identified as the cousin of the same co-conspirator who connected Blanco with CW-1.  See id. at 24 (Blanco texting Shelton "Bro got the first John wick 3" and then "Or want to wait for the second wick..? I spoke to LO. He said his cousin is good. Thats part of his craftsmanship").  The two ultimately decided on "wick #1" because "Wick knows the drill." Id. at 25.  CW-1 testified at the trial in this case about numerous failed attempts to commit the murder during this time period, including attempts with another cooperating witness ("CW-2"), another driver and, ultimately Ross.  CW-2 also went to the Bronx by himself with a gun on one occasion to kill Sylvester Zottola but fled after he was seen by Salvatore Zottola.  Throughout this entire time period, Shelton and Anthony Zottola continued to exchange coded text messages about the conspiracy.

6.    Spring and Summer 2018 Attempts and Attacks

Also in the spring 2018, Shelton recruited CW-2 to carry out the attacks.  Id. ¶ 18. As with CW-1, Shelton provided CW-2 with firearms, access to vehicles and drivers on multiple occasions to carry out the murder-for-hire plot.  On April 16, 2018, CW-2 drove to the Bronx to kill Sylvester Zottola, at Shelton's behest.  Id. ¶ 20.  CW-2 approached Salvatore Zottola with a gun in his hand—realized he was not his intended victim, Sylvester Zottola—and fled in a car

---

[6]    Notably, according to phone registration records that Blanco provided to Edgecombe Correctional Facility in 2018, that number was used by an individual named Tracey Taylor.  Ms. Taylor also provided information to defense counsel and submitted a letter to the Court with Blanco's sentencing submission, noting the charges against Blanco "came as a shock to her." Def. Mem. at 18.  The phone communications shows that Ms. Taylor served as a middleman for the defendant and received photographs and other information about the victims more than six months before the attempted murder of Salvatore Zottola and the murder of Sylvester Zottola, which was covered extensively in the media.

provided by Shelton.  Id.  A couple weeks later, on May 1, 2018, defendant Jason Cummings broke into the Zottola family office with a gun and with the intent to kill Sylvester Zottola but fled after he accidentally tripped the office's panic alarm and the police responded.  Id. ¶ 22.

On the evening of May 3, 2018, into the early morning of May 4, 2018, Shelton and Blanco arranged for another attempt—this time to be carried out by both CW-1 and CW-2 together.  On May 2, 2018, Blanco asked Shelton whether everything was a "go," to which Shelton indicated he was "se[tt]ing everything up for tomorrow," because the "driver [i.e., CW-2] can't go tonight but im definitely going tomorrow."  GX 1206 at 28.  Shelton then informed Blanco, "We will be picking John wick up tomorrow night around 2 a.m.," and "I didn't hit him until I confirmed with [CW-2] that he[] was in he[] just hit me so we on for tomorrow. I got the triple, the driver, and the v."  Id.  In the early morning hours of May 4, 2018, NYPD officers arrested CW-2 after undercover officers observed CW-1 and CW-2 exit CW-2's residence and, after the two men spotted the officers, CW-1 abandoned a bag containing, among other things, a gun and a license plate.  Although the case against CW-2 was dropped in the state, both men testified at trial that they intended to go to the Bronx that evening to carry out the murder.  In the days after the botched attempt, Shelton texted Blanco about what happened, and Shelton informed Blanco that CW-1, who had not been arrested, was "not answering [Shelton] and he said he was going to finish."  GX 1206 at 29.  Blanco told Shelton he would try to reach CW-1.  See id. ("Kopy..Imma hit him later").  Shelton, through Blanco, continued to try to reach CW-1 in May 2018 to finish the job. See id. at 32 ("Bro I just tried to call John wick is there a easy you can contact him").

On June 9, 2018, Blanco checked in with Shelton about "that situation" "with John Wick."  Id. at 36.  Blanco asked whether Shelton gave "ace," i.e., Ross, "the van."  Id.  Text message and video evidence in this case established that in the spring 2018 attempts, the various co-conspirators used a tan van in numerous attempts on the victims' lives, including an attempt on June 12, 2018, carried out by CW-1 and Ross, in which CW-1 attempted to shoot at Sylvester Zottola outside of his residence, but was unable to get the gun to work.  Sylvester Zottola fired a shot back at CW-1, resulting in Zottola's arrest for unlawful possession of a firearm.  CW-1 was arrested later that day after he fled from NYPD officers attempting to pull over his and Ross's car after observing it commit a traffic violation.  The following day, Shelton informed Blanco that "John Wick . . . cost to[o] much," and Shelton and Blanco arranged to meet to discuss in person. Id. at 38.

In June 2018, Shelton discussed via text message with numerous individuals, including Blanco, his need to obtain a rental car to carry out the attack, as victims had already identified two other cars used by the perpetrators in other attacks in the spring of 2018.  See GX 1206 at 41 (Shelton texting Blanco that he "need[s] a rental" and Blanco informing him that his "card [wa]s over the limit").  Also in June 2018, Shelton began tracking Salvatore Zottola's location through the use of two tracking devices on his personal vehicle and a work van that he frequently used.

On the morning of July 11, 2018, Salvatore Zottola parked his vehicle in front of his residence.  PSR ¶ 23.  As he exited the vehicle, a red Nissan Altima (borrowed from a friend of a friend) driven by defendant Arthur Codner pulled up to the residence.  Id.  Ross exited the vehicle and shot Salvatore Zottola several times in the head, torso, and hand and fled in the red

Nissan.  Id.  Salvatore Zottola survived the attack after undergoing surgery.  Id.  Law enforcement officers later recovered a tracking device from the underside of the vehicle Salvatore Zottola was driving on the morning he was attacked.

       7.     The October 4, 2018 Murder of Sylvester Zottola

       Following the July 11 attempted murder of Salvatore Zottola, in or around September and early October 2018, Shelton, Ross and others, including Blanco, texted about the need to procure additional individuals to assist in the murder-for-hire scheme.  For example, on September 10, 2018, Blanco texted Shelton that he spoke to a new "John wick"—CW-1 was still in custody from his June arrest—and Blanco told Shelton he would meet with the John Wick.  See GX 1206 at 48.  On September 29, 2018—only days before the murder—video surveillance captured Blanco, Shelton and Ross meet up and test out a tracking device (the "Murder Tracking Device") that was then placed on Sylvester Zottola's car.  Later that day, Blanco texted Shelton that "we got to talk bout John Wick."  GX 1206 at 52.

       On October 4, 2018, Blanco texted separately with Ross and Shelton about a meeting between Blanco and Ross.  See GX 1206; see also GX 126.[7]  That meeting—also attended by Alfred Lopez, who acted as the driver for the murder (but who was acquitted at trial)—occurred just before cell site location data shows that Ross began tracking Sylvester Zottola using the Murder Tracking Device.  That afternoon, Ross and Lopez tracked Sylvester Zottola's car to a McDonald's in the Bronx, where Ross shot him to death in the drive-thru lane.  PSR ¶ 26.  Immediately following the murder, Ross and Shelton exchanged text messages, and then Shelton and Anthony Zottola exchanged text messages, including in the minutes after Anthony Zottola was informed his father had just been murdered, in which Shelton and Anthony Zottola celebrated the completed hit.  Id. ¶ 27.  In the days after the murder, Zottola paid Shelton and Shelton paid additional co-conspirators, including Ross.  Id. ¶¶ 28-32.

       Blanco was not present for Sylvester Zottola's murder.  While Shelton and Blanco exchanged dozens of text messages the day of the murder, see, e.g., GX 1206 at 56-62, and discussed the late arrival of Ross (i.e., Ace), Blanco was coincidentally arrested on a parole violation for unrelated offenses hours before the murder.  See id. ¶ 26.

       Blanco was federally arrested on November 16, 2018.  PSR ¶ 33.  Since his arrest, the defendant has remained in custody, first at the Metropolitan Detention Center, then at the Essex County Correctional Facility.  While at the MDC, the defendant lost 41 days of good time credit for possessing a hazardous tool in his cell.  PSR ¶ 78.

---

      [7]     Government Exhibit 126, introduced at the trial of Blanco's co-defendants, is comprised of text messages recovered from various of Shelton's phones, as well as Blanco's phone and call detail records, indicated by the "data source" column, placed in date and time order to provide a full chronology of the timeline of the murder on October 4, 2018.

C.     The Defendant's Criminal History

In 2008, Blanco—alongside Shelton—was convicted by a jury of assault in the first degree, in violation of N.Y.P.L. § 120.10, and three counts of burglary in the first degree, in violation of N.Y.P.L. §§ 140.30(3)-(5), in connection with Blanco and Shelton's burglary of a drug stash house.  Specifically, Shelton, Blanco and Shelton's cousin, Lamont Shelton, entered a home without permission.  PSR ¶ 69.  One of them placed his hands on the female victim's throat and told her to be quiet or she would be killed, while another held a gun to her head.  Id.  Blanco duct taped the victim's hands and mouth and demanded to know where money was.  Id.  The victim called her boyfriend, and a struggle over the firearm ensured.  Shelton's cousin was killed during the course of the crime by an errant bullet fired from Shelton's gun as the male victim struggled with Shelton to gain control of the gun.  The male victim was treated for a skull fracture and brain swelling; a part of his skull had to be removed to ease the brain swelling.  Id.  In January 2009, Blanco was sentenced to a term of imprisonment of 12 years and six months for his role in the offense.[8]  He was released from custody on May 16, 2017.  Id.

In addition to this conviction, Blanco and Shelton were also closely tied in light of their membership in the same gang, the Murderous Maddawg Bloods, and regularly texted about it.  For example, in April 2018, Shelton texted Blanco the address "for the 9," a Bloods gang meeting.  See Ex. 1206 at 21.  CW-2 testified at trial about Blanco's membership in the gang.

Finally, Blanco also has four misdemeanor convictions.  In September 2004, he was convicted of misdemeanor criminal possession of a weapon (a 12-inch machete) in the fourth degree, in violation of N.Y.P.L. § 265.01, for which he initially was sentenced to a conditional discharge and five days' community service.  Id. ¶ 68.  After a bench warrant was issued, he was resentenced to 15 days' imprisonment.  Id.  In February 2004, Blanco was convicted of misdemeanor criminal possession of a controlled substance (crack cocaine) in the seventh degree, in violation of N.Y.P.L. § 220.03, for which he was sentenced to a conditional discharge, two days' community service and a six-month license suspension.  Id. ¶ 67.  In January 2004, he was convicted of misdemeanor intent to obtain transportation without paying, in violation of N.Y.P.L. § 165.15, for which he was sentenced to a conditional discharge.  Id. ¶ 66.  Finally, also in 2004, he was convicted of misdemeanor criminal facilitation in the fourth degree, in violation of

[8]     Shelton was also convicted at trial.  However, in 2012, the New York Supreme Court, Appellate Division, reversed Shelton's conviction after determining that the trial court failed to properly instruct the jury as to an accomplice-corroboration charge and failed to ensure the prosecution laid a proper foundation prior to impeaching an alibi witness's credibility.  See People v. Shelton, 951 N.Y.S.2d 69 (2d Dep't 2012).  After the reversal, the Queens County District Attorney's Office elected not to retry Shelton.

N.Y.P.L. § 115.00, for which he initially was sentenced to three years' probation.  After a bench warrant was issued, he was resentenced to 15 days' imprisonment.  Id. ¶ 65.

        D.     Guidelines Calculation

        The Guidelines calculated in the plea agreement and stipulated to by Peterson differ from those calculated in the PSR.  Specifically, the PSR calculated the Guidelines with reference to a grouping analysis, as set forth below:[9]

Count 1, Murder-for-Hire Conspiracy and Murder for Hire – Sylvester Zottola

| | | |
|---|---|---|
| Base Offense Level (§ 2E1.4(a)(2); 2A1.1(a)) | | 43 |
| Total: | | 43 |

Count 1, Murder-for-Hire Conspiracy – Salvatore Zottola

| | | |
|---|---|---|
| Base Offense Level (§§ 2E1.4(a)(2); 2A2.1(a)) | | 33 |
| Plus: | Victim Sustained Life-Threatening Injury (§ 2A2.1(b)(2)(A)) | +4 |
| Plus: | Offer and Receipt of Pecuniary Value (§ 2A2.1(b)(2)) | +4 |
| Total: | | 41 |

Grouping Analysis

| | | |
|---|---|---|
| Highest Offense Level: | | 43 |
| Additional Points from 2 Units | | +2 |
| Less: | Timely Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | | 42 |

        Because the defendant is in Criminal History Category III, the resulting Guidelines range calculated in the PSR is 360 months to life.  The parties' calculation in the plea agreement omitted the grouping analysis and, thus, resulted in an adjusted offense level of 40, and a Guidelines range of 360 months to life.  However, in either case, because the statutory maximum is 480 months, the effective range of imprisonment is 360 months to 480 months.  PSR ¶ 102.  In the plea agreement, the defendant stipulated that the Guidelines calculation was

---

[9]     As explained in the PSR, Counts 1 and 2 as to Sylvester Zottola (murder for hire conspiracy and murder for hire, respectively) are grouped for Guidelines purposes as they involve the same victim and are connected by a criminal objective or a common scheme or plan.  PSR ¶ 43.  Count 1 as to Salvatore Zottola cannot be grouped with the other conduct and is subject to a grouping analysis.  Id.

360 months to 480 months and further stipulated that he will not advocate for a sentence below 240 months.

II.    Analysis

A sentence within the Guidelines range of 360 months to 480 months' imprisonment would reflect the nature and circumstances of the offense, avoid unwarranted sentencing disparities, and promote general and specific deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2) and (a)(6). As set forth above, the evidence shows that Blanco was a key participant in the murder-for-hire plot, joining and encouraging Shelton from its inception through the murder of Sylvester Zottola in October 2018. Blanco joined the murder-for-hire plot as early as the fall of 2017, recruited CW-1 into the conspiracy and participated in Sylvester Zottola's murder by testing and planning the use of the Tracking Device placed on Sylvester Zottola's car in the days leading up to his murder.

Blanco was the first person Shelton recruited into the scheme in August 2017 – indeed, Shelton sent Blanco a message about giving one of Anthony Zottola's tenants a beating on the very day that Shelton saved Zottola's phone number. Blanco immediately agreed ("Kopy. Let me know I'm on deck."). Shelton treated Blanco as his full partner in the conspiracy as it unfolded, reminding Blanco that "he got some other big shit lined up for us but I want to knock this out first." GX 1206. To accomplish the plan, Blanco proceeded to conduct surveillance on the victim-tenant and reported back to Shelton about what he observed. The fact that co-defendant Branden Peterson—rather than Blanco—ultimately conducted the beating makes no difference. By his words and actions, Blanco demonstrated repeatedly that he was willing to engage in violence for money.

Blanco did not draw the line at the September 2017 beating of a 70-year-old man – "a grandfather" as Blanco referred to Sylvester Zottola. The following month, Blanco requested a photograph of the victim, agreed to surveil Sylvester Zottola with Shelton and advocated the use a vehicle tracking device to follow the victim's movements. On November 18, 2017, days before the attempted murder, it was Blanco who encouraged Shelton to use a gun ("the fast way is better . . . bang bang!") to kill Sylvester Zottola.

BLANCO:          Bet Bro… I think the fast way is better (11:04 PM)

SHELTON:        Fast way? (11:14 PM)

BLANCO:          Bang bang!!! (11:15 PM)

SHELTON:        Kopy (11:15 PM)

BLANCO:          That's ur style (11:16 PM)

SHELTON:        Best way (11:16 PM)

BLANCO:          1,2,3 (11:16 PM)

13

When Sylvester Zottola escaped the November attack, Blanco continued to demonstrate his willingness to help Shelton kill not only Sylvester Zottola but later Salvatore Zottola for money. In December 2017, Blanco provided Shelton with contact information for someone to recruit for the violent home invasion. In the early winter and spring of 2018, Blanco successfully recruited CW-1 to kill both Salvatore and Sylvester Zottola for money, telling Shelton, "it's a touchdown." GX 1206 at 18-19. Blanco continued to act as a go-between for CW-1 and Shelton, passing along photographs and other information about the victims. Blanco also assisted in coordinating planned attacks during this period, including the failed attempted on May 3 and May 4 that led to the arrest of CW-2, another would-be assassin recruited to carry out the murder.

The continuing failures to kill the victims only spurred Blanco and Shelton to redouble their efforts. In early June 2018, Blanco checked in with Shelton about the plan to kill the Zottolas, including the effort to get Ross a vehicle to assist in another attack, which ultimately went forward on June 12, 2018. In late September 2018 – only days before the murder – Blanco met up Shelton and Ross and test out the Murder Tracking Device that was then placed on Sylvester Zottola's car. On the day of the murder, Blanco helped Shelton contact Ross, the man who ultimately executed Sylvester Zottola in the McDonald's drive-thru.

The frequency and the detail in the correspondence between Blanco and Shelton demonstrate Blanco's intimate knowledge of the plan, loyalty to Shelton and involvement in the details of who would carry out the attacks and when and how they would occur. Blanco and Shelton, who had been involved in violent crimes resulting in death together before, discussed logistics and laid the groundwork for the murder together. In fact, during the conspiracy, Blanco and Shelton communicated about "John Wick" and their hired killers more than 30 times according to their phone records. Blanco's efforts and encouragement were vital to Shelton and Anthony Zottola in their quest to kill both Sylvester and Salvatore Zottola. Accordingly, Blanco's role in the cold-blooded murder of elderly patriarch and the attempt to gun down his eldest son could not be more serious.

Blanco's history and characteristics re-enforce the need for a Guidelines sentence here. Blanco has five prior convictions, despite having been incarcerated from 2008 through 2017 and again, since November 2018. In 2004, he was convicted of four different misdemeanors crimes—criminal facilitation, intent to obtain transportation without paying, possession of crack cocaine, and possession of a weapon (a machete). In 2008, he was convicted of a violent home invasion alongside Shelton, which resulted in the death of their co-conspirator and injuries to two victims. In the course of home invasion, the men choked the female victim, held a gun to her head and told her she would be killed if she was not quiet, and restrained her with duct tape. When her boyfriend arrived, he was assaulted so badly that part of his skull had to be removed to reduce the swelling of his brain. Blanco's co-conspirator, the third assailant, was killed when he was accidentally hit by a bullet from Shelton's firearm. After his release in 2017, Blanco did not attempt to distance himself from a life of crime. While on parole, in addition to joining and further the murder-for-hire plot, Blanco also regularly communicated with Shelton about the affairs of their gang, the Murderous Maddawg Bloods.

Blanco seeks a sentence of 240 months' imprisonment for his conduct—the minimum sentence for which Blanco agreed to advocate pursuant to his plea agreement. Blanco

14

argues, among other factors, that his sentence should be mitigated by difficult circumstances and a lack of a father figure in his childhood and young adulthood. Blanco, however, notes at least from the ages of 12 to 17, he had a stable and safe home with his mother and stepfather and his education was marked by supportive and encouraging teachers, where he dreamed of becoming the president of the United States. Def. Mem. at 9. Blanco claims that after his stepfather's health rapidly declined when Blanco was 17 years old, he "became susceptible to any outside interaction." Def. Mem. at 9-11. Notably absent from his discussion of this time period is acknowledgment of his four misdemeanor convictions (for possession of crack cocaine and a machete, among other things). Blanco also dismisses his 2006 robbery and home invasion which left a co-conspirator dead and two victims with injuries as "stupid stuff." Def. Mem. at 11. Blanco does not appear to recognize or take responsibility for his membership in the Bloods, despite text communications with Shelton about the gang's meetings and CW-2's trial testimony.

Blanco also argues that a 240-month sentence is in line with the Second Circuit's decision in United States v. Pugh, 945 F.3d 9, 27 (2d Cir. 2019) which he argues "emphasized a presumption for concurrent sentencing." Def. Mem. at 22. In Pugh, the Second Circuit remanded a sentence which the district court sought to run consecutively not for substantive unreasonableness but so the district court could better explain the necessity of the sentence imposed. Thus, Pugh emphasized only the requirement of a clear statement of reasons for the sentence by the district court, not a requirement that any particular sentence be imposed. Indeed, the Second Circuit recognized that the Guidelines' presumption in favor of concurrent sentences applies "except when consecutive sentences are required in order to impose a total sentence reflecting just punishment." In other words, current sentences are favored only if the sentence imposed on the highest count "is adequate to achieve the total punishment." Pugh, 945 F.3d at 27 (quoting U.S.S.G. § 5G1.2(c)). Consecutive or partially consecutive sentences are required here to produce a combined sentence that is sufficient but not greater than necessary, given the nature of the offense, Blanco's sincere efforts to further the murder-for-hire conspiracy, the number of victims, and the violent attempts on both their lives and their effect on the lives of their family members. Blanco's below-Guidelines sentencing request seeks to downplay his central and long-running role in the murder scheme. Blanco claims his involvement started in the summer of 2018, which the evidence demonstrates is patently false. Blanco was among the first (if not the first person) contacted by Shelton as the conspiracy developed. Indeed, by the summer of 2018, Blanco had conspired with Shelton for a year, assisting him in planning several attacks and personally recruiting and meeting with CW-1, one of the hired assassins who made several unsuccessful attempts on the victims' lives.

While Blanco claims a 240-month sentence of imprisonment would avoid sentencing disparities among defendants convicted in New York, this requested sentence is below the nationwide average sentence for defendants convicted of this crime who share his criminal history category. According to statistics maintained by the United States Sentencing Commission, the average sentence for murder is 244 months. For defendants in criminal history category III, like Blanco, that number jumps to 258 months. The average sentence for the defendant's primary guidelines—Sections 2E1.4 and 2A1.1, as outlined above—is yet higher, at 267 months, and still

higher—269 months—when accounting for the defendant's criminal history category.[10]  But that nationwide average does not fully capture Blanco's conduct here, for Blanco did not plead guilty to an isolated murder-for-hire or even an isolated murder.  From August 2017 through October 2018, attack after attack, Blanco supported, encouraged, and assisted Shelton and others to carrying out the murders.  A Guidelines sentence would much better account for Blanco's role here.  See United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007) (emphasis added) (re-affirming that the focus of 18 U.S.C. § 3553(a)(6) is primarily "to minimize nationwide disparities" and that a court is not even required to consider disparities among co-defendants), abrogated on other grounds by United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc).

The cases cited by Blanco in his sentencing submission are not applicable here.  See Def. Mem. at 24.  In United States v. Rodriguez, No. 19-CR-779 (AKH) (S.D.N.Y.), the victim of the murder-for-hire plot was a rival gang member, who although certainly deserving of justice, chose to involve himself in violent gang life.  In United States v. Rivera, No. 17-CR-050 (DRH) (E.D.N.Y.), the defendant Rivera received a sentence of 220 months' imprisonment when, after an alcohol-fueled party at a crowded club turned into a melee, Rivera, who was himself under the influence of drugs and alcohol, shot and killed an innocent victim who Rivera mistakenly believed had tried to shoot and kill his friend and mentor.  See ECF Dkt. No. 51, at 1-3, United States v. Rivera, No. 17-CR-050 (DRH) (E.D.N.Y. filed April 29, 2022).  Nor is United States v. Rodriguez et al., 20-CR-301 (PKC) (SDNY), a fair comparator because the murder in Rodriguez occurred after a failed drug deal and the sentence (222 months) fell within the Guidelines range of 210 to 262 months' imprisonment.  See, e.g., ECF Dkt. No. 285 at 2-3, United States v. Rodriguez et al., 20-CR-301 (PKC) (S.D.N.Y. filed September 13, 2022).  Here, Blanco did not target a rival gang member – Sylvester Zottola was a 71-year-old hardworking patriarch of a Bronx family and his son Salvatore Zottola, the father of young children.  Blanco's actions were not the product of some momentarily lapse in judgment; Blanco schemed for more than a year to kill two innocent individuals for money and persisted despite many setbacks.  Blanco's requested sentence is far outside the Guidelines range and far outside the range of a reasonable sentence in this case.

---

[10]     See U.S. Sentencing Commission Interactive Data Analyzer for Fiscal Year 2021, available at https://ida.ussc.gov/analytics/ (displaying data based on selection of "crime type" to be murder; primary guideline to be §§ 2E1.4 and 2A1.1; and criminal history category to be III, where applicable).

III.     Conclusion

        For these reasons, a sentence between 360 and 480 months' imprisonment would properly reflect the history and characteristics of the defendant and the seriousness of the offense, promote respect for the law, and provide adequate specific and general deterrence, and is not greater than necessary to serve these purposes.  See 18 U.S.C. § 3553(a)(1) & (a)(2).  Such a sentence would also the public from the defendant.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:      _____/s/_____
        Kayla Bensing
        Emily Dean
        Devon Lash
        Andrew Roddin
        Assistant U.S. Attorneys
        (718) 254-6279

cc:   Michael K. Bachrach, Esq., Michael O. Hueston, Esq., John A. Diaz, Esq.
     United States Probation Officer Jennifer E. Baumann

17